# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

PAUL W. ABBOTT,                                          )
TONI L. ABBOTT,                                          )
BRITTANY N. ADKINS,                                      )
JAYME E. ALEMAN,                                         )
BRIAN H. ALSPACH,                                        )
TAMMY F. BAIN,                                           )
LESLIE N. MILES,                                         )
MICHAEL BECH,                                            )
SANDRA M. BECH,                                          )
JODY T. BERTRAM,                                         )
STEPHEN E. BOND,                                         )
MARVIS L. BOSARGE GONZALEZ,                              )
TERRELL M. BOUIE,                                        )
GENIE E. BRABHAM,                                        )
DEBORAH A. BROOKS,                                       )
EVE O. BUERO,                                            )
MACK NEWMAN BUTLER,                                      )
CONNIE PANELLE BUTLER,                                   )
JONES and BUTLER INVESTMENTS, LLC,                       )
 GAE CAMPBELL,                                           )
LINDSEY CAMPBELL,                                        )
MARY LISA TANT CAMPBELL,                                 )
JOANN K. TANT,                                           )
MYRL D. CARR, as Executor of the Estate                  )
of MYRL J. CARR,                                         )
CHARLES CAVANAUGH,                                       )
DESTIN R. CHAMBERS,                                      )
KELSEY Y. CHAMBERS,                                      )
JULIE LYNN CHASE,                                        )
CALEB B. CHASE,                                          )
DAVID R. CHEATHAM,                                       )
STEVE W. COFIELD                                         )
JAN COFIELD,                                             )
LYNN M. COLLINS,                                         )
TERRY D. DANIEL                                          )
CAROL A. DANIEL,                                         )
LEON C. DODD,                                            )
AMY E. DOWLING,                                          )
DON J. DOWLING,                                          )
JUSTIN W. DUMAS,                                         )
MERRY D. DUMAS,                                          )
CHRISTOPHER DUNAWAY,                                     )

JOHN P. EAMES, )
LOIS A. EAMES, )
TIMOTHY JAMES EASLEY, )
TIMOTHY FANNIN, )
JOSEPH FRATINI, )
SANDRA M. FRATINI, )
LINDA K. GARRETT, )
STEPHEN R. GILMORE, )
DEBORAH L. GILMORE, )
BRET M. GREER, )
DANIELL L. GREER, )
STEPHANIE R. GREICO, )
RONALD R. WHISNANT, Jr., )
BRENDA J. HALSEY, )
JAMES L. HALSEY, )
RUSSELL E. HASKINS, )
CHERYL F. HASKINS, )
MARK HASS, )
TERRI HASS, )
KIRK L. HEINSOHN, )
SHARON H. HIRSCHFIELD, )
DAVE HISEY, )
KAREN M. HOLDING, )
HARRY R. HOLDING, )
JAMES D. HOLIFIELD, )
JAMES D. HOLIFIELD, )
BRANDI M. HOLIFIELD, )
JOHN L. HONDULAS, )
STEPHEN C. HOSSE, )
CHARLIE BOB HUGHES, JR., )
VICTORIA D. FISTER, )
JAMES M. HUNTER, )
KATHY JONES, )
DAVID L. JOYNER, )
JENNIFER L. KAYLOR, )
RICHARD I. KIMNER, )
BROOKE A. KRATCHOFF, )
KYLE S. KING, )
DOREEN R. KING, )
DAVID M. KLASSEN, )
LINDA F. KLASSEN, )
JOHN C. KLING, )
CHERYL A. KLING, )
KAREN N. LEVERETTE, )
JOHN R. LEVERETTE, )
DAMON J. MATTHEWS, )

JOHN H.H. MATTHEWS,                           )
KENNETH M. MATTHEWS,                          )
JO RITA MAXWELL,                              )
EDGAR C. McKINNEY,                            )
ZINA FAYE McKINNEY,                           )
PATRICK McKNIGHT,                             )
KAREN McKNIGHT,                               )
LAUREN J. MEIER,                              )
ROY F. MERCK ,                                )
ANTHONY F. MERCK,                             )
RITA S. MONTERO,                              )
DOUGLAS E. MOORE,                             )
SANDY M. MOORE,                               )
CAROL G. MUSZIK,                              )
JAMES DALE GRACE CHRISTIAN TRUST,             )
MSM CAPITAL MANAGEMENT, LLP,                  )
DAVID L. NAQUIN, Sr.,                         )
DENISE A. NAQUIN,                             )
SUE NAQUIN,                                   )
CARROLL E. NICHOLS,                           )
CHARLES M. NICHOLS, III,                      )
JACOB W. PARTON,                              )
BETTY J. PARTON,                              )
MIRANDA L. PAULK,                             )
DORA JEAN PAULK,                              )
AMANDA B. PERRYMAN,                           )
WESLEY M. PITTMAN,                            )
KATRINA L. PITTMAN,                           )
GISELLE PORRASPITA,                           )
PAUL CLIFF PRICE,                             )
FLORIAN J. PUHALA, Jr.,                       )
MARY E. PUHALA,                               )
LARRY D. RAYMES,                              )
KAREN RAYMES,                                 )
BETSY C. RETTIG,                              )
SANDRA ROVHANA-LOLLINO,                       )
JACQUELINE R. ROBERTSON,                      )
MARK RUETER,                                  )
GLEN BEASLEY,                                 )
KERRY "TOM" SANDERS,                          )
DENISE M. SANDERS,                            )
PHYLLIS J. SEIDEL,                            )
JAMES TOM SHOFNER,                            )
CHERYL A. SHOFNER,                            )
ELIZABETH A. SMITH,                           )
CLAUDE THOMAS,                                )

OWEN G. SMITH, )
RICK COOK, )
JOEL A. SORTORE, )
TOMEIKA C. STALLWORTH, )
CONNIE R. SPRINGFIELD, )
BARRY S. SPRINGFIELD, )
TAMMIE R. STARKEY, )
TOMMY L. STARKEY, )
ARTHUR W. STEWART, )
JUDY A. SULLIVAN and GERALD SULLIVAN,)
doing business as MOUNTAINSIDE RENTALS,)
MICHAEL B. THOMPSON, )
MICHAEL G. THOMPSON, )
SUE D. THOMPSON, )
DARLENE R. VERITO, )
KEITH M. FLANNERY, )
RAYMOND A. WADDLE, Jr., )
JACQUELINE WADDLE, )
DELBERT R. WALLACE, )
THOMAS R. WORY, )
AMANDA L. WORY, )
DOUGLAS S. YATES, )
AUDREY YATES, )
JOSHUA YATES, )
KRISTA YATES, )
JULIE O. YATES, )
ANTHONY L. YATES, )
ISEBELLA M. YEAGY, a minor, by next friend, )
JENNIFER L. KAYLOR, )
CHARLES C. YOUNG and )
DEBORAH L. YOUNG, )
)
)
    Plaintiffs, )
)
v. )   Civil Action No.
)
)
UNITED STATES OF AMERICA, )
the federal government, )
)
)
    Defendant. )

## COMPLAINT FOR DAMAGES
## UNDER FEDERAL TORTS CLAIMS ACT

# TABLE OF CONTENTS

I.    JURISDICTION AND VENUE .................................................................... 1

II.    NATURE OF THE ACTION .................................................................. 20

III.    PARTIES ............................................................................................. 27

IV.    PARK OFFICIALS, FIRE MANAGERS AND LOCAL OFFICIALS ....................... 48

V.    INAPPLICABILITY OF THE DISCRETIONARY FUNCTION EXCEPTION......... 51

     A.    Acts or Omissions Deviating From NPS or GSMNP Fire Management Policies ................................................................................................ 52

     B.    Neglect of Safety Policies and Directives .......................................... 54

VI.    FACTUAL BACKGROUND ...................................................................... 55

     A.    The Great Smoky Mountains National Park ..................................... 55

     B.    Surrounding Areas ............................................................................ 56

     C.    Eighty Years of Built-Up Fuels and Record Drought Levels Made the Risk of Wildland Fire in the GSMNP Significant in November 2016 ........ 58

     D.    DAY ONE – Wednesday, November 23, 2016 – a Small Wildfire (Less Than an Acre) Is Discovered Near the Peak of Chimney Tops – About 5.5 Miles From Gatlinburg .................................................................. 62

         1.    Organizational Roles and Responsibilities ..................................... 64

         2.    NPS Fire Management Policies ....................................................... 65

         3.    Complexity Analysis and Fire-Command Structure ....................... 67

         4.    Salansky Improperly Functioned in Five Critical Roles During the Chimney Tops 2 Fire: Zone FMO, GSMNP FMO, IC, DO and Safety Officer ..................................................................................... 75

     E.    DAY TWO – Thursday, November 24, 2016 – Salansky Fails to Order Aviation Support; Decides On An Indirect Attack; and Fails to Order Additional Resources ........................................................................ 79

i

1.  No Air-Attack Requested, Despite Availability ................................. 79

2.  Salansky Decides On An Indirect-Attack Strategy ........................... 79

3.  Although Short-handed, Salansky Failed to Request Additional Firefighters ..................................................................... 81

4.  Salansky Failed to Recognize Overriding Suppression Priority: Protection of Human Life .................................................. 81

F.  DAY THREE – Friday, November 25, 2016 – With the Fire the Size of a Football Field, Salansky Devises a 410–Acre "Containment Box," as No Air Attack, Water Drops or Fire Lines Were Ordered .......................... 82

1.  Still No Request for Aviation Resources ......................................... 82

2.  The "Containment Box" .................................................................. 83

3.  No Contingency Plan Was Ever Conceived In Case the Containment Box Failed ................................................................. 85

G.  DAY FOUR – Saturday, November 26, 2016 – The Chimney Tops 2 Fire Is Now Approximately 6-8 Acres; No Fire-Lines Are Constructed; No Air-Attack Is Ordered; High-Winds of 60 MPH Are Forecast for Monday, November 28, 2016; and The Chimney Tops 2 Fire Is Left Unmonitored for the Fourth Consecutive Night ........................................ 87

1.  The Mountain Wave Weather Phenomenon .................................... 87

2.  High-Wind Forecast Prompted No Change in Fire-Suppression Strategy or Decision Not to Notify or Warn Others .............................................................................................. 88

3.  Salansky Requests, Then Ignores, a Near-Term Fire Behavior ("NTFB") Projection Showing The Chimney Tops 2 Fire Spreading Through the GSMNP .................................. 90

H.  DAY FIVE – Sunday, November 27, 2016 – The Chimney Tops 2 Fire Is Now 35-50 Acres and "Active on All Flanks;" Nearing the Edge of the "Containment Box;" with Strong Winds Ahead; Without Being Monitoring for the Fifth Consecutive Night ............................................. 93

1.  No Warning Provided to Gatlinburg Officials About The Chimney Tops 2 Fire By Sunday, November 27, 2016 .................... 95

2.  Darkness and Distance Limit Number of Water Drops .................. 95

3.  With the Fire Continuing to Grow – Now 35 Acres –
    Salansky Released All Fire Personnel until Monday
    Morning ...................................................................................... 97

4.  The Requirement to Monitor Wildfires Is Ignored for
    Five Consecutive Nights .............................................................. 99

I.  DAY SIX – Monday, November 28, 2018 – "Running Through Hell" ..... 101

1.  Monday Morning: The Chimney Tops 2 Fire Has Grown
    to 500 Acres with Long-Range Spotting ...................................... 101

2.  Salansky Fails to Notify Park Neighbors, Local
    Residents and Visitors About the Imminent Danger
    Posed by The Chimney Tops 2 Fire Despite Clear Policy
    Directives to Do So ...................................................................... 105

3.  Mid-Day Monday: the Fire Threatens Mynatt Park and
    Nears the City of Gatlinburg........................................................ 109

4.  Command-Confusion and Initial Evacuation Actions ................... 112

5.  Mid-Afternoon Monday: Fire Spreading as Much as Half
    a Mile Per Hour, Bouncing from Ridge to Ridge, and
    Spotting Fires as Far as Five Miles Away ...................................... 115

6.  Late-Afternoon Monday: Fire Spreads to About 4,000
    Acres and Winds Carry Embers Miles Away, Igniting
    New Fires ...................................................................................... 117

7.  Monday Night: Fire in the City....................................................... 119

8.  The Chimney Tops 2 Fire Jumps Containment Lines, As
    Firefighters, Dispatchers and Mandatory Evacuations
    Are Stymied by Communications Breakdowns.............................. 122

9.  Communication-Breakdowns Affect Total Evacuation of
    Gatlinburg...................................................................................... 125

10. "It Was like Running Through Hell" ............................................. 128

11. Rain Finally Comes......................................................................... 131

ii

J.     Aftermath – 14 Deaths, 191 Injuries, 2,500 Structures Damaged or Destroyed and More Than 17,000 Acres Burned.........................................132

K.     Park Fire Managers Generally Respond By Saying There Was Nothing They Could Have Done To Stop the Fire .....................................................133

L.     NPS After-Action Report .........................................................................135

M.    ABS Group Consulting Report.................................................................. 138

N.     Other Reactions ........................................................................................139

VII. CLAIMS FOR RELIEF ........................................................................................ 140

COUNT ONE – NEGLIGENCE – FAILURE TO MONITOR ......................................... 140

COUNT TWO – NEGLIGENCE – FAILURE TO COMPLY WITH COMMAND STRUCTURE REQUIREMENTS..................................................................................144

COUNT THREE – NEGLIGENCE – FAILURE TO ADHERE TO MANDATORY FIRE MANAGEMENT POLICIES AND REQUIREMENTS .......................................... 148

Neglecting to Perform Requisite Complexity Analysis ........................................149

Negligently Implementing a 410-Acre Containment Box ....................................150

Negligently Failing to Adopt Contingency Plans In Case the Chimney Tops 2 Fire Escaped the Containment Box or the Park ....................................................153

Negligently Disregarding Fire Behavior Modeling and Weather Forecast..........154

Negligently Failing to Utilize Available Air Operations to Suppress the Chimney Tops 2 Fire........................................................................................155

Negligently Failing to Implement a Universal Communications System to Permit Inter-Agency Communications, Thus Preventing Many Responders from Effectively Communicating With One Another.............................................156

Neglecting to Utilize the Wildland Fire Decision Support System ("WFDSS"), Which Would Have Prompted (1) Periodic Assessments of the Ongoing Effectiveness and (2) Re-evaluation of Suppression-Strategies ..........................157

ALL VIOLATIONS OF FIRE POLICIES BREACHED THE PARK'S DUTIES TO PARK NEIGHBORS.................................................................................................. 161

iii

COUNT FOUR – NEGLIGENCE – FAILURE TO WARN .................................................162

      Neglecting to Provide Timely and Accurate Notice and Warning to Park Neighbors, Local Government Officials, Local Fire Departments, Local Residents and Visitors About the Status of and Imminent Danger Presented by the Chimney Top 2 Fire.................................................................................164

VIII.  PRAYER FOR RELIEF ...................................................................................170

iv

COME the Plaintiffs, PAUL W. ABBOTT and TONI L. ABBOTT, BRITTANY N. ADKINS, JAYME E. ALEMAN, BRIAN H. ALPACH, TAMMY F. BAIN and LESLIE N. MILES, MICHAEL BECH and SANDRA M. BECH, JODY T. BERTRAM, STEPHEN E. BOND, MARVIS L. BOSARGE GONZALEZ, TERRELL M. BOUIE, GENIE E. BRABHAM, DEBORAH A. BROOKS, EVE O. BUERO, MACK NEWMAN BUTLER and CONNIE PANELLE BUTLER, JONES and BUTLER INVESTMENTS, LLC, GAE CAMPBELL, LINDSEY CAMPBELL, MARY LISA TANT CAMPBELL and JOANN K. TANT, MYRL D. CARR, as Executor of the Estate of MYRL J. CARR, CHARLES CAVANAUGH, DESTIN R. CHAMBERS and KELSEY Y. CHAMBERS, JULIE LYNN CHASE and CALEB B. CHASE, STEVE W. COFIELD and JAN COFIELD, LYNN M. COLLIN, TERRY D. DANIEL and CAROL A. DANIEL, LEON C. DODD, AMY E. DOWLING and DON J. DOWLING, JUSTIN W. DUMAS and MERRY D. DUMAS, CHRISTOPHER DUNAWAY, JOHN P. EAMES and LOIS A. EAMES, TIMOTHY JAMES EASLEY, TIMOTHY FANNIN, JOSEPH FRATINI and SANDRA M. FRATINI, LINDA K. GARRETT, STEPHEN R. GILMORE and DEBORAH L. GILMORE, BRET M. GREER and DANIELL L. GREER, STEPHANIE R. GREICO and RONALD R. WHISNANT, JR, BRENDA J. HALSEY and JAMES L. HALSEY, RUSSELL E. HASKINS and CHERYL F. HASKINS, MARK HASS and TERRI HASS, KIRK L. HEINSOHN, SHARON H. HIRSCHFIELD, DAVE HISEY, KAREN M. HOLDING and HARRY R. HOLDING, JAMES D. HOLIFIELD, JAMES D. HOLIFIELD and BRANDI M. HOLIFIELD, JOHN L. HONDULAS, STEPHEN C. HOSSE and TINA K. HOSSE, CHARLIE BOB HUGHES and VICTORIA D. FISTER, JAMES M. HUNTER, KATHY JONES, DAVID L. JOYNER, JENNIFER L. KAYLOR, RICHARD I. KIMNER and BROOKE A. KRATCHOFF, KYLE

v

and DOREEN R. KING, DAVID M. KLASSEN and LINDA F. KLASSEN, JOHN C. KLING and CHERYL A. KLING, KAREN N. LEVERETTE and JOHN R. LEVERETTE, DAMON J. MATTHEWS, JOHN H.H. MATTHEWS and KENNETH M. MATTHEWS, JO RITA MAXWELL, EDGAR C. McKINNEY, ZINA FAYE McKINNEY, LAUREN J. MEIER, ROY F. MERCK and ANTHONY F. MERCK, RITA S. MONTERO, DOUGLAS E. MOORE and SANDY M. MOORE, CAROL G. MUSZIK, JAMES DALE GRACE CHRISTIAN TRUST and MSM CAPITAL MANAGEMENT, LLP, DAVID L. NAQUIN, Sr. and DENISE A. NAQUIN, SUE NAQUIN, CARROLL E. NICHOLS, CHARLES M. NICHOLS, III, JACOBW. PARTON and BETTY J. PARTON, MIRANDA L. PAULK and DORA JEAN PAULK, AMANDA B. PERRYMAN, WESLEY M. PITTMAN and KATRINA L. PITTMAN, GISELLE PORRASPITA, PAUL CLIFF PRICE, FLORIAN J. PUHALA, Jr. and MARY E. PUHALA, LARRY D. RAYMES and KAREN RAYMES, BETSY C. RETTIG, JACQUELINE R. ROBERSTSON, SANDRA ROVHANA- LOLLINO, MARK RUETER and GLEN BEASLEY, KERRY "TOM" SANDERS and DENISE M. SANDERS, PHYLLIS J. SEIDEL, JAMES TOM SHOFNER and CHERYL A. SHOFNER, ELIZABETH A. SMITH and CLAUDE THOMAS, OWEN G. SMITH and RICK COOK, JOEL A. SORTORE and TOMEIKA C. STALLWORTH, CONNIE R. SPRINGFIELD and BARRYS. SPRINGFIELD, TAMMIE R. STARKEY and TOMMY L. STARKEY, ARTHUR W. STEWART, JUDY A. SULLIVAN and GERALD SULLIVAN, doing business as MOUNTAINSIDE RENTALS, MICHAEL B. THOMPSON, MICHAEL G. THOMPSON and SUE D. THOMPSON, DARLENE R. VERITO and KEITH M. FLANNERY, RAYMOND A. WADDLE, Jr. and JACQUELINE WADDLE, DELBERT R. WALLACE, THOMAS R> WORY and AMANDA L. WORY, DOUGLAS S. YATES and AUDREY YATES, JOSHUA YATES

and KRISTA YATES, JULIE O. YATES and ANTHONY L. YATES, ISEBELLA M. YEAGY, a minor, by next of kin, JENNIFER L. KAYLOR, CHARLES C. YOUNG and DEBORAH L. YOUNG (collectively, "Plaintiffs"), and file this Complaint ("Complaint") against the UNITED STATES OF AMERICA ("Defendant" or "USA") on the basis of damages realized as a direct and proximate result of the negligent actions and/or omissions of employees or agents of the Department of the Interior ("DOI") and/or its component, the National Park Service ("NPS"), in performing their duties within the course and scope of their employment or agency.[1]

# I. JURISDICTION AND VENUE

1.    Plaintiffs bring this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2401, and 2671-2680 against the USA for property and/or personal injury damages arising from the negligent acts or omissions on the part of employees or agents of the DOI and/or NPS in response to The Chimney Tops 2 Fire in the Great Smoky Mountains National Park ("GSMNP" or the "Park").[2] The fire was initially discovered as less than a single acre in size by Greg Salansky ("Salansky"), Fire Management Officer ("FMO") of the GSMNP on Wednesday, November 23, 2016. While Salansky and other Park officials believed the small and smoldering fire would be controlled inside the Park,

---

[1]Allegations related to the facts surrounding Plaintiffs' own injuries/damages are alleged on their personal knowledge. All other allegations are made on information and belief and on investigation of Plaintiffs' counsel, which included: a review of two "after-action" reports (one by the National Park Service and another by ABS Group Consulting, Inc.), documents and information released to the public, information obtained via public record requests, interviews with former Park Rangers, firefighters, fire experts, and hundreds of victims of The Chimney Tops 2 Fire, review of the National Park Service's official website (nps.gov), government-issued press releases, public statements via news conferences, news articles (including numerous well-substantiated reports by The Knoxville News-Sentinel and Asheville Citizen-Times), media reports (including weather.com, pbs.org, WATE-TV, CNN, and foxnews.com), other publications and/or websites (including gunsandgardens.com and wildfiretoday.com), and other readily obtainable information. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[2]Wildfire is best understood as fire occurring on sparsely or unpopulated land that is not burning at the intention of a responsible land manager. *See* Ron Wakimono, "*Wilderness Fire Policy – 'Let It What?,'*" *Wilderness & Wildfire* 1, 4 (Tom Walsh ed., 1989).

1

eighty (80)-years of built-up ground fuels, months of severe drought conditions and a Saturday morning, November 26, 2016 National Weather Service ("NWS") forecast of high-winds foretold a substantial and dangerous change in The Chimney Tops 2 Fire's behavior.

2.      The conditions, especially the high-wind forecast, should have served as "a call-to-action" for Park officials. But FMO Salansky, who had taken complete and unfettered command-control of The Chimney Tops 2 Fire, not only *failed to monitor the fire for five consecutive nights*, but he also failed to initiate any direct-attack to suppress the fire, opting instead to treat the fire as a "prescribed" burn, letting it burn inside a poorly-designed and negligently implemented 410-acre "containment box."

3.      After five days of nesting deep in duff, growing in size and strength, the high-winds came (as predicted) on Monday, November 28, 2016 and The Chimney Tops 2 Fire rolled down the mountain, creating what Gatlinburg Fire Department ("GFD") Chief Greg Miller ("Chief Miller") called "an ember storm."

4.      By 6:00 p.m. that evening, The Chimney Tops 2 Fire had escaped the Park, and hurricane-force winds pushed it north toward Gatlinburg. In a matter of hours, the fire had swollen from 70 acres to 17,000 acres, ultimately resulting in fourteen (14) deaths and one-hundred and ninety-one (191) injuries, along with well over $1 billion in insurance claims. In a span of only six to eight hours, The Chimney Tops 2 Fire damaged or destroying more than two-thousand five-hundred (2,500) homes, buildings, or other structures, along with their contents, including the homes, businesses, and/or personal property of the

2

Plaintiffs, becoming one the largest natural disasters in the history of Tennessee and the deadliest wildfire in the Eastern United States since the Great Fires of 1947, which killed 16 people in Maine.[3]

5.    Plaintiffs seek remedies for the substantial property damages and/or personal injuries they suffered as a result of the negligent acts and/or omissions of employees or agents of the NPS and/or DOI – while acting within the course and scope of their employment or agency – in direct violation of mandated requirements and/or policies and in wanton neglect and disregard of public safety, including:

- the failure to monitor The Chimney Tops 2 Fire in the GSMNP;

- failure to adhere to mandatory command-structure requirements;

- failure to adhere to mandatory fire management policies and requirements;

- neglecting to perform requisite complexity analyses;

- negligently implementing a 410-acre containment box;

- negligently failing to adopt contingency plans in case The Chimney Tops 2 Fire escaped the containment box or the GSMNP;

- negligently disregarding fire-behavior modeling;

- negligently failing to utilize available air operations to suppress The Chimney Tops 2 Fire;

---

[3]Butler, Joyce; Parent, Tom, *When Maine Burned: Remembering 50 Years Ago,* Firehouse (retrieved 12/6/16).

3

■ negligently failing to implement a universal communications system to permit inter-agency communications, thus preventing many responders from effectively communicating with one another;

■ negligently failing to utilize the Wildland Fire Decision Support System ("WFDSS"), which would have prompted (1) periodic assessments of the ongoing effectiveness and (2) re-evaluation of suppression-strategies; and

■ negligently failing to provide timely and accurate notice and warning to Park neighbors, local government officials, local fire departments, local residents and visitors about the status of and imminent danger presented by The Chimney Top 2 Fire.

6. Plaintiffs PAUL W. ABBOTT and TONI L. ABBOTT, a married couple, timely submitted a claim for property damages of $283, 640 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Collective Exhibit 1 (Cover Letter, List of Claimants, Certified Mail Return Receipt, and Standard Form 95s)] [Exh. 1, at 1].[4]

7. Plaintiff BRITTANY N. ADKINS timely submitted a claim for property damages of $1,000,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 2].

8. Plaintiff JAYME E. ALEMAN timely submitted a claim for property damages on November 7, 2017. Ms. Aleman of submitted an amended claim for $300,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 3].

---

[4]The letter and attachments mailed to the DOI included numerous names and claim forms of individuals who are not listed in this particular Complaint. Only the claim forms of those persons named in this Complaint are included in Exh. 1.

4

9. Plaintiff BRIAN H. ALSPACH timely submitted a claim for property damages of $20,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 4].

10. Plaintiffs TAMMY F. BAIN and LESLIE N. MILES timely submitted a claim for property damages to the DOI on or about November 7, 2017, pursuant to the FTCA, 28 U.S.C. § 2671-2680. They amended their claim to request $1,200,000 on November 27, 2018. [Exh. 1, at 5].

11. Plaintiffs MICHAEL BECH and SANDRA M. BECH, a married couple, timely submitted a claim for property damages of $385,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 6].

12. Plaintiff JODY T. BERTRAM timely submitted a claim for property damages to the DOI on or about November 7, 2017, pursuant to the FTCA, 28 U.S.C. § 2671-2680. Bertram amended her claim to request $300,000 on November 27, 2018. [Exh. 1, at 7].

13. Plaintiff STEPHEN E. BOND timely submitted a claim for property damages of $450,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 8].

14. Plaintiff MARVIS L. BOSARGE GONZALEZ timely submitted a claim for property damages of $450,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 9].

15. Plaintiff TERRELL M. BOUIE timely submitted a claim for property damages of $4,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 10].

16.    Plaintiff GENIE E. BRABHAM timely submitted a claim for property damages of $500,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 11].

17.    Plaintiff DEBORAH A. BROOKS timely submitted a claim for personal injury and property damages to the DOI on September 5, 2017, pursuant to the FTCA, 28 U.S.C. § 2671-2680. Brooks amended her claim to request $6,500,000 on November 27, 2018. [Exh. 1, at 12].

18.    Plaintiff EVE O. BUERO timely submitted a claim for property damages of $60,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 13].

19.    Plaintiffs MACK NEWMAN BUTLER and CONNIE PANELLE BUTLER, a married couple, timely submitted a claim for property damages of $380,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 14].

20.    Plaintiff JONES and BUTLER INVESTMENTS, LLC, an Alabama limited liability company, timely submitted a claim for property damages of $840,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 15].

21.    Plaintiff GAE CAMPBELL timely submitted a claim for property damages of $175,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 16].

22.    Plaintiff LINDSEY CAMPBELL timely submitted a claim for property damages of $100,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 17].

6

23. Plaintiffs MARY LISA TANT CAMPBELL and JOANN K. TANT timely submitted a claim for property damages of $1,800,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 18]. Plaintiff MYRL D. CARR, as Executor of the Estate of MYRL J. CARR, timely submitted a claim for property damages of $350,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 19].

24. Plaintiff CHARLES CAVANAUGH timely submitted a claim for property damages of $20,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 20].

25. Plaintiffs DESTIN R. CHAMBERS and KELSEY Y. CHAMBERS, a married couple, timely submitted a claim for property damages of $150,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 21].

26. Plaintiffs JULIE LYNN CHASE and CALEB B. CHASE, a married couple, timely submitted a claim for property damages of $30,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 22].

27. Plaintiff DAVID R. CHEATHAM timely submitted a claim for property damages of $525,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 23].

28. Plaintiffs STEVE W. COFIELD and JAN COFIELD, a married couple, timely submitted a claim for property damages of $1,100,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 24].

29. Plaintiff LYNN M. COLLINS timely submitted a claim for property damages of $500,000 to the DOI on or about November 27, 2018, pursuant to the

7

FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 25].

30. Plaintiffs TERRY D. DANIEL and CAROL A. DANIEL, a married couple, timely submitted a claim for property damages of $286,400 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 26].

31. Plaintiff LEON C. DODD timely submitted a claim for property damages of $20,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 27].

32. Plaintiffs AMY E. DOWLING and DON J. DOWLING, a married couple, timely submitted a claim for property damages of $100,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 28].

33. Plaintiffs JUSTIN W. DUMAS and MERRY D. DUMAS, a married couple, timely submitted a claim for property damages for $350,000 to the DOI on or about November 7, 2017, pursuant to the FTCA, 28 U.S.C. § 2671-2680. They amended their claim on November 27, 2018 to request $100,000. [Exh. 1, at 29].

34. Plaintiffs CHRISTOPHER DUNAWAY, timely submitted a claim for property damages of $1,150,00 to the DOI on or about November 7, 2017, pursuant to the FTCA, 28 U.S.C. § 2671-2680. They amended their claim on November 27, 2018 to request $100,000. [Exh. 1, at 30].

35. Plaintiffs JOHN P. EAMES and LOIS A. EAMES, a married couple, timely submitted a claim for property damages for $50,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 31].

36. Plaintiff TIMOTHY JAMES EASLEY timely submitted a claim for property damages for $450,000 to the DOI on or about November 27, 2018, pursuant to the FTCA,

8

28 U.S.C. § 2671-2680. [Exh. 1, at 32].

37. Plaintiff TIMOTHY FANNIN timely submitted a claim for property damages for $300,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 33].

38. Plaintiffs JOSEPH FRATINI and SANDRA M. FRATINI, a married couple, timely submitted a claim for property damages for $200,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C.§ 2671-2680. [Exh. 1, at 34].

39. Plaintiff LINDA K. GARRETT timely submitted a claim for property damages for $1,000,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 35].

40. Plaintiffs STEPHEN R. GILMORE and DEBORAH L. GILMORE, a married couple, timely submitted a claim for property damages for $1,000,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 36].

41. Plaintiffs BRET M. GREER and DANIELL L. GREER timely submitted a claim for property damages for $360,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 37]

42. Plaintiffs STEPHANIE R. GREICO and RONALD R. WHISNANT, JR, timely submitted a claim for property damages for $250,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 38].

43. Plaintiffs BRENDA J. HALSEY and JAMES L. HALSEY, a married couple, timely submitted a claim for property damages for $840,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 39].

44. Plaintiffs RUSSELL E. HASKINS and CHERYL F. HASKINS, a married

9

couple, timely submitted a claim for property damages for $200,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 40].

45.     Plaintiffs MARK HASS and TERRI HASS, a married couple, timely submitted a claim for property damages for $550,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 41].

46.     Plaintiff KIRK L. HEINSOHN timely submitted a claim for property damages for $450,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 42].

47.     Plaintiff SHARON H. HIRSCHFIELD timely submitted a claim for property damages for $500,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 43].

48.     Plaintiff DAVE HISEY timely submitted a claim for property damages for $400,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 44].

49. Plaintiffs KAREN M. HOLDING and HARRY R. HOLDING, a married couple, timely submitted a claim for property damages for $350,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 45].

50. Plaintiff JAMES D. HOLIFIELD timely submitted a claim for property damages for $100,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 46].

51. Plaintiff JAMES D. HOLIFIELD and BRANDI M. HOLIFIELD timely submitted a claim for property damages for $60,000 to the DOI on or about September 5, 2017, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 47].

52. Plaintiff STEPHEN C. HOSSE and TINA K. HOSSE, a married couple, timely submitted a claim for property damages for $325,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 48].

53. Plaintiff JOHN L. HONDULAS timely submitted a claim for property damages for $112,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 49].

54. Plaintiffs CHARLIE BOB HUGHES, Jr. and VICTORIA D. FISTER, a married couple, timely submitted a claim for property damages for $836,187 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 50].

55. Plaintiff JAMES M. HUNTER timely submitted a claim for property damages for $350,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 51].

56. Plaintiff KATHY JONES timely submitted a claim for property damages for $250,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. §

11

2671-2680. [Exh. 1, at 52].

57. Plaintiff DAVID L. JOYNER timely submitted a claim for property damages for $375,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 53].

58. Plaintiff JENNIFER L. KAYLOR timely submitted a claim for property damages for $200,000 and $800,000 for personal injuries, totaling $1,000,000, to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 54].

59. Plaintiff RICHARD I. KIMNER and BROOKE A. KRATCHOFF, timely submitted a claim for property damages for $20,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 55].

60. Plaintiffs KYLE S. KING and DOREEN R. KING, a married couple, timely submitted a claim for property damages for $100,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 56].

61. Plaintiffs DAVID M. KLASSEN and LINDA F. KLASSEN, a married couple, timely submitted a claim for property damages for $425,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 57].

62. Plaintiffs JOHN C. KLING and CHERYL A. KLING, a married couple, timely submitted a claim for property damages for $79,375 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 58].

63. Plaintiffs KAREN N. LEVERETTE and JOHN R. LEVERETTE, a married couple, timely submitted a claim for property damages for $500,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 59].

12

64. Plaintiff DAMON J. MATTHEWS timely submitted a claim for property damages for $35,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 60].

65. Plaintiffs JOHN H.H. MATTHEWS and KENNETH M. MATTHEWS timely submitted a claim for property damages for $450,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 61].

66. Plaintiff JO RITA MAXWELL timely submitted a claim for property damages for $40,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 62].

67. Plaintiff EDGAR C. McKINNEY timely submitted a claim for property damages for $631,405 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 63].

68. Plaintiff ZINA FAYE McKINNEY timely submitted a claim for property damages for $1,000,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 64].

69. Plaintiffs PATRICK McKNIGHT and KAREN McKNIGHT, a married couple, timely submitted a claim for property damages for $1,500,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 65].

70. Plaintiff RITA S. MONTERO timely submitted a claim for property damages for $300,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 66].

71. Plaintiff LAUREN J. MEIER timely submitted a claim for property damages for $40,000 to the DOI on or about November 27, 2018, pursuant to the FTCA,

13

28 U.S.C. § 2671-2680. [Exh. 1, at 67].

72.     Plaintiffs ROY F. MERCK and ANTHONY F. MERCK timely submitted a claim for property damages for $345,500 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. 2671-2680. [Exh. 1, at 68].

73.     Plaintiffs DOUGLAS E. MOORE and SANDY M. MOORE, a married couple, timely submitted a claim for property damages for $2,000,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 69].

74.     Plaintiff CAROL G. MUSZIK timely submitted a claim for property damages for $11,950,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 70].

75.     Plaintiffs JAMES DALE GRACE CHRISTIAN TRUST and MSM CAPITAL MANAGEMENT, LLP timely submitted a claim for property damages for $1,786,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 71].

76.     Plaintiffs DAVID L. NAQUIN, Sr. and DENISE A. NAQUIN, a married couple, timely submitted a claim for property damages for $1,380,708 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 72].

77.     Plaintiff SUE NAQUIN timely submitted a claim for property damages for $380,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 73].

78.     Plaintiff CARROLL E. NICHOLS timely submitted a claim for property damages for $6,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 74].

79. Plaintiff CHARLES M. NICHOLS, III timely submitted a claim for property damages for $80,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 75].

80. Plaintiffs JACOB W. PARTON and BETTY J. PARTON, a married couple, timely submitted a claim for property damages for $85,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 76].

81. Plaintiffs MIRANDA L. PAULK and DORA JEAN PAULK timely submitted a claim for property damages for $400,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 77].

82. Plaintiff AMANDA B. PERRYMAN timely submitted a claim for property damages for $389,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 78].

83. Plaintiffs WESLEY M. PITTMAN and KATRINA L. PITTMAN, a married couple, timely submitted a claim for property damages (for $150,000) and personal injuries (for $5,000,000) for a total of $5,150,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 79].

84. Plaintiff GISELLE PORRASPITA timely submitted a claim for property damages for $350,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 80].

85. Plaintiff PAUL CLIFF PRICE timely submitted a claim for property damages for $50,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 81].

86. Plaintiffs FLORIAN J. PUHALA, Jr. and MARY E. PUHALA, a married

couple, timely submitted a claim for property damages for $175,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 82].

87.     Plaintiffs LARRY D. RAYMES and KAREN RAYMES, a married couple, timely submitted a claim for property damages for $632,500 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 83].

88.     Plaintiff BETSY C. RETTIG timely submitted a claim for property damages for $500,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 84].

89.     Plaintiff JACQUELINE R. ROBERTSON timely submitted a claim for property damages for $50,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 85].

90.     Plaintiff SANDRA ROVHANA-LOLLINO timely submitted a claim for property damages for $750,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 86].

91.     Plaintiffs MARK RUETER and GLEN BEASLEY timely submitted a claim for property damages for $150,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 87].

92.     Plaintiffs KERRY "TOM" SANDERS and DENISE M. SANDERS, a married couple, timely submitted a claim for property damages for $4,800,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 88].

93.     Plaintiff PHYLLIS J. SEIDEL timely submitted a claim for property damages for $500,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 89].

16

94. Plaintiffs JAMES TOM SHOFNER and CHERYL A, SHOFNER, a married couple, timely submitted a claim for property damages for $250,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 90].

95. Plaintiffs ELIZABETH A. SMITH and CLAUDE THOMAS, a married couple, timely submitted a claim for property damages for $45,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 91].

96. Plaintiffs OWEN G. SMITH and RICK COOK timely submitted a claim for property damages for $600,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 92].

97. Plaintiffs JOEL A. SORTORE and TOMEIKA C. STALLWORTH timely submitted a claim for property damages for $425,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 93].

98. Plaintiffs CONNIE R. SPRINGFIELD and BARRY S. SPRINGFIELD, a married couple, timely submitted a claim for property damages for $750,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 94].

99. Plaintiffs TAMMIE R. STARKEY and TOMMY L. STARKEY, a married couple, timely submitted a claim for property damages for $200,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 95].

100. Plaintiff ARTHUR W. STEWART timely submitted a claim for property damages for $625,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 96].

101. Plaintiffs JUDY A. SULLIVAN and GERALD SULLIVAN, a married couple,

doing business as MOUNTAINSIDE RENTALS, timely submitted a claim for property damages for $1,000,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 97].

102. Plaintiff MICHAEL B. THOMPSON timely submitted a claim for property damages for $90,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 98].

103. Plaintiffs MICHAEL G. THOMPSON and SUE D. THOMPSON, a married couple, timely submitted a claim for property damages for $1,000,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 99].

104. Plaintiffs DARLENER. VERITO and KEITH M. FLANNERY timely submitted a claim for property damages for $405,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 100].

105. Plaintiffs RAYMOND A. WADDLE, Jr. and JACQUELINE WADDLE, a married couple, timely submitted a claim for property damages for $3,500,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 101].

106. Plaintiff DELBERT R. WALLACE timely submitted a claim for property damages for $20,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 102].

107. Plaintiffs THOMAS R. WORY and AMANDA L. WORY, a married couple, timely submitted a claim for property damages for $500,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 103]. Plaintiffs DOUGLAS S. YATES and AUDREY YATES, a married couple, timely submitted a

18

claim for property damages for $2,292,114 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 104].

108. Plaintiffs JOSHUA YATES and KRISTA YATES, a married couple, timely submitted a claim for property damages for $197,143 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 105].

109. Plaintiffs JULIE O. YATES and ANTHONY L. YATES, a married couple, timely submitted a claim for property damages for $1,750,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 106].

110. Plaintiff ISEBELLA M. YEAGY, a minor, by next friend, JENNIFER L. KAYLOR, timely submitted a claim for personal injury damages for $2,000,000 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 107].

111. Plaintiffs CHARLES C. YOUNG and DEBORAH L. YOUNG, a married couple, timely submitted a claim for property damages for $6,226 to the DOI on or about November 27, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. [Exh. 1, at 108].

112. 28 U.S.C. §2675 allows claimants (Plaintiffs) to file a lawsuit after six (6) months after having received no response from the United States government. Pursuant to the FTCA, the USA has had more than the permitted six (6) months in which to respond to Plaintiffs' claims, as more than six (6) months has elapsed from the date of Plaintiffs' submission of their respective claims to the DOI.

113. The USA having made no effort to resolve Plaintiffs' respective claims, all conditions precedent to those claims under the FTCA have been satisfied, and Plaintiffs therefore bring this Complaint pursuant to the FTCA, 28 U.S.C. § 2671.

19

114. The claims advanced herein arise out of certain actions, omissions and otherwise negligent conduct by employees of the DOI and/or NPS, a component of the DOI and authorized agent of the USA, which resulted in, among other things, injuries to the real and/or personal property of the Plaintiffs, including the destruction of their homes, businesses, the contents therein, motor vehicles, and other property.

115. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1331 and 1346(b).

116. Venue is properly within the Eastern District of Tennessee pursuant to 28 U.S.C. § 1402(b), as Plaintiffs' claims arose here and the acts complained of occurred within this District.

## II. NATURE OF THE ACTION

117. From June 2016 through November 2016, fuel advisories for the GSMNP had predicted significant fire danger. By November 2016, the risk of wildland fire was significant in Eastern Tennessee. Deepening drought throughout the region had been expanding since summer. Fire-danger indices were at record levels. The impact of the drought was substantial, resulting in lower moisture contents of not only dead fuels (leaves, sticks, logs, and duff), but also live vegetation. The normal autumn leaf-fall was also underway. This litter layer – normally somewhat compacted by moisture – remained uncompressed and subject to movement by winds.

118. The fall fire season in the GSMNP is also commonly characterized by cold-fronts accompanied by low relative humidity, preceded by high winds. The combination of this low humidity, strong winds, and hardwood leaf-litter increases the likelihood of fires becoming larger and more difficult to control. Add to these hazards the fact that extreme-

20

wind events called "mountain waves" frequently occur in the western foothills of the southern Appalachian Mountains from November through March.

119.    On November 22, 2016, the NWS declared Gatlinburg and the GSMNP to be in an "extreme" and "exceptional" drought condition. The drought had already spawned fires consuming about 44,000 acres in Tennessee, prompting Tennessee governor to impose a fire-ban in the eastern half of the state.

120.    The following day, Wednesday, November 23, 2016, at about 5:20 p.m., a slow-moving fire of less than an acre was discovered by FMO Salansky near the top of the Chimney Tops Trail.  After scouting the fire, Salansky decided the fire should be contained, not extinguished, as the rocky, steep terrain presented a safety risk to firefighters.

121.    Salansky and the Park's senior leadership ultimately developed a plan to "contain" the fire (hereinafter, "The Chimney Tops 2 Fire")[5] inside a 410-acre indirect-

---

[5]Government agencies exercise absolute authority in wildfire decision-making. The government controls firefighting efforts. Private individuals do not get to make decisions about which or how many resources the government will employ during a wildfire. *See* Karen M. Bradshaw, *A Modern Overview of Wildfire Law*, 21 Fordham Env. L. Rev. 445, 476, at n. 160 (2010).

attack "box" ("containment box") utilizing natural features, including trails and a nearby creek, and constructed fire-lines, to "hold the fire."[6] From the outset, however, the plan's likelihood of success "was very low."[7]

122. In the end, events of the succeeding five days demonstrated the plan devised by Salansky was a debacle of historic proportions, made worse by innumerable and repeated failures by Salansky and Park officials to adhere to settled fire-management policies. These failures notably included their blatant disregard of mandatory requirements to monitor The Chimney Tops 2 Fire for five consecutive days and their failure to notify or warn local governments, Park neighbors, local residents and visitors of the absolute and imminent danger the fire posed to them and the surrounding area.

123. Salansky, already functioning as both the Zone FMO[8] and the Park FMO, exacerbated an already precarious situation by disregarding settled fire policy and anointing himself as both The Chimney Tops 2 Fire's Incident Commander ("IC") and Duty Officer ("DO") and by failing to assign a separate Safety Officer. This self-anointment grossly undermined the fire-command structure[9] that was intended to ensure policy oversight.[10]

---

[6][National Park Service After-Action Report ("NPS Report"), at p. 3; *see Reed, et al. v. United States of America*, No. 3:18-cv-00201-TWP-DCP (E.D. Tenn. May 23, 2018), Doc. 1, # 5 (Exh. 3 - NPS Report), incorporated herein by reference as Exhibit 2].

[7][NPS Report, at p. 3].

[8]Salansky was the Appalachian-Piedmont Zone Fire Management Officer ("AP Zone FMO"), responsible for 19 other parks. [NPS Report, at p. 53].

[9]Incident Command Teams ("ICTs") are tasked with coordinating strategy and tactical decision-making in wildfire suppression. *See* Montrose District Wildfire Protection and Management, *Colo. State Forest Serv. Colo. State Univ.*, http://csfs.colostate.edu/pages/montrose-wildfire.html.

[10][NPS Report, at p. 58].

Salansky also inexplicably failed not only to request additional funding for resources for the unprecedented and extraordinary fire season, but also to recall personnel on-leave for the Thanksgiving holiday, leaving a critical shortage of fire personnel and resources.

124.    For *five consecutive nights* – from Wednesday, November 23, 2016 through Sunday, November 27, 2016 – Salansky and Park officials abandoned The Chimney Tops 2 Fire in the overnight hours, leaving it un-monitored and unattended, only to discover the succeeding mornings that the fire had grown to two acres, then to six acres, then to eight acres, then to ten acres, then to between thirty-five (35) and fifty (50) acres, and as the winds increased, eventually spreading out-of-control on Sunday, November 27, 2016 to 250-500 acres.

125.    For those same *five consecutive nights*, Salansky and Park officials failed to notify or warn Gatlinburg officials, Park neighbors, local residents and visitors about the imminent danger posed by The Chimney Tops 2 Fire.

126.    From his discovery of the small and smoldering fire until Monday morning, November 28, 2016, Salansky underestimated the complexity and dangerous potential of The Chimney Tops 2 Fire. And from the moment the "containment box" was designed, he was crippled by an unrealistic belief that The Chimney Tops 2 Fire would never escape the "box," basing his ill-advised opinion initially on historical fire-suppression success in the GSMNP, as opposed to actual circumstances, and by Saturday, November 26, 2016, on the "hope" that rain would arrive before high-winds blew toward Gatlinburg.

127.    Numerous experienced wildland firefighters believe The Chimney Tops 2 Fire fire required aggressive action and planning. But Salansky and the Park's senior leadership

were too casual in their approach to suppress the fire.[11] From its discovery until the fire ultimately exploded out of control on Monday, November 28, 2016, Salansky and Park officials failed to monitor The Chimney Tops 2 Fire at all in the overnight hours, failed to mount a serious – much less effective – effort to suppress The Chimney Tops 2 Fire on the ground until it was out-of-control, and failed to order air-attack/air-tankers or additional personnel until Sunday, November 27, 2016.

128. By early Saturday, November 26, 2016, Salansky had received a NWS Special Weather Alert warning of high-winds and rain for Monday, November 28, 2016.[12] From the moment rain was predicted for Monday, instead of using available air-resources and more aggressive suppression-efforts on the ground to extinguish the fire, Salansky allowed "hope for rain" to become part of his strategy to contain the fire.

129. By Sunday, November 27, 2016, The Chimney Tops 2 Fire was "active on all flanks." Only then did Salansky finally appear to see the fire's potential danger, ordering additional resources, *e.g.*, helicopters, air-attack, crew module, engines, etc. Yet, Salansky, wearing all of five critical fire-decision-making hats, again failed to monitor the fire in the overnight hours and completely failed to communicate the danger to Park neighbors, including local officials in Gatlinburg, Pigeon Forge and elsewhere in Sevier County, as well as local residents and visitors. Such a warning would have allowed for significant steps to be taken to prepare for The Chimney Tops 2 Fire.

---

[11]In fact, no action was taken to construct fire-lines to block the fire until Sunday. [NPS Report, at p. 3].

[12][NPS Report, at p. 3].

24

130. By Monday morning, November 28, 2016, the Chimney Tops 2 Fire had expanded to as much as 500 acres, spread to the Chimney Picnic Area outside of the "containment box," and began the long-range ignition of spot fires. Shortly thereafter, The Chimney Tops 2 Fire also threatened the Park's Headquarters, historical structures, and a residential area known as Mynatt Park.

131. By about 6:00 p.m., The Chimney Tops 2 Fire had breached the Park's boundary[13] and near-hurricane force winds carried it from the Park across a three-mile Park interface into numerous Gatlinburg neighborhoods, eventually reaching the southern edge of Pigeon Forge.[14]

132. According to the team of experts hired by Gatlinburg and Pigeon Forge, the most critical failure of all during The Chimney Tops 2 Fire was the complete lack of early notice from the Park to local officials, residents and visitors in Sevier County, including Gatlinburg and Pigeon Forge. Because of this failure, firefighters had no advance warning of the fire until late-Monday morning, November 28, 2016, when a GFD captain called the Park to ask about the thick smoke pouring into the city. Salansky errantly advised the captain that everything was "under control" and no help was needed. Meanwhile, The Chimney Tops 2 Fire was barreling toward Gatlinburg at speeds that eventually exceeded 2,000 acres per hour, *more than half an acre per second*.

---

[13][NPS Report, at p. 3].

[14]This After-Action Review ("ABS Report") was prepared by ABSG Consulting Inc. (ABS Group) solely for the benefit of the City of Gatlinburg, Tennessee, and Sevier County, Tennessee. ABS Group is a leading technical and risk management advisor to both industry and government. [ABS Report, at p. 13; *see Reed*, Doc. 1, # 6 (Exh. 4 - ABS Report), incorporated herein by reference as Exhibit 3].

133. The devastating fire left its mark: 14 deaths, 191 fire-related injuries or illnesses, damage or destruction to about 2,500 homes, buildings and other structures, more than 17,000 acres burned, and nearly a billion dollars in damages.

134. Numerous experienced wildland firefighters have opined The Chimney Tops 2 Fire could have been – and should have been – suppressed immediately after it was discovered as a small and smoldering fire. Salansky and Park senior leadership were not only unprepared, but unqualified to manage a fire under these extraordinary conditions. Thus, they were compelled to make unsubstantiated and ad hoc decisions as The Chimney Tops 2 Fire continued to grow, repeatedly failing to comply with settled and mandated fire-policies, directives, procedures, guidelines and accepted fire-management and fire-suppression practices.[15]

135. The NPS Review Team examined the Park's response to The Chimney Tops 2 Fire in the initial days[16] and concluded that a lack of wildland-fire preparedness during a period of drought conditions favorable to wildfires simply overwhelmed the Park's response to the fire,[17] finding inaction, under-staffing and a failure to appreciate the danger led to a response that violated NPS fire-management policies.[18]

---

[15][NPS Report, at pp. 32-36, 41, 45-56].

[16]William Kaage, Division Chief of Fire and Aviation Management for the NPS ordered a review of the Chimney Tops 2 Fire. An interagency fire review team reviewed and compiled findings on the fire, focusing on the NPS's preparedness and response to the fire. [*See Chimney Tops 2 Fire Review: Individual Fire Review Report*, hereinafter "NPS Report," at p. 43].

[17][NPS Report, at p. 4].

[18][NPS Report, at p. 56].

136. A second report, the ABS Report, was commissioned by the City of Gatlinburg and Sevier County, and concluded, among other findings, that "insufficient warning" by Park officials contributed to a dramatically reduced time-frame "to conduct needed evacuations."[19]

137. Plaintiffs allege that the substantial losses of property to Plaintiffs were the direct, natural, and probable result of the negligent acts and/or omissions of NPS employees who acted in direct violation of established NPS fire-management policies, negligent failure to prioritize the safety of citizens and their properties, and negligent failure to notify and/or warn Park neighbors, local residents, and visitors, including the Plaintiffs, of the imminent, dangerous, and deadly threats posed by The Chimney Tops 2 Fire.

### III. PARTIES, INJURIES, AND DAMAGE CLAIMS

138. Plaintiffs PAUL W. ABBOTT and TONI L. ABBOTT are citizens and residents of Johnson City, Tennessee 37601. As a result of The Chimney Tops 2 Fire, Mr. and Mrs. Aboott lost their private residence, located at 617 Baskins Creek Road, Gatlinburg, Tennessee 37738, and its entire contents. The Abootts also lost a 1973 camper valued at about $1,500 and expended approximately $32,000 to clean and make repairs to their property. All of this property was damaged or destroyed by The Chimney Tops 2 Fire, totaling $283,640 in damages.

139. Plaintiff BRITTANY N. ADKINS is a citizen and resident of Tennessee, residing at 2239 Grassy Branch Road, Sevierville, Tennessee 37876. Adkins was renting a private residence located at 1661 Mitchell Drive, Pigeon Forge, Tennessee 37876. As a result

---

[19][ABS Report, at p. 63].

of The Chimney Tops 2 Fire, personal property belonging to Ms. Adkins and her two children was destroyed in the rented residence and her vehicle was destroyed. All of this property was destroyed or damaged by The Chimney Tops 2 Fire, totaling $1,000,000 in damages.

140. Plaintiff JAYME E. ALEMAN is a citizen and resident of Tennessee, residing at 1475 Robert Ridge Road, Sevierville, Tennessee 37862. Aleman lost a building in which he owned and operated a grocery store and deli/restaurant, located at 330 Baskins Creek Road, Gatlinburg, Tennessee 37738, as a result of the Chimney Tops 2 Fire, along with all of the contents therein, totaling $3,000,000 in damages.

141. Plaintiff BRIAN H. ALSPACH is a citizen and resident of Gatlinburg, Tennessee. Alspach was renting a private residence located at 474 Baskins Creek, Gatlinburg, Tennessee 37738. As a result of The Chimney Tops 2 Fire, personal property belonging to Alspach was destroyed in the rented residence. All of this property was destroyed or damaged by The Chimney Tops 2 Fire, totaling $20,000 in damages.

142. Plaintiffs TAMMY F. BAIN and LESLIE N. MILES, a married couple, are citizens and residents of Sevierville, Tennessee, residing at 827 Sunrise Blvd., Sevierville, Tennessee 37862. Bain and Miles were renting an apartment at 602 East Parkway, Apt. 19, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of their furnishings and personal belongings, totaling $1,200,000 in damages.

143. Plaintiffs MICHAEL BECH and SANDRA M. BECH, a married couple, are citizens and residents of Tennessee, residing at 312 Saddleback Way, Sevierville, Tennessee 37862. As a result of The Chimney Tops 2 Fire, Mr. and Mrs. Bech lost their private residence, located at 1150 Hemlock Drive, Gatlinburg, Tennessee 37738, and its entire

28

contents, including jewelry, antiques, and family papers. They also lost vehicle components, a 1993 Ford van, and a 2000 Ford van, as a result of the Chimney Tops 2 Fire. All of this property was destroyed by The Chimney Tops 2 Fire, totaling $385,000 in damages.

144. Plaintiff JODY T. BERTRAM is a citizen and resident of Tennessee, residing at 520 Johnson Lane, Gatlinburg, Tennessee 37738. Bertram was renting a residence at 754 Widows Knob Road, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents of the rented property, including furnishings, totaling $300,000 in damages.

145. Plaintiff STEPHEN E. BOND is a citizen and resident of Ohio. As a result of The Chimney Tops 2 Fire, Mr. Bond lost his private residence at 224 Sherman Clabo Road, Gatlinburg, and all contents therein, totaling $450,000 in damages.

146. Plaintiff MARVIS L. BOSARGE GONZALEZ is a citizen and resident of Pigeon Forge, Tennessee 37868. As a result of The Chimney Tops 2 Fire, Gonzalez lost his private residence, located at 424 Troy Drive, Pigeon Forge, Tennessee 37863, and its entire contents, including artwork and jewelry. All of this property was destroyed by The Chimney Tops 2 Fire, totaling $450,000 in damages.

147. Plaintiff TERRELL M. BOUIE is a citizen and resident of Tennessee, residing at 4749 Towensend, Gatlinburg, Tennessee 37738. Bouie was renting a residence at 249 Bear Mountain Road, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents of the rented property, totaling $4,000 in damages.

148. Plaintiff GENIE E. BRABHAM is a citizen and resident of Gatlinburg, Tennessee, residing at 535 Greenbriar Lane, Gatlinburg, Tennessee 37738. As a result of The Chimney Tops 2 Fire, Brabham lost her private residence, located at 520 Roaring Fork

29

Cove, Gatlinburg, Tennessee 37738, and its entire contents, including two cats. All of this property was lost or destroyed by The Chimney Tops 2 Fire, totaling $500,000 in damages.

149. Plaintiff DEBORAH A. BROOKS is a citizen and resident of Pigeon Forge, Tennessee, residing at 219 Emert Street, Pigeon Forge, Tennessee 37863. As a result of The Chimney Tops 2 Fire, Brooks lost her private residence, located at 985 Chestnut Drive, Gatlinburg, Tennessee 37738, and its entire contents, along with a 2005 Honda Pilot. All of this property was lost or destroyed by The Chimney Tops 2 Fire, totaling $1,500,000 in property damages. Brooks also suffered first and second-degree burns, requiring hospitalization. Brooks requests the sum of $5,000,000 for personal injuries. Altogether, Brooks seeks $6,500,000 in damages.

150. Plaintiff EVE O. BUERO is a citizen and resident of Sevierville, Tennessee, residing at 1256 Kingbranch Rd., Sevierville, Tennessee 37876. As a result of The Chimney Tops 2 Fire, Buero lost her private residence, located at 738 Ellis Ogle Rd., Gatlinburg, Tennessee 37738, and its entire contents. All of this property was lost or destroyed by The Chimney Tops 2 Fire, totaling $60,000 in damages.

151. Plaintiffs MACK NEWMAN BUTLER and CONNIE PANELLE BUTLER, a married couple, are citizens and residents of Alabama. As a result of The Chimney Tops 2 Fire, Mr. and Mrs. Butler lost her private residence, located at 407 Pebble Creek, Gatlinburg, Tennessee 37738, and its entire contents, including furnishings. All of this property was lost or destroyed by The Chimney Tops 2 Fire, totaling $380,000 in damages.

152. Plaintiff JONES and BUTLER INVESTMENTS, LLC is an Alabama limited liability company. The company owned rental properties located at 1019 and 1030 Daisy Lane, Gatlinbur2g, Tennessee 37738. As a result of The Chimney Tops 2 Fire, the properties

30

were lost, along with their entire contents. The company also lost rental income from these property losses. The total loss was $840,000 in damages.

153. Plaintiff GAE CAMPBELL is a citizen and resident of Sevierville, Tennessee, residing at 4206 Dolly's Drive, Sevierville, Tennessee 37876. As a result of The Chimney Tops 2 Fire, Campbell lost a private residence, located at 129 Village East Drive, G-104, Gatlinburg, Tennessee 37738, along with all of the contents therein, including furnishings, totaling $175,000 in damages.

154. Plaintiff LINDSEY CAMPBELL is a citizen and resident of Gatlinburg, Tennessee, residing at 608 E. Reagan Lane, Gatlinburg, Tennessee 37738. As a result of The Chimney Tops 2 Fire, Campbell lost a private residence, located at 408 Greystone Heights Rd., Gatlinburg, Tennessee 37738, along with all of the contents therein, including clothing, a record collection, fine art supplies, and paintings, totaling $100,000 in damages.

155. Plaintiffs MARY LISA TANT CAMPBELL and JOANN K. TANT are citizens and residents of Gatlinburg, Tennessee. As a result of the Chimney tops 2 Fire, the Campbell's lost a private residence, located at 406 Greystone Heights Road, Gatlinburg, Tennessee 37738, along with all the contents therein and a 2006 Toyota Scion XB, totaling $1,800,000 in damages.

156. Plaintiff MYRL D. CARR, as Executor of the Estate of MYRL J. CARR, is a citizen and resident of Tennessee, residing at 3230 Woods Way, Sevierville, Tennessee 37876. As a result of The Chimney Tops 2 Fire, the decedent lost a private residence, located at 535 Baskin Creek Road, Gatlinburg, Tennessee 37738, along with all of the contents therein, including furnishings, totaling $350,000 in damages.

157. Plaintiff CHARLES CAVANAUGH is a citizen and resident of Tennessee,

residing at 413 McMahon Avenue, Sevierville, Tennessee 37862. Cavanaugh was renting a residence located at 1705 West Ski View Drive, Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Cavanaugh lost all contents therein, totaling $20,000 in damages.

158. Plaintiffs DESTIN R. CHAMBERS and KELSEY Y. CHAMBERS, a married couple, citizens and residents of Tennessee, residing at 1013 Powdermilk Road, Gatlinburg, Tennessee 37738. The Chambers were renting a private residence located at 611 Davenport Rd., Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all contents therein, totaling $150,000 in damages.

159. Plaintiffs JULIE LYNN CHASE and CALEB B. CHASE, a married couple, citizens and residents of Sevierville, Tennessee. Mr. and Mrs. Chase were renting a private residence located at 345 Greystone Heights Rd., Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all contents therein, including tools of the trade, totaling $30,000 in damages.

160. Plaintiff DAVID R. CHEATHAM is a citizen and resident of Tennessee, residing at 611 Anderson Drive, Clarksville, Tennessee 37040. As a result of The Chimney Tops 2 Fire, Cheatham lost a private residence, located at 819 Village Place, Gatlinburg, Tennessee 37738, along with all of the contents therein, totaling $525,000 in damages.

161. Plaintiffs STEVE W. COFIELD and JAN COFIELD, a married couple, are citizens and residents of Alabama. As a result of The Chimney Tops 2 Fire, Mr. and Mrs. Cofield lost their private residence, located at 407 Smokey View Rd., Gatlinburg, Tennessee 37738, and its entire contents, including furnishings. All of this property was lost or destroyed by The Chimney Tops 2 Fire, totaling $1,100,000 in damages.

162. Plaintiff LYNN M. COLLINS is a citizen and resident of Gatlinburg,

Tennessee. Collins was renting an apartment located at 474 Baskins Creek Road., Apt. 16, Gatlinburg, Tennessee 37738 and as a result of the Chimney Tops 2 Fire she lost all of the contents of the apartment, including furnishings, ark work of her brother's, and antiques, totaling $500,000 in damages.

163. Plaintiffs TERRY D. DANIEL and CAROL A. DANIEL, a married couple, are citizens and residents of Ohio. As a result of The Chimney Tops 2 Fire, Mr. and Mrs. Daniel lost her private residence, located at 855 Campbell Lead Rd., Unit 515, Gatlinburg, Tennessee 37738, and its entire contents, including furnishings. All of this property was lost or destroyed by The Chimney Tops 2 Fire, totaling $286,400 in damages.

164. Plaintiff LEON C. DODD, a citizen and resident of Knoxville, Tennessee. DODD was renting a private residence located at 191 Newton Lane, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents therein, totaling $20,000 in damages.

165. Plaintiffs AMY E. DOWLING and DON J. DOWLING, a married couple, are citizens and residents of Gatlinburg, Tennessee. The Dowlings were renting a private residence located at 657 Red Bud Lane, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all contents therein, as well as four vehicles (2005 Chevrolet Tahoe, 2008 Lincoln Navigator, 2910 Ford Explorer, 2008 Volkswagen Cabriolet), totaling $100,000 in damages.

166. Plaintiffs JUSTIN W. DUMAS and MERRY D. DUMAS, a married couple, are citizens and residents of Seymour, Tennessee. Mr. and Mrs. Dumas were renting a private residence located at 1328 Garrett Drive, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all contents therein, totaling $350,000 in damages.

33

167. Plaintiff CHRISTOPHER DUNAWAY is a citizen of Pigeon Forge, Tennessee. As a result of The Chimney Tops 2 Fire, Dunaway lost his private residence located at 780 Loop Road, Gatlinburg, Tennessee 37738 and its entire contents, including furnishings, a cat, his father's ashes and painting that his mother had painted, totaling in $1,500,00 in damages.

168. Plaintiffs JOHN P. EAMES and LOIS A. EAMES, a married couple, are citizens and residents of Sevierville, Tennessee. Mr. and Mrs. Eames were renting a private residence located at 545 Baskins Creek Rd., Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all contents therein, as well as a 2008 Dodge Calibar, totaling $50,000 in damages.

169. Plaintiff TIMOTHY JAMES EASLEY is a citizen and resident of Tennessee. As a result of The Chimney Tops 2 Fire, Easley lost a private residence, located at 552 Campbell Lead, Gatlinburg, Tennessee 37738, along with all of the contents therein, totaling $450,000 in damages.

170. Plaintiff TIMOTHY FANNIN is a citizen and resident of Michigan. As a result of The Chimney Tops 2 Fire, Fannin lost a private condominium residence, located at 125 Village Drive, B-1, Gatlinburg, Tennessee 37738, along with all of the contents therein and a storage unit, totaling $300,000 in damages.

171. Plaintiffs JOSEPH FRATINI and SANDRA M. FRATINI, a married couple, citizens and residents of Florida, lost a private residence, located at 516 Cherry Street, Gatlinburg, Tennessee 37738, and its entire contents, including furnishings, as a result of The Chimney Tops 2 Fire, totaling $200,000 in damages.

172. Plaintiff LINDA K. GARRETT is a citizen and resident of Gatlinburg,

34

Tennessee. As a result of The Chimney Tops 2 Fire, Garrett lost a private 2-story log residence, located at 234 Benson Lane, Gatlinburg, Tennessee 37738, along with all of the contents therein and a Ford Escape, totaling $1,000,000 in damages.

173. Plaintiffs STEPHEN R. GILMORE and DEBORAH L. GILMORE, a married couple, citizens and residents of Florida, lost a private residence, located at 315 Tower Rd., Gatlinburg, Tennessee 37738, and its entire contents, including furnishings, jewelry, and two pets, as a result of The Chimney Tops 2 Fire, totaling $1,000,000 in damages.

174. Plaintiffs BRET M. GREER and DANIELL L. GREER citizens and residents of Tennessee, lost a private residence, located at 1157 E. Kings Ridge Road, Gatlinburg, Tennessee 37738, and its entire contents, including furnishings, a detached garage, tools, and work van, as a result of The Chimney Tops 2 Fire, totaling $360,000 in damages.

175. Plaintiffs STEPHANIE R. GREICO and RONALD R. WHISNANT, JR. citizens and residents of Tennessee and rented a private residence, located at 723 Old Ridge Road, Gatlinburg, Tennessee 37738. As a result of The Chimney Tops 2 Fire they lost its entire contents totaling $250,000 in damages.

176. Plaintiffs BRENDA J. HALSEY and JAMES L. HALSEY, a married couple, citizens and residents of Ohio, lost a private residence, located at 639 Kings Way, Gatlinburg, Tennessee 37738, and its entire contents, including furnishings, as a result of The Chimney Tops 2 Fire, totaling $840,000 in damages.

177. Plaintiffs RUSSELL E. HASKINS and CHERYL F. HASKINS, a married couple, citizens and residents of Tennessee, lost a private residence, located at 855 Campbell Lead Rd., Unit 402, Gatlinburg, Tennessee 37738, and its entire contents,

including furnishings, as a result of The Chimney Tops 2 Fire, totaling $200,000 in damages.

178. Plaintiffs MARK HASS and TERRI HASS, a married couple, citizens and residents of Kentucky, lost a private residence, located at 855 Campbell Lead Rd., Unit 305, Gatlinburg, Tennessee 37738, and its entire contents, including furnishings, as a result of The Chimney Tops 2 Fire, totaling $550,000 in damages.

179. Plaintiff KIRK L. HEINSOHN is a citizen and resident of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, Heinsohn lost a private residence, located at 660 Washington Rd., Gatlinburg, Tennessee 37738, along with all of the contents therein, including antiques, ceramics, firearms, and music equipment, along with a 1987 Volkswagen Vanagon, totaling $450,000 in damages.

180. Plaintiff SHARON H. HIRSCHFIELD is a citizen and resident of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, Hirschfield's private residence, located at 1431 N. Arvon Lane, Gatlinburg, Tennessee 37738, was damaged, and all of the contents therein, as well as a vehicle, were lost, totaling $500,000 in damages.

181. Plaintiff DAVE HISEY is a citizen and resident of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, Hisey's private residence, located at 634 Wiley Oakley Drive, Gatlinburg, Tennessee 37738, and all of the contents therein were lost, as well as a vehicle, totaling $400,000 in damages.

182. Plaintiffs KAREN M. HOLDING and HARRY R. HOLDING, a married couple, citizens and residents of Indiana, lost a private residence, located at 305 Roaring Fork Rd., Gatlinburg, Tennessee 37738, and its entire contents, as a result of The Chimney Tops 2 Fire, totaling $350,000 in damages.

183. Plaintiff JAMES D. HOLIFIELD, a citizen and resident of Gatlinburg, Tennessee, was renting a private residence located at 474 Baskins Creek Rd., Apt. # 12, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents therein, including a civil war collection, original civil war uniforms, totaling $100,000 in damages.

184. Plaintiffs JAMES D. HOLIFIELD and BRANDI M. HOLIFIELD were a married couple, residents of Tennessee at the time of The Chimney Tops 2 Fire., and were renting a private residence, located at 474 Baskins Creek Rd., Gatlinburg, Tennessee 37738. As a result of the fire, they lost its entire contents and apart from Mr. Holifield's separate claim above for separate property, totaling $60,000 in damages.

185. Plaintiff JOHN L. HONDULAS is a citizen and resident of Knoxville, Tennessee. As a result of The Chimney Tops 2 Fire, Hondulas lost two newly-remodeled private cabins, located at 345 and 351 Silverbell Lane, Gatlinburg, Tennessee 37738, and all of the contents therein, including a carved cedar mantel piece made by a local artist, totaling $112,000 in damage, was renting a private residence located at 474 Baskins Creek Rd., Apt. # 12,

186. Plaintiffs CHARLIE BOB HUGHES, Jr. and VICTORIA D. FISTER, a married couple, are citizens and residents of Carthage, Tennessee. As a result of The Chimney Tops 2 Fire, Hughes and Fister lost their private residence, located at 513 Campbell Lead Rd., Gatlinburg, Tennessee 37738, and all of the contents therein, totaling $836,187 in damages.

187. Plaintiffs STEPHEN C. HOSSE and TINA K. HOSSE, a married couple, are citizens and residents of Rockvale, Tennessee. As a result of The Chimney Tops 2 Fire, Mr.

37

and Mrs. Hosse lost their rental property, located at 782 Chestnut Drive, Gatlinburg, Tennessee 37738, and all of the contents therein and rental income, totaling $325,000 in damages.

188. Plaintiff JAMES M. HUNTER is a citizen and resident of Chattanooga, Tennessee. As a result of The Chimney Tops 2 Fire, Hunter lost his private residence, located at 855 Campbell Lead Rd., Unit 105, Gatlinburg, Tennessee 37738, and all of the contents therein, totaling $350,000 in damages.

189. Plaintiff KATHY JONES is a citizen and resident of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Jones lost her private residence, located at 1661 Mitchell Drive, Sevierville, Tennessee 37876, and all of the contents therein, including furnishings, totaling $250,000 in damages.

190. Plaintiff DAVID L. JOYNER is a citizen and resident of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Joyner lost his private residence, located at 883 Red Fox Trail, Gatlinburg, Tennessee 37738, and all of the contents therein, as well as a 2016 utility trailer, totaling $375,000 in damages.

191. Plaintiff JENNIFER L. KAYLOR is a citizen and resident of Pigeon Forge, Tennessee. Kaylor was renting a private residence, located at 1705 West Ski View Drive, Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Kaylor lost all of her personal belongings that were in the rented residence, totaling $200,000 in damages. Also as a result of The Chimney Tops 2 Fire, Kaylor suffered injuries to her lungs due to smoke inhalation, and seeks $800,000 in damages for such personal injuries, bringing her total claim to $1,000,000.

192. Plaintiffs RICHARD I. KIMNER and BROOKE A. KRATCHOFF are

38

residents of Sevierville, Tennessee. Mr. KIMNER and Mrs. KRATCHOFF were renting a private residence located at 2103 Redmond Way, Sevierville, Tennessee 37876, and as a result of The Chimney Tops 2 Fire, lost all contents therein, totaling $20,000 in damages.

193. Plaintiffs KYLE S. KING and DOREEN R. KING, a married couple, are citizens and residents of Gatlinburg, Tennessee. Mr. and Mrs. King were renting a private residence located at 804 Crestwood Lane, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all contents therein, totaling $100,000 in damages.

194. Plaintiffs DAVID M. KLASSEN and LINDA F. KLASSEN, a married couple, citizens and residents of Nashville, Tennessee, lost a private residence, located at 565 Baskins Creek Rd., Gatlinburg, Tennessee 37738, and its entire contents, as a result of The Chimney Tops 2 Fire, totaling $425,000 in damages.

195. Plaintiffs JOHN C. KLING and CHERYL A. KLING, a married couple, are citizens and residents of Dandridge, Tennessee. The Klings were renting a private residence, located at 652 Kings Way, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, the Klings lost the entire contents of the residence, along with a motorcycle trailer, totaling $79,375 in damages.

196. Plaintiffs KAREN N. LEVERETTE and JOHN R. LEVERETTE, a married couple, are citizens and residents of Alabama. As a result of The Chimney Tops 2 Fire, the Leverettes lost their private residence, located at 548 Campbell Lead Rd., Gatlinburg, Tennessee 37738, and all of the contents therein, totaling $500,000 in damages.

197. Plaintiff DAMON J. MATTHEWS, a citizen and resident of Sevierville, Tennessee, was renting a private residence located at 545 Baskins Creek Rd., Gatlinburg,

39

Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents therein, totaling $35,000 in damages.

198. Plaintiffs JOHN H.H. MATTHEWS and KENNETH M. MATTHEWS are citizens and residents of Maryland. As a result of The Chimney Tops 2 Fire, the Matthews brothers lost their private residence, located at 160 Martin Creek Rd., Gatlinburg, Tennessee 37738, and all of the contents therein, including furnishings, totaling $450,000 in damages.

199. Plaintiff JO RITA MAXWELL, a citizen and resident of Pigeon Forge, Tennessee, was renting a private residence located at 432 Ski Mountain Road, Apt. #2, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents therein, including autograph collection, jewelry, coin collection, and music equipment, totaling $40,000 in damages.

200. Plaintiff EDGAR C. McKINNEY is a citizen and resident of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, McKinney lost his private residence, located at 717 Beanstalk Court, Gatlinburg, Tennessee 37738, and all of the contents therein, as well as his vehicle rental business, parts store and garage, totaling $631,405 in damages.

201. Plaintiff ZINA FAYE McKINNEY is a citizen and resident of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, McKinney lost her private residence, located at 712 Beanstalk Court, Gatlinburg, Tennessee 37738, and all of the contents therein, as well as rental houses located at 136, 116, and 109 Hickman Hollow Rd., Gatlinburg, Tennessee 37738, and a vehicle, totaling $1,000,000 in damages.

202. Plaintiffs PATRICK McKNIGHT and KAREN McKNIGHT, a married couple,

40

are citizens and residents of Kentucky. As a result of The Chimney Tops 2 Fire, the McKnights lost their private residence, located at 856 Pine Top Lane, Gatlinburg, Tennessee 37738, and all of the contents therein, totaling $1,500,000 in damages.

203. Plaintiff RITA S. MONTERO is a citizen and resident of Marion, Virginia. As a result of The Chimney Tops 2 Fire, Montero lost her private residence, located at 125 Village Drive, B2, Gatlinburg, Tennessee 37738, and all of the contents therein, totaling $300,000 in damages.

204. Plaintiffs DOUGLAS E. MOORE and SANDY M. MOORE, a married couple, are citizens and residents of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, the Moores lost two private residences, located at 325 Beech Branch Rd. and 407 Beech Branch Rd., Gatlinburg, Tennessee 37738, and all of the contents therein, as well as two vehicles, totaling $2,000,000 in damages.

205. Plaintiff LAUREN M. MEIER is a citizen and resident of Pigeon Forge, Tennessee. MEIER was renting a private residence located at 710 Windswept Rd., Gatlinburg, Tennessee 37738, all of the contents therein, including antiques from mother and collectables, totaling $40,000 in damages.

206. Plaintiffs ROY F. MERCK and ANTHONY F. MERCK are citizens and Residents of Liberty, South Carolina. As a result of The Chimney Tops 2 Fire, the Merck's lost their private residence located at 740 Topside Rd., Gatlinburg, Tennessee, and all of the contents therein, including furnishings, totaling $345,500 in damages.

207. Plaintiff CAROL G. MUSZIK is a citizen and resident of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Muszik lost three private residences, located at 935 Campbell Lead, 560 Greystone Heights, and 720 Pinecrest Dr., Gatlinburg, Tennessee 37738, all of the contents therein, including furnishings, as well as four vehicles, totaling

41

$11,950,000 in damages.

208. Plaintiffs JAMES DALE GRACE CHRISTIAN TRUST and MSM CAPITAL MANAGEMENT, LLP lost commercial property (ZipGatlinburg) located at 222 Savage Gardens Rd., Gatlinburg, Tennessee 37738, and two rental cabins, located at 414 Reagan Drive and 1115 Villa Drive, in Gatlinburg, Tennessee 37738, including all contents therein, plus lost rental income, totaling $1,786,000 in damages.

209. Plaintiffs DAVID L. NAQUIN, Sr. and DENISE A. NAQUIN, a married couple, are citizens and residents of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, the Naquins lost a private residence, located at 760 Wiley Oakley Dr., Gatlinburg, Tennessee 37738, and all of the contents therein, as well as a vehicle, totaling $1,380,708 in damages.

210. Plaintiff SUE A. NAQUIN is a citizen and resident of Dandridge, Tennessee. As a result of The Chimney Tops 2 Fire, Naquin lost her private residence, located at 862 Sourwood Drive, Gatlinburg, Tennessee 37738, and all of the contents therein, totaling $380,000 in damages.

211. Plaintiff CARROLL E. NICHOLS is a citizen and resident of Pigeon Forge, Tennessee. Nichols rented a cabin apartment, located at 334 Ski Mountain Rd., Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, Nichols lost all of the contents therein, totaling $6,000 in damages.

212. Plaintiff CHARLES M. NICHOLS, III is a citizen and resident of Pigeon Forge, Tennessee. Nichols rented a private residence, located at 710 Windswept Rd., Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, Nichols lost all of the contents therein, including a vehicle, tools, and equipment totaling $80,000 in

42

damages.

213. Plaintiffs JACOB W. PARTON and BETTY J. PARTON, a married couple, are citizens and residents of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, the Partons lost their private residence, located at 742 Ellis Ogle Rd., Gatlinburg, Tennessee 37738, and all of the contents therein, totaling $85,000 in damages.

214. Plaintiffs MIRANDA L. PAULK and DORA JEAN PAULK, a married couple, are citizens and residents of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, the Paulks lost their private residence, located at 462 Hilltop Rd., Gatlinburg, Tennessee 37738, and all of the contents therein, includg furnishings, totaling $400,000 in damages.

215. Plaintiff AMANDA B. PERRYMAN is a citizen and resident of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, Perryman lost her private residence, located at 364 Loop Rd., Gatlinburg, Tennessee 37738, and all of the contents therein, including furnishings, totaling $389,000 in damages.

216. Plaintiffs WESLEY M. PITTMAN and KATRINA L. PITTMAN, a married couple, are citizens and residents of Gatlinburg, Tennessee. The Pittmans rented a private residence, located at 723 Bear Walk Way, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost the total contents therein, including furnishings, as well as a 1996 Chevrolet Blazer. Mrs. Pittman also suffered a miscarriage as a result of The Chimney Tops 2 Fire. The Pittmans claim total damages of $5,150,000.

217. Plaintiff GISELLE PORRASPITA is a citizen and resident of Florida. As a result of The Chimney Tops 2 Fire, Porraspita lost her private residence, located at 772 Cliff Branch Rd., Gatlinburg, Tennessee 37738, along with all of the contents therein, totaling $350,000 in damages.

43

218. Plaintiff PAUL CLIFF PRICE is a citizen and resident of Gatlinburg, Tennessee. Price rented a private residence, located at 432 Ski Mountain Rd., Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents therein and two vehicles, totaling $50,000 in damages.

219. Plaintiffs FLORIAN J. PUHALA, Jr. and MARY E. PUHALA, a married couple, are citizens and residents of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, the Puhalas lost their private residence, located at 730 Turkey Nest Rd., Gatlinburg, Tennessee 37738, and all of the contents therein, including furnishings, totaling $175,000 in damages.

220. Plaintiffs LARRY D. RAYMES and KAREN RAYMES, a married couple, are citizens and residents of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, the Raymes lost their private residence, located at 835 Terry Drive, Gatlinburg, Tennessee 37738, and all of the contents therein, including furnishings, totaling $632,500 in damages.

221. Plaintiff BETSY C. RETTIG is a citizen and resident of Pigeon Forge, Tennessee. As a result of The Chimney Tops 2 Fire, Rettig lost her private residence, located at 817 Perry Drive, Gatlinburg, Tennessee 37738, along with all of the contents therein, totaling $500,000 in damages.

222. Plaintiff JACQUELINE R. ROBERTSON is a citizen and resident of Sevierville, Tennessee. Roberson was renting a private residence, located at 745 Jess Field Rd., Gatlinburg, Tennessee 37738. As a result of The Chimney Tops 2 Fire, Robertson all of the contents therein, including a vehicle, totaling $50,000 in damages.

223. Plaintiff SANDRA ROVHANA-LOLLINO is a citizen and resident of Florida. As a result of The Chimney Tops 2 Fire, Rovhana-Lollino lost her private residence, located

44

at 863 Wesley Dr., Gatlinburg, Tennessee 37738, along with all of the contents therein, including furnishings, totaling $750,000 in damages.

224. Plaintiffs MARK RUETER and GLEN BEASLEY are citizens and residents of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Rueter and Beasley lost their jointly-owned private residence, located at 111 W. Holly Ridge, Gatlinburg, Tennessee 37738, along with all of the contents therein, including furnishings, totaling $150,000 in damages.

225. Plaintiffs KERRY "TOM" SANDERS and DENISE M. SANDERS, a married couple, are citizens and residents of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Mr. and Mrs. Sanders suffered damages to their business, Your Scrapbook Superstore, and their warehouse and inventory, located at 250 Collier Drive, Sevierville, Tennessee 37862 and 659 Parkway, Sevierville, Tennessee 37862, totaling $4,800,000 in damages.

226. Plaintiff PHYLLIS J. SEIDEL is a citizen and resident of Ohio. As a result of The Chimney Tops 2 Fire, Seidel lost her private residence, located at 213 Roaring Fork Rd., Gatlinburg, Tennessee 37738, along with all of the contents therein, and a bridge, totaling $500,000 in damages.

227. Plaintiffs JAMES TOM SHOFNER and CHERYL A. SHOFNER, a married couple, are citizens and residents of South Carolina. As a result of The Chimney Tops 2 Fire, the Shofners lost their private residence, located at 855 Campbell Lead Rd., Unit 503, Gatlinburg, Tennessee 37738, and its entire contents, including furnishings, totaling $250,000 in damages.

228. Plaintiffs ELIZABETH A. SMITH and CLAUDE THOMAS, a married couple,

are citizens and residents of Sevierville, Tennessee. They rented an apartment, located at 518 Ski Mountain Rd., Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents therein, totaling $45,000 in damages.

229. Plaintiffs OWEN G. SMITH and RICK COOK are citizens and residents of Ohio. As a result of The Chimney Tops 2 Fire, Smith and Cook lost their jointly-owned private residence, located at 919 Wiley Oakley Drive, Gatlinburg, Tennessee 37738, along with all of the contents therein, totaling $600,000 in damages.

230. Plaintiffs JOEL A. SORTORE and TOMEIKA C. STALLWORTH are citizens and residents of Sevierville, Tennessee. They rented an apartment together, located at 611 Davenport Rd., Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents of their rented apartment as well as a vehicle, totaling $425,000 in damages.

231. Plaintiffs CONNIE R. SPRINGFIELD and BARRY S. SPRINGFIELD, a married couple, are citizens and residents of Georgia. As a result of The Chimney Tops 2 Fire, the Springfields lost their private residence, located at 904 Tinker Lane, Gatlinburg, Tennessee 37738, and its entire contents, totaling $750,000 in damages.

232. Plaintiffs TAMMIE R. STARKEY and TOMMY L. STARKEY, a married couple, are citizens and residents of Pigeon Forge, Tennessee. As a result of The Chimney Tops 2 Fire, the Starkeys lost their private residence, located at 735 Turkey Nest Rd., Gatlinburg, Tennessee 37738, its entire contents, and two pets, totaling $200,000 in damages.

233. Plaintiff ARTHUR W. STEWART is a citizen and resident of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Stewart lost his private residence, located at 716 Kelly Street, Gatlinburg, Tennessee 37738, along with all of the contents

46

therein, a motorcycle, and antiques, totaling $625,000 in damages.

234. Plaintiffs JUDY A. SULLIVAN and GERALD SULLIVAN, a married couple, doing business as MOUNTAINSIDE RENTALS, are citizens and residents of Alabama. As a result of The Chimney Tops 2 Fire, the Sullivans lost their private residence, located at 928 Village Loop, Gatlinburg, Tennessee 37738, along with its entire contents, totaling $1,000,000 in damages.

235. Plaintiff MICHAEL B. THOMPSON is a citizen and resident of Sevierville, Tennessee. Thompson rented a private residence, located at 293 Greystone Heights Rd. Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents of his rented residence, including motorcycle parts, tools, a drum set, medical equipment, and leg braces, totaling $90,000 in damages.

236. Plaintiffs MICHAEL G. THOMPSON and SUE D. THOMPSON, a married couple, are citizens and residents of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, the Thompsons lost their private residence, located at 293 Greyston Heights Rd., Gatlinburg, Tennessee 37738, along with its entire contents, and also lost their nightly and weekly rental business, located at 289 Greystone Heights Rd., Gatlinburg, Tennessee 37738, totaling $1,000,000 in damages.

237. Plaintiffs DARLENE R. VERITO and KEITH M. FLANNERY are a citizens and residents of Gatlinburg, Tennessee. Ms. Verito and Mr. Flannery rented a private residence located at 850 Chestnut Drive, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents of their rented residence, including furnishings, 2005 Saturn. They also lost Car and Jeep rental business and Parkside Real Estate business located at 321 Gatlinburg, Tennessee 37738 along with all the contents therein, totaling $405,000 in damages.

47

238. Plaintiffs RAYMOND A. WADDLE, Jr. and JACQUELINE WADDLE, a married couple, are citizens and residents of Cosby, Tennessee. As a result of The Chimney Tops 2 Fire, the Waddles lost their private residence, located at 705 Vixen Run, Gatlinburg, Tennessee 37738, along with its entire contents, and also lost four motorcycles, a 1967 Datsun Roadster, a 1982 Datsun King-Cab pickup, and a 2010 Dodge Ram, totaling $3,500,000 in damages.

239. Plaintiff DELBERT R. WALLACE is a citizen and resident of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Stewart lost his private residence, located at 745 Ellis Ogle Rd., Gatlinburg, Tennessee 37738, along with all of the contents therein, totaling $20,000 in damages.

240. Plaintiffs THOMAS R WORY and AMANDA L. WORY, a married couple, are citizens and residents of Gatlinburg, Tennessee. As a result of The Chimney Tops 2 Fire, the Worys lost their private residence, located at 708 Beanstalk Court, Gatlinburg, Tennessee 37738, along with its entire contents, including furnishings, a 2007 Doge Caliber, and pet cat, totaling $500,000 in damages.
$3,500,000 in damages.

241. Plaintiffs DOUGLAS S. YATES and AUDREY YATES, a married couple, are citizens and residents of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Mr. and Mrs. Yates lost two private residences, located at 611 Wiley Oakley Dr. and 650 Red Bud, Gatlinburg, Tennessee 37738, along with their entire contents, including furnishings, totaling $2,292,114 in damages.

242. Plaintiffs JOSHUA YATES and KRISTA YATES, a married couple, are citizens and residents of Sevierville, Tennessee. Mr. and Mrs. Yates rented a private residence,

located at 1134 Hemlock Drive, Gatlinburg, Tennessee 37738, and as a result of The Chimney Tops 2 Fire, lost all of the contents of their rented residence, totaling $197,143 in damages.

243. Plaintiffs JULIE O. YATES and ANTHONY L. YATES, a married couple, are citizens and residents of Sevierville, Tennessee. As a result of The Chimney Tops 2 Fire, Mr. and Mrs. Yates lost a private residence, located at 1130 Hemlock Drive, Gatlinburg, Tennessee 37738, along with their entire contents, a garage with an apartment above, located at 1134 Hemlock Drive, Gatlinburg, Tennessee 37738, as well as an antique car, two trailers, a boat, a motorcycle, and a golf cart, totaling $1,750,000 in damages.

244. Plaintiff ISEBELLA M. YEAGY, a minor, by next friend, JENNIFER L. KAYLOR, is a citizen and resident of Pigeon Forge, Tennessee. As a result of The Chimney Tops 2 Fire, Ms. Yeagy suffered smoke inhalation, resulting in abdominal pain, weight loss, diarrhea, and anxiety, totaling $2,000,000 in damages.

245. Plaintiffs CHARLES C. YOUNG and DEBORAH L. YOUNG, a married couple, are citizens and residents of Bartlett, Tennessee. As a result of The Chimney Tops 2 Fire, Mr. and Mrs. Young lost a private time share, located at 805 Ski Mountain Rd., Building A, Unit 201, Gatlinburg, Tennessee 37738, along with its entire contents, as well as damage to their vehicle, totaling $6,226 in damages.

246. At all times relevant to this action, the USA owed a duty of due care to the Plaintiffs, and it violated that duty in the manner alleged below.

247. The foregoing and below-described acts of the NPS and its employees proximately caused damages to Plaintiffs, entitling Plaintiffs to recover damages as sought herein from the USA. Specifically, each of the Plaintiffs' injuries – to their bodies, homes

49

and real and personal properties – were directly and proximately caused by the Defendant and its employees' negligent failure to monitor, contain, and/or suppress The Chimney Tops 2 Fire, as more fully described below.

248. **Defendant.** Defendant is the United States of America. At all relevant times herein, the negligent actions and/or inactions giving rise to the Plaintiffs' claims were undertaken by persons and/or entities – inclusive any and all persons employed by the National Park Service ("NPS"), a component of the Department of Interior ("DOI"), at the Great Smoky Mountains National Park (the "Park") – who were also "employees of the [U.S.] government," as the term is defined by 28 U.S.C. §2671.

249. The NPS is a component of the DOI and an agency of the USA. The NPS owns, manages, controls, operates and/or maintains the 417 parks of the National Park System, including the GSMNP. At all times referred to herein, the USA, its agencies, employees and agents, whether named or unnamed herein, were acting under color of federal law, statutes, ordinances, regulations, policies, customs, practices and usages of the USA, pursuant to their authority thereunder. Specifically, at all times relevant to this lawsuit, fire managers, identified herein, were performing services for the NPS, and, therefore, were governmental employees acting in the course and scope of their employment, for whose actions or omissions the USA is liable.

250. The United States of America can be served with process via the Attorney General, William Barr, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001, or via J. Douglas Overbey, United States Attorney, Eastern District of Tennessee, U.S. Attorney's Office, 800 Market Street, Suite 211, Knoxville, Tennessee 37902, both of whom are agents authorized to accept service of process for the

United States.

## IV. PARK OFFICIALS, FIRE MANAGERS AND LOCAL OFFICIALS

251. ***Park Superintendent Cassius Cash.*** Cash was the GSMNP's managing officer, responsible to the Regional Director for the safe and efficient implementation of fire management activities within their unit, including cooperative activities with other agencies and landowners in accordance with delegations of authorities. [Fire Management Plan, at p. 38; *see Reed*, Doc. 1, # 7 (Exh. 5 - Fire Management Plan), incorporated herein by reference as Exhibit 4; NPS Report, at p. 8]. On information and belief, Cash was one of many Park employees scheduled to be off work from November 23 to 27, 2016, spending the Thanksgiving holiday with his family. Deputy Superintendent Clayton F. Jordan essentially served as "Acting" Park Superintendent during that period of The Chimney Tops 2 Fire crisis. Superintendent Cash returned to work on Monday, November 28, 2016, as The Chimney Tops 2 Fire continued to increase in size.

252. ***Deputy Superintendent Clayton F. Jordan.*** As Deputy Superintendent, Jordan was responsible for the day-to-day operations of the GSMNP, including Visitor and Resource Protection, Natural and Cultural Resource Management and Science, Facility Management, Planning and Professional Services, Resource Education, Concessions, Safety and Environmental Management and Administration of the Nations most visited National Park. In Superintendent Cash's absence, Jordan served as "Acting" Park Superintendent, taking such responsibilities as consenting to Salansky's decision to set up a 410-acre containment box instead of attacking the fire directly with an aggressive suppression effort.

253. ***Chief, Resource and Visitor Protection (Chief Ranger) Steve Kloster.*** As Chief Kloster, Kloster was responsible for overseeing 75 employees in the

51

Resource and Visitor Protection Division, who perform law enforcement duties, emergency medical services, search and rescue operations, campground fee collection, dispatching, and back-country operations. Among other responsibilities, the Chief Ranger was responsible for coordinating with the FMO for initial response to wildfires; coordinating wildland fire-related issues with the Chief of Resource Management and Science; and coordinating public safety efforts (evacuations, traffic control, etc.) on behalf of the Incident Commander ("IC") during wildfire and prescribed fire incidents. [FMP, at p. 38]. Along with Jeff Troutman, Chief of Resource Management and Science, Kloster was also a member of the Fire Management Committee.

254. ***Chief, Resource Management and Science Jeff Troutman***. As Chief of Resource Management and Science, Troutman was responsible for directing the staff functions of "fire management through the FMO" and "briefs the Superintendent, Assistant Superintendent, and Chief Ranger on current fire management activity." [FMP, at p. 38].

255. ***Fire Management Officer, Incident Commander, and Duty Officer Greg Salansky***. As Fire Management Officer ("FMO"), Salansky was responsible for oversight of the Park's fire program. As IC, Salansky was also responsible for the overall management of The Chimney Tops 2 Fire, reporting to Park Superintendent Cash. Also serving as Duty Officer ("DO"), Salansky provided operational oversight for monitoring unit incident activities and ensuring compliance with NPS safety policies; coordinating and setting priorities for unit-suppression actions and resource allocation; informs the Park Superintendent, suppression resources and Information Officers of the current and expected situation; plans and implements actions for required future needs; and documents all decision and actions.

52

256. **_Park Fire Management Committee._** The purpose of the Fire Management Committee ("FMC") is to provide consistent and coordinated management of wildfires and prescribed fires." [FMP, at p. 39]. The FMC consisted of the Chief of Resource Management and Science (Troutman), who was responsible for chairing the FMC; the Chief of Resource and Visitor Protection (Kloster); and the FMO (Salansky). [FMP, at p. 39]. Among other things, the FMC is responsible for reviewing all decision-support documentation for ongoing wildfires for adherence to fire-policy and goals stated in land and resource management plans; and recommending Wildfire Document Support System ("WFDSS") for superintendents approval and daily validation. [FMP, at p. 39]. The FMC is required to review WFDSS documents for recommendation to the Park Superintendent for approval. [FMP, at p. 47].

257. **_Gatlinburg City Manager (Cindy Ogle)._** Cindy Cameron Ogle has served as Gatlinburg's City Manager since 1989, the longest tenure in the history of the City. In her role as City Manager, Ogle oversees the day to day operations and ensures that the policies and programs approved by the Gatlinburg City Commission are implemented in an efficient and effective manner. Ogle is also responsible for the management of over 350 employees and a budget of close to $60 million. During The Chimney Tops 2 Fire, Ogle met with Park fire managers and Gatlinburg Fire and Police Department officials about the fire.

258. **_Gatlinburg Fire Chief Gregory A. Miller._** Chief Miller heads a department with a Class 2 fire protection rating.[20] Chief Miller led the Gatlinburg Fire Department ("GFD") through the fire after first being notified about it late in the morning on Monday, November 28, 2016. In the late morning hours on Monday, November 28, 2016, Chief Miller met with Park fire managers and Gatlinburg Police Department officials

about the fire.

259. ***Gatlinburg Police Chief Randy Brackins.*** Chief Brackins leads a department with a staff of 45 officers and 10 support personnel. His department led the evacuation efforts on Monday, November 28, 2016. In the late morning hours on that day, Chief Brackins met with Park fire-managers and GFD's officials about the fire.

260. ***Pigeon Forge Fire Chief Tony Watson.*** Chief Watson leads a department with 37 full-time career and 12 volunteer firefighters. The department serves a 15-square mile city district with an ISO classification of 3 and a 22 square mile county district with an ISO classification of 9.

## V.  INAPPLICABILITY OF THE DISCRETIONARY FUNCTION EXCEPTION

261. The USA is not shielded from liability from Plaintiffs' claims under the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), as (a) the acts or omissions of NPS employees, which were the actual and proximate cause of Plaintiffs' injuries, were in direct violation of mandated fire-management requirements and policies, and (b) the acts or omissions of NPS employees challenged by Plaintiffs involve safety considerations under established fire management policies, rather than the balancing of competing public policy considerations.

---

[20]According to information from Insurance Service Office, of the 48,825 fire departments across the country, less than 920 obtain a rating of Class 2 rating.

54

## A. Acts or Omissions Deviating From NPS or GSMNP Fire Management Policies.

262. Plaintiffs' allegations challenge conduct apart from the GSMNP's policy decisions. Neglect, ignoring requirements, policies and procedures, failing to implement corrective measures or modifications under those requirements, policies or procedures, and the failure to have in place the necessary requirements, policies, and procedures *are not* discretionary decisions involving the permissible exercise of policy judgment and consideration of public policy.

263. While the design of a course of governmental action is shielded by the discretionary function exception, the *implementation* and application of that course of action is not. For instance, matters of scientific and professional judgment – particularly *judgments concerning safety* – are rarely considered to be susceptible to social, economic or political policy.

264. The judgments made by NPS officials within the FMP, Director's Order # 18 ("DO #18"),[21] the Interagency Standards for Fire and Fire Aviation Operations (the "Redbook"),[22] Fire Monitoring Handbook ("FMH"),[23] and other written and unwritten NPS

---

[21][*See Reed*, Doc. 2, # 1 (Exh. 6 - Director's Order # 18), incorporated herein by reference as Exhibit 5].

[22][*See Reed*, Doc. 2, # 2 (Exh. 7 - Redbook), incorporated herein by reference as Exhibit 6].

[23][*See Reed*, Doc. 2, # 3 (Exh. 8 - Fire Monitoring Handbook), incorporated herein by reference as Exhibit 7].

or GSMNP fire-management policies themselves may reflect public policy decisions for which the USA would be entitled to freedom from judicial review. However, the failure of NPS employees, *i.e.*, Park employees, to adequately perform responsibilities outlined in and directed by the FMP, DO #18, Redbook, FMH, and other NPS or GSMNP fire-management policies and to adhere to such requirements, policies or procedures, followed by significant deviations from them receives no such deference.

265. In this case, following or acting pursuant to such requirements, policies and procedures was not a matter of discretion by NPS employees, as the issues raised by Plaintiffs' claims are not solely questions of social wisdom, but also of negligence; and not questions of political or economic practicability, but of due care.

266. A failure to effectuate established policy choices is not protected under the discretionary function exception. While fire-management decisions, in the general sense, are obviously grounded on considerations of public policy, the on-the-ground decisions made by fire-managers are akin to matters of scientific and professional judgment, not decisions involving "social, economic, and political policy." Here, Plaintiffs do not challenge the overall propriety of the management of The Chimney Tops 2 Fire; rather, they primarily maintain that the fire-strategy was grossly misapplied and negligently implemented. Thus, Plaintiffs' theory does not implicate the type of "policy" judgments the discretionary function exception was designed to protect.

238. While Salansky's decisions to treat the fire as a prescribed burn and allow the fire to burn via an indirect-attack may have been a policy-based discretionary decision, his subsequent decisions, *e.g.*, to require neither a 24-hour watch nor overnight monitoring, to require neither the recall of off-duty personnel nor the assignment of roles, tasks, and

56

duties to qualified personnel (*e.g.*, Incident Commander, Duty Officer, Safety Officer), etc., are among the acts or omissions that subject the USA to suit under the FTCA, as that course of conduct did not involve any permissible exercise of policy judgment. For instance, having exercised discretion to use a "containment box," the USA was accountable for its employees' negligence in failing to properly monitor the fire and for implementing the "containment box" in a careless and negligent manner.

## B. Neglect of Safety Policies and Directives

239. When the conduct of an agency, such as the NPS, is challenged, and the challenged conduct – to the extent it even arises from an identifiable decision – involves neglect or an agency's adherence to safety recommendations, the discretionary function exception does not shield the agency from suit. Here, Park officials' decisions were influenced mainly by factors unique to the situation, rather than broad policy concerns.

240. Here, when FMO Salansky decided that he alone could fill all critical decision-making duties, roles and functions of fire-command incident management, then decided to repeatedly forego overnight monitoring of an expanding wildfire while confronted by extreme drought conditions and NWS forecasts of high winds and increasing risks, and then failed to notify or warn local officials, Park neighbors, local residents or visitors of an imminent threat to their safety, those decisions are based on fire-behavior, weather conditions, the experience of other firefighters, the time constraints on the FMO, and other similar factors – all of which have little to do with "policy." Even if a fire manager's decision is a choice to be exercised within established objective safety standards, because Plaintiffs maintain the fire managers were negligent in their failure to follow such standards, the discretionary function exception does not apply.

57

241. Park officials' inexplicable failure to identify and warn local governments, Park neighbors, local residents and/or visitors of the dangers posed by The Chimney Tops 2 Fire was a departure from the clear safety considerations established in NPS and Park fire-management and monitoring policies, not merely a matter of "mistaken judgment" in a matter clearly involving choices among political, economic and social factors.

## VI.  FACTUAL BACKGROUND

### A.  The Great Smoky Mountains National Park

242. The Great Smoky Mountains are part of the Blue Ridge Mountains, a division of the larger Appalachian Mountain chain. The Park was chartered by Congress in 1934 and officially dedicated by President Franklin Roosevelt in 1940.[24]

243. The GSMNP covers 522,427 acres, divided almost evenly between the states of North Carolina and Tennessee.[25] The Park is almost ninety-five percent (95%) forested.[26] It is also the most visited National Park in the United States, with over 11.3 million recreational visitors in 2016,[27] nearly twice as many tourists as the second most visited National Park in the country (Grand Canyon National Park).[28]

---

[24]https://www.nps.gov/grsm/learn/historyculture/stories.htm

[25]https://www.nps.gov/grsm/learn/management/statistics.htm

[26]Mary Byrd Davis, *"Old Growth in the East: A Survey. North Carolina"* (Jan. 23, 2008).

[27]https://www.nps.gov/grsm/learn/management/statistics.htm

[28]*"NPS Annual Recreation Visits Report,"* NPS (retrieved February 8, 2017).

244. Elevations in the Park range from approximately 875-feet at the mouth of Abrams Creek to 6,643-feet at Clingmans Dome. Sixteen mountain peaks exceed 6,000-feet in elevation. 342 structures are maintained in the Park, which employs about 240 permanent employees and more than 80 seasonal employees, and volunteers.[29]

245. On its route from Maine to Georgia, the Appalachian Trail passes through the center of the Park. The main Park entrances are located along U.S. Highway 441 (Newfound Gap Road) at Gatlinburg, in East Tennessee, and Cherokee, North Carolina. Thru-hikers travel through the Park en route to complete the Appalachian Trail. The Appalachian Trail includes overnight shelters within the Park. The GSMNP was the first National Park whose land and other costs were paid for, in part, with federal funds.[30]

## B. Surrounding Areas

246. ***Sevier County.*** Sevier County consists of 598 square miles and has a population of approximately 95,946. The southern part of the county is located within the Great Smoky Mountains, and is protected by the GSMNP. The county has grown into a major tourist destination since the establishment of the GSMNP, which dominates the county's southern portion. The tourism industry drives the county's economy.

247. The Great Smoky Mountains Parkway connects Interstate 40 (Exit 407) to the Park via the cities of Sevierville, Pigeon Forge, and Gatlinburg. From the exit, the Parkway follows Tennessee State Route 66 ("Winfield Dunn Parkway") into Sevierville, where it becomes U.S. Route 441/Tennessee State Route 71 as TN-66 terminates at a four-way

---

[29]https://www.nps.gov/grsm/learn/management/statistics.htm

[30]http://www.pbs.org/nationalparks/parks/great-smoky-mountains/2/

59

intersection where US-441 splits from U.S. Route 411 and changes direction. It continues along US-441 through Pigeon Forge and Gatlinburg, before entering the Park, where it ascends to the crest of the Smokies at Newfound Gap. The Parkway is joined by U.S. Route 321 in Pigeon Forge and they run concurrently until US-321 splits away in downtown Gatlinburg. Along this stretch of highways, a nearly continuous tourist sprawl (separated only by a spur route of the Foothills Parkway, known as "the spur") has emerged in the three communities.

248. *Gatlinburg.* Gatlinburg is a mountain resort city in Sevier County. It is thirty-nine (39) miles southeast of Knoxville. Its population is 4,206, according to the latest Census estimate. It rests on the border of the GSMNP along U.S. Route 441, which connects it to Cherokee, North Carolina, through the Park. The city is hemmed-in on all sides by high ridges, with Le Conte and Sugarland Mountain rising to the south, Cove Mountain to the west, Big Ridge to the northeast, and Grapeyard Ridge to the east.

249. U.S. Route 441 is the main traffic artery in Gatlinburg, running through the center of town from north to south. Along 441, Pigeon Forge is approximately six miles to the north, and the Park (viz, the Sugarlands) is approximately two miles to the south. TN-73 (Little River Road) forks off from 441 in the Sugarlands and heads west for roughly twenty-five (25) miles, connecting the Gatlinburg area with Townsend and Blount County. U.S. Route 321 enters Gatlinburg from Pigeon Forge and Wears Valley to the north before turning east, connecting Gatlinburg with Newport and Cosby.

250. *Pigeon Forge.* Pigeon Forge is a mountain resort city in Sevier County visited by more than ten million people each year. As of 2016, the city had a total population of *6,199* and covers an area of 11.58 square miles. Situated just five miles north

60

of the GSMNP, the city's attractions include Dollywood, as well as numerous gift shops, outlet malls, amusement rides, and music theaters.

### C. Eighty Years of Built-Up Fuels and Record Drought Levels Made the Risk of Wildland Fire in the GSMNP Significant in November 2016.

251. ***Fuels three-feet deep.*** For centuries, wildfires played a crucial role in the natural life cycle of the Great Smoky Mountains. Studies of the southern and central Appalachian Mountains show that widespread fires burned about once every seven years from the mid-1700s until the early- to mid-1900s, when a policy of widespread fire-suppression was introduced and human-ignited fires were greatly reduced. The last indication of a major forest fire was 1934. That fire, sparked the same year the GSMNP was established, charred at least 10,000 acres. That was one of the last times a natural fire of that magnitude burned in the Smoky Mountains.

252. As fewer wildfires were allowed to burn in the nation's National Parks, fuel continued to build up on the forest floor. The National Park System finally began conducting controlled burns in the 1990s – but it was too little, too late. "We now have, after the last fire, ***80 years of fuels*** built up," said Dr. Henri Grissino-Mayor, a Professor of Geography at the University of Tennessee Knoxville. "And that means when fires return, it will be much more intense. We call that the Smokey Bear effect," said Grissino-Mayor. That is why Grissino-Mayor, a specialist on the behavior and history of forest fires and their effects on communities,[31] began warning GSMNP officials ***as early as 2001*** that the Park

---

[31]In 1994, as a University of Arizona graduate student, Grissino-Mayor warned of a major fire threat to Summerhaven, Ariz., which was devastated by a wildfire nine years later.

had become a half-million-acre tinderbox, just waiting for an excuse to ignite. Grissino-Mayer presented his 2008 PowerPoint presentation, *"Will our Great Smoky Mountains One Day Go Up in Smoke?"* to civic groups and also warned of the dangers in published, peer-reviewed science journals. Park officials ignored these science-based warnings.

253. And so, until November 2016, "There ha[d] been no major fires since 1934," said Grissino-Mayor, stating further, "We have much higher tree densities. We have shrubs choking the understory – grasses, twigs, needles, leaves, logs, branches, everything on the forest floor. That's all fuel, and it's accumulated for 80 years now." Thus, by November 2016, duff – woodland debris that piles up over the seasons on the forest floor – lay *3 feet deep* in places.

254. ***Severe drought conditions***. By November 2016, it had been four months since any considerable rain had fallen across the GSMNP, with rainfall deficits approaching a foot in some parts of the Park. An exceptional drought was starving the forest of moisture. "We could see we were in severe drought conditions," says Grissino-Mayor.

255. The 2016 fire season, fed by the long drought, was historic in the South. Extreme drought conditions existed in East Tennessee for most of October and November 2016. The summer of 2016 had proved one of the driest on record, leading to a busy fire season through Fall. Unusual drought conditions were prevalent across the Southeast.[32] Clearly, the risk of wildland fire in East Tennessee was known and significant due to the deepening drought that had been expanding across the state since the summer.[33]

---

[32][NPS Report, at p. 2].

[33][NPS Report, at p. 43].

256. The scope of the drought was also measurable. The Keetch-Byram Drought Index ("KBDI") is an index designed in 1968 specifically for fire-potential assessment. "It is a number representing the net effect of evapotranspiration and precipitation in producing cumulative moisture deficiency in deep duff and upper soil layers. It is a continuous index, relating to the flammability of organic material in the ground." By November 2016, the KBDI in the GSMNP was 599.[34]

257. For reference, a KBDI of 600 or more indicates severe drought and increased wildfire potential. Intense, deep-burning fires with significant downwind spotting are expected to occur. Live fuels (growing plants, trees, and other vegetation) should also be expected to burn actively at this drought level.[35] A fire burning under those conditions would likely ***burn more intensely, have a rate-of-spread faster than normal, and have more resistance to control.*** Under such conditions, experienced fire managers have stated they would immediately attack emerging fires aggressively with overwhelming force, *i.e.*, they would deploy many firefighters on the ground to dig fire-lines to burn ground fuels and order numerous aircraft to drop water/fire-retardant chemicals.[36]

258. According to the GSMNP's own Fire Management Plan ("FMP"), "[t]hough fires will readily spread in fine fuels at virtually every KBDI value, the persistence and severity of fire on the landscape are strongly related to the drought index  a broad

---

[34]U.S. Forest Service Wildland Fire Assessment System [https://www.wfas.net/index.php/keetch-byram-index-moisture--drought-49.

[35][ABS Report, at p. 19].

[36]http://wildfiretoday.com/2016/12/05/analyzing-the-fire-that-burned-into-gatlinburg/

annual maximum (250-450) occurs between August and **November**. During an average year, fall fires can thus be **more resistant to control**" (emphasis added).[37] The KBDI in November 2016 was well-above this (599), making fall fires even more resistant to control.

259. By November 2016, wildfires across the Southeast threatened to set a new record, and were already the most on-record in fifteen years. Some fires were still burning. The severe drought had made even small fires in remote spots risky. On November 1, 2016, the GSMNP banned all back-country fires. Two weeks later, the Park banned all fires.[38]

260. In fact, based on the fuels and fire-behavior advisories, as well as other activity in the area, two weeks earlier, the Regional Fire Management Officer for the Southeastern United States had warned Greg Salansky ("Salansky") – the Appalachian-Piedmont Zone Fire Management Officer ("Zone FMO") and GSMNP FMO – that "the big one" could be just around the corner. As it turns out, Salansky – who had only been on the job for eight months – did not share his supervisor's perception of the risk.[39] But he was directed to "start thinking about scenarios.[40]

261. In addition to eighty-years' worth of ground fuels and severe drought conditions, by November 23, 2016, the GSMNP had a shortage of fire-personnel due to the Thanksgiving holiday, as:

> "most of the fire staff was on leave. Other than a Type 6 engine
> and two firefighters brought in with severity funding, [GSMNP

---

[37][FMP, at ¶ 3.1.5, at p. 16].

[38]NPS Bulletin/Press Release: *"Park Issues Ban on All Campfires and Open Grills"* (Nov. 15, 2016).

[39][NPS Report, at p. 48].

[40][NPS Report, at p. 105].

FMO Salansky] had not staffed extra resources to cover leave requests and no leave requests had been cancelled, even with the [P]ark in severity status. National parks can use wildland fire suppression funds (severity) for additional staffing based on elevated fire danger and weather forecasts identified in Step-Up Plans."[41]

**D.**     <u>**DAY ONE**</u> **– Wednesday, November 23, 2016 – a Small Wildfire (Less Than an Acre) Is Discovered Near the Peak of Chimney Tops – About 5.5 Miles From Gatlinburg.**

262. At about 5:20 p.m., as darkness approached on Wednesday, November 23, 2016, GSMNP FMO Salansky and firefighter April Deming were reportedly responding to a call about a car fire on Newfound Gap Road[42] when Salansky spotted a column of smoke rising from a nearby peak to the north. After determining the car-fire had been extinguished, the two Park employees set out on foot to investigate the smoke. What they discovered was a vegetation fire near the top of the north spire of The Chimney Tops, a steep 4,800-foot hill located about 5.5 miles from Gatlinburg.[43] Because a fire in the same

---

[41][NPS Report, at p. 9].

[42]Although the NPS Report makes reference to a call about a car fire at about 5:00 p.m. on Wednesday, November 23, 2016 [NPS Report, at p. 8], Gatlinburg city records obtained do not reveal that a call was made to Salansky or Deming from dispatch concerning a so-called car fire (Gatlinburg handled all non-wildland fire-related calls under a mutual-aid agreement). According to the NPS Report, a law enforcement officer and the Gatlinburg Fire Department were also dispatched. [NPS Report, p. 8].

[43][ABS Report, at p. 19].

area a week earlier had been designated, "The Chimney Tops 1 Fire,"[44] the new fire was designated "The Chimney Tops 2 Fire."[45]

263.    Salansky and Deming hiked about two miles up The Chimney Tops Trail to reconnoiter the fire.  When they got close, they recognized the fire was in a very steep area which had not officially been open since August 1994 (after a 16-year-old boy fell more than 350 feet to his death).  Deming stayed back, deciding it was unsafe to continue.[46] Salansky continued ahead and worked his way along a portion of the fire-edge, where he found very dense vegetation and steep, rocky terrain made travel difficult.[47]

264.    Salansky later said he "looked for ways to try to contain the fire," as it burned deep under thick duff,[48] using a small hand-tool to try to brush away enough leaves and duff to start a fire-line, but relented after his efforts made little to no impact.[49]   He later

---

[44]Crews had quickly dug a containment line and reported the first fire out just three days after it was discovered, with barely a quarter-acre burned.

[45]http://wildfiretoday.com/tag/tennessee/

[46][NPS Report, at p. 8].

[47]http://wildfiretoday.com/tag/tennessee/

[48][NPS Report, at p. 9].

[49]A fire line – usually 3 feet wide – is a break in fuels created by removing all vegetation up to an existing barrier, such as bare mineral soil; a natural feature (such as a rock outcrop, creek, or other body of water); or a constructed surface (such as a road or driveway). Fire-lines are started at an anchor point, usually the coldest part of the fire. The anchor point ensures a safe barrier between the fire and any unburned vegetation that could ignite and trap firefighters. The width of a fire line depends on topography, types of fuels, and weather – all factors that determine fire behavior. After a fire line has been established, firefighters must ensure it will keep the fire from spreading. When it's windy, wildfires can jump fire lines, requiring firefighters to move to another location and start building a fire line again.
[http://idahofirewise.org/fire-ecology-and-management/fire-management-strategies-and-tactics/].

explained his actions to a private tour group. He had said to himself:

> "[w]ell, maybe I can go in on the north side. So I walked that ridge and the smoke laid over about chest high. I'd get in about 20 feet and the wind would let up and the smoke would come up. There was a drop off on both sides. I did that a couple of times before I figured out I shouldn't even be here. What am I doing here? So I thought I'm done, there's nothing I can do with it. It's dark. It's not safe."[50]

**265.** Salansky turned back and met up with Deming, telling her, ***"It can wait. We'll come back in the morning."*** The two firefighters hiked back down, with Salansky thinking to himself, "We've got a squad coming in the next day, Thanksgiving, welcome to Thanksgiving Day."[51]

266. Before leaving, they closed The Chimney Tops Trail to protect the public.[52] The fire was estimated to be less than one acre in size.[53]

### 1. Organizational Roles and Responsibilities

267. The organizational roles and responsibilities of wildland fire in the GSMNP's FMP are atypical.[54] In November 2016, the Park's Chief of Resource Management and Science (Jeff Troutman) supervised the FMO (Salansky). However, the duties of wildland fire response fell under the auspices of the Chief of Resource and Visitor Protection (Steve Kloster). Thus, there was dual supervision of fire-management activities. This, according

---

[50]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfirethat-burned-into-gatlinburg/

[51]http://wildfiretoday.com/tag/tennessee/

[52][NPS Report, at p. 2].

[53][NPS Report, at p. 9].

[54][NPS Report, at p. 26].

to the NPS Review Team, resulted in a lack of clarity in certain situations, including extended fire events.[55]

268. As FMO Salansky's direct supervisor, Troutman was responsible for directing staff functions of fire-management through Salansky.[56]

269. The Chief of Resource and Visitor Protection (Kloster) was responsible for coordinating the initial attack to wildland fires with the FMO and for ensuring that Park staff are prepared and qualified to perform wildland fire duties.[57]

### 2. NPS Fire Management Policies

*"Firefighter and public safety is the first priority. All Fire Management Plans and activities must reflect this commitment."*[58]

270. The NPS and the National Park System – including the GSMNP – have several sources of detailed written guidance to assist fire managers in making day-to-day decisions. The primary source of guidance is the 2006 edition of Management Policies ("NPS Management Policies"),[59] which is also the foremost element of the NPS's directives system. Other elements include Director's Orders, Handbooks and Reference Manuals.[60]

---

[55][NPS Report, at p. 26].

[56][NPS Report, at p. 26].

[57][NPS Report, at p. 26].

[58][DO #18, at ¶ 5.1].

[59][*See Reed*, Doc. 3, # 1 (Exh. 9 - NPS Management Policies, pp. 1-100), incorporated herein by reference as Exhibit 8); *Reed*, Doc. 4, # 1 (Exh. 9 - NPS Management Policies, pp. 101-end), incorporated herein by reference as Exhibit 8 (continued)].

[60]https://www.nps.gov/applications/npspolicy/DOrders.cfm

273. DO #18 lists and explains the basic principles and strategic guidelines governing the management of wildland fire by the NPS.[65] DO #18 provides that part of the mission of the NPS is to manage:

> wildland fire to protect the public; park communities and infrastructure; conserve natural and cultural resources; and maintain and restore natural ecosystems and processes . . . . ***The highest priority under all circumstances is firefighter and public safety. All plans, project implementation, and responses to wildland fire must demonstrate this commitment.***[66]

274. DO #18 defines "[a]ll fires burning in natural or landscaped vegetation" as "wildland fires."[67] DO #18 further provides:

> All wildland fires will be effectively managed through application of the appropriate strategic and tactical management options. These options will be selected after comprehensive consideration of firefighter and public safety, the resource values to be protected and costs.[68]

### 3. Complexity Analysis and Fire-Command Structure

275. Wildfires are typed by complexity, from Type 5 (the least complex) to Type 1 (the most complex). The Incident Command System ("ICS") is an organizational management structure developed in a modular fashion based on the complexity of the incident.[69] The 2016 Interagency Standards for Fire and Aviation Operations, referred to

---

[65]https://www.nps.gov/fire/wildland-fire/about/policy/order-18.cfm

[66]DO #18, at ¶ 1.1 (Effective Date: Jan. 16, 2008)(emphasis added). Director's Order #18 was issued pursuant to 16 U.S.C. §§ 1-4 and Delegations of Authority in Part 245 of the Departmental Manual.

[67][DO #18, at ¶ 3].

[68][DO #18, at ¶ 3].

[69][Redbook, Ch. 11, at p. 229].

70

by wildfire management professionals as the "Redbook" (due to its red cover) (hereinafter,

"Redbook")[70] mandates that "[a]ll wildfires, regardless of complexity, will have an Incident

Commander ("IC"). The IC is a single individual responsible to the Agency Administrator(s)

for all 23 incident activities."[71]

---

[70]The Redbook provides fire and fire aviation program management direction for Bureau of Land Management, U.S. Forest Service, U.S. Fish and Wildlife Service, National Park Service, and Bureau of Indian Affairs managers. It states, references, or supplements policy and provides program direction for the NPS and other agencies.

[71][Redbook, at p. 230]. The IC is responsible for, among other duties:

■ Obtaining a Delegation of Authority and/or expectations to manage the incident from the Agency Administrator. For Type 3, 4, or 5 incidents, delegations/expectations may be written or oral;

■ Ensuring that safety receives priority consideration in all incident activities, and that the safety and welfare of all incident personnel and the public is maintained;

■ Assessing the incident situation, both immediate and potential;

■ Maintaining command and control of the incident management organization;

■ Ensuring transfer of command is communicated to host unit dispatch and to all incident personnel;

■ Assisting with WFDSS documentation and support in the coordination with the local office(s), if requested by the delegating agency administrator(s);

■ Developing incident objectives, strategies, and tactics consistent with the Delegation of Authority and latest published WFDSS decision(s);

■ Developing the organizational structure necessary to manage the incident;

71

276. For purposes of the initial attack, the first IC on scene qualified at any level will assume the duties of initial attack IC. The IC will have responsibility for all suppression efforts on the incident up to his/her level of qualification until relieved by an IC qualified at a level commensurate with incident complexity. As an incident escalates and de-escalates, a continuing reassessment of complexity should be completed to validate the current command organization or identify the need for a different level of incident management.[72]

277. Here, Salansky immediately assumed the role of IC when The Chimney Tops 2 Fire was discovered on Wednesday, November 23, 2016.[73]

278.

---

- Approving and implementing the Incident Action Plan, as needed;

- Ordering, deploying, and releasing resources;

- Ensuring incident financial accountability and expenditures meet agency policy and standards; and

- Ensuring incident documentation is complete.

[Redbook, at pp. 230-31].

[72]An IC is expected to establish the appropriate organizational structure for each incident and manage the incident based on his/her qualifications, incident complexity, and span of control. If the incident complexity exceeds the qualifications of the current IC, the IC must continue to manage the incident within his/her capability and span of control until replaced. [Redbook, at p. 231].

[73][NPS Report, at p. 2].

279. On November 25, 2016, Salansky completed a Wildland Fire Risk and Complexity Analysis ("Complexity Analysis")[74] utilized for Type 5, 4 and 3 incidents[75] and

---

[74][NPS Report, at p. 30].

[75]The Type 5 incident is the lowest level of complexity formally recognized in the Incident Command System (ICS); the Type 1 incident is the most complex. In a Type 4 Incident:

> a) Command staff and general staff functions are not activated.
>
> b) Resources are local and vary from a single module to several resources.
>
> c) The incident is usually limited to one operational period in the control phase.
>
> d) No written incident action plan (IAP) is required.

In a Type 3 Incident:

> a) Resources are usually local and some or all of the command and general staff positions may be activated, usually at the division/group supervisor and/or unit leader level. Units may have a predetermined Type 3 organization designated.
>
> b) Type 3 organizations manage initial attack fires with a significant number of resources, an extended attack fire until containment/control is achieved, or an escaped fire until a Type 1 or 2 team assumes command.
>
> c) Initial briefing and closeout are more formal.
>
> d) Resources vary from several resources to several task forces/strike teams.
>
> e) The incident may be divided into divisions.
>
> f) The incident may involve multiple operational periods prior to control, which may require a written Incident Action Plan (IAP).
>
> g) A documented operational briefing will be completed for all

73

280. The NPS Review Team concluded Salansky underrated the complexity elements of The Chimney Tops 2 Fire, stating it should have initially been classified as a Type 3 fire, not a Type 4 fire.[78] The NPS Report attributed Salansky's error to "the lack of awareness regarding actual conditions on the ground." Significantly, Park senior leadership – Cash (Park Superintendent(, Jordan (Deputy Superintendent), Troutman (Salansky's direct supervisor), and Kloster (Chief Ranger) – appears not to have participated at all in this complexity analysis process, either deferring to Salansky or having had no knowledge of the process.[79]

281. Salansky was the Zone FMO, simultaneously responsible for nineteen (19) other National Parks.[80] As Zone FMO, Salansky was also the GSMNP's FMO,[81] required, among other things, to:

> ■ "Develop and maintain an open line of communication vh the public and cooperators,"[82]

---

by NPS fire policy, Salansky and Park fire managers converted The Chimney Tops 2 Fire from a Type 4 organization fire to a Type 3 organization fire using Park fire-staff. [NPS Report, at p, 30].

[78]Because the KBDI value in November 2016 was 599 and because even during an average year fall fires can be *more resistant to control* [FMP, at ¶ 3.1.5, at p. 16]. Salansky should have known that a wildfire at that place and time and under those conditions would be more unpredictable.

[79][NPS Report, at p. 30].

[80][NPS Report, at p. 53].

[81][NPS Report, at p. 30].

[82][Redbook, at p. 80].

- "Monitor fire season severity predictions, fire behavior, and fire activity levels. Take actions to ensure safe, efficient, and effective operations,"[83] and

- "Ensure all fire management actions and activities are consistent with those contained in the current Fire Management Plan and associated environmental compliance documentation."[84]

282. On Wednesday, November 23, 2016, Salansky had assumed command and was functioning as the IC.[85] Under the FMP, the IC is responsible for performing a strategic fire size-up. The conditions and circumstance under which a fire occurs, the likely consequences to firefighter and public safety, natural and cultural resources, in addition to the values to be protected, dictate the IC's response and management strategy. The FMP requires the IC to relay the size-up and planned strategy and tactics to the FMO and Duty Officer ("DO"),[86] who must initiate the Wildland Fire Decision Support System ("WFDSS")

---

[83][Redbook, at p. 81].

[84][Redbook, at p. 82].

[85][NPS Report, at p. 2].

[86]The required duties for all DOs are to:

- Monitor unit incident activities for compliance with NPS safety policies,

- Coordinate and set priorities for unit suppression actions and resource allocation,

- Keep Agency Administrators, suppression resources and Information Officers informed of the current and expected situation,

- Plan for and implement actions required for future needs, and

- Document all decisions and actions.

documentation process and notify the Fire Management Committee ("FMC").[87] But Salansky was not only the IC, but he was also the FMO, as well as the DO.

283. DOs are critical to fire management. They provide operational oversight and perform any specific duties assigned by fire managers through the fire operating plan. DO coverage must be implemented during periods of anticipated prolonged increased fire danger, such as that existing in November 2016.

284. Fire management policy, however, as set out in the Redbook, prohibits an individual from holding the positions of IC and DO concurrently, since a DO may not hold any ICS position.[88] Nor can an IC hold concurrent management duties, such as functioning as a Park or Zone FMO.[89]

285. As Park FMO, Salansky was responsible for determining the need for and assigning the DO. Perhaps, because there was a shortage of fire-staff (due, in part, to Salansky's failure to recall vacationing Park fire personnel, as well as his failure to seek more personnel via severity funds), Salansky also assumed the position of DO, his fourth command role.

---

[Redbook, at p. 86].

[87][FMP, 4.1.2, at p. 45].

[88][FMP, Table 6, at p. 40; NPS Report, at p. 31].

[89][NPS Report, at p. 36].

286. Nor was there discussion or analysis of safety risks, likely because no Safety Officer was either requested or assigned by Salansky,[90] meaning that along with his position as Zone FMO, Park FMPO, IC, and DO, Salansky also appears to have assumed the role of Safety Officer.

### 4. Salansky Improperly Functioned in Five Critical Roles During The Chimney Tops 2 Fire: Zone FMO, GSMNP FMO, IC, DO and Safety Officer.

287. Under settled NPS fire management policy, three people should have been running the fire management operation: the FMO overseeing the big picture; an overall IC; and an on-scene DO.

288. This policy ensured oversight of decisions and imagined three different individuals and sets of eyes to identify mistakes and check and balance their respective decisions. From the outset, the Park's senior leadership and fire-management leadership – including Salansky – completely disregarded the Park FMP's command-structure requirements. According to the NPS Review Team, Salansky "did not follow the direction of the fire management plan to staff with duty officers and additional support functions. The park's leadership did not ensure that the fire management plan was followed."[91]

289. This violation of command-structure requirements had serious consequences as The Chimney Tops 2 Fire continued to grow from a small smoldering fire under the duff to a 250-500 acre out-of-control wildfire late Sunday, November 27, 2016 into early Monday, November 28, 2016. Salansky was in-charge of managing The Chimney Tops 2

---

[90][Line Safety Officer, Redbook, at p. 233].

[91][NPS Report, at p. 31].

78

Case 3:20-cv-00149-JRG-CRW   Document 1   Filed 04/08/20   Page 88 of 185
PageID #: 88

Fire, and made practically every decision with little, if any, input from others, and no policy oversight, as he concurrently served in five distinct fire-command roles – Zone FMO, Park FMO, IC, DO, and, by default, Safety Officer – that should have been held by at least *four different individuals.*[92]

290. Salansky's assumption of all of these command-control roles was contrary to policies outlined in the Redbook.[93] Nevertheless, Salansky continued to function in each role for at least seven consecutive days – until at least Tuesday, November 29, 2016, when a Type 1 Incident Management Team ("IMT") assumed command. The Park's senior leadership – Superintendent Cash, the Park's managing officer; Deputy Superintendent Jordan, who was responsible for the day-to-day operations of the Park; Chief of Resource and Visitor Protection Kloster, who was responsible for coordinating with Salansky for initial response to wildfires and coordinating public safety efforts on behalf of the IC (Salansky) during wildfire incidents; and Chief of Resource Management and Science Jeff Troutman, who was responsible for directing staff functions of fire management through FMO Salansky; and the Fire Management Committee ("FMC"), responsible for reviewing all decision-support documentation for ongoing wildfires for adherence to fire policy – neither questioned nor opposed Salansky having all of those concurrent duties.[94]

291. As FMO, Salansky also failed at the preparedness level by not appropriately utilizing the Park's Step-Up Plan. This plan is best described as a wildland fire

---

[92]As Zone FMO responsible for 19 other parks, Salansky was also GSMNP FMO, by policy holding both positions concurrently.

[93][NPS Report, at pp. 9, 36, 53].

[94][NPS Report, at p. 53].

preparedness plan, which specifies when fire-danger increases. The Park identifies additional measures and staffing needs[95] that must be taken to provide appropriate response to wildland fires.[96] The NPS Review Team concluded that based on conditions existing when The Chimney Tops 2 Fire was discovered on November 23 through November 28, when it left the Park, management actions were not in place, support functions were not fully-initiated, and daily coordination of available resources with other agencies was not conducted with the Tennessee and North Carolina Divisions of Forestry, Cherokee Bureau of Indian Affairs (BIA),and Cherokee National Forest.[97]

292.    In the face of a dangerous conglomeration of conditions existing in November 2016 – eighty years of fuels built up on the Park-floor, a severe drought, weather conditions ripe for wildfires, *e.g.*, low humidity, and numerous wildfires already burning in the region – Salansky and Park officials simply failed to anticipate the seriousness of the small and smoldering fire high up on The Chimney Tops.

293.    This fundamental failure is evident by Park officials' lack of preparedness for a major wildfire. Park officials, including Salansky, failed to have adequate fire-staff and equipment on-hand to effectively engage The Chimney Tops 2 Fire. Information about conditions or awareness of other fire-activity around the Park did not appear to influence their decisions on either staffing or fire-strategy. For instance, prior to the discovery of The

---

[95]DO #18 also provides that the"superintendent of each park will integrate fire management with all other aspects of park management, and will make employees available for fire assignments during periods of high regional or national fire activity, while providing for NPS mission priorities." [DO #18, at ¶ 5.2].

[96][NPS Report, at p. 31].

[97][NPS Report, at pp. 31-33].

Chimney Tops 2 Fire, many Park fire-staff employees were granted "annual leave" (vacation) for the Thanksgiving Holiday weekend. Salansky and Park leadership did not believe an immediate need existed to recall staff.[98] Just as problematic, the Park had not submitted a "severity packet,"[99] despite persistent severe drought conditions, until November 4, 2016. And even then, the request did not identify the need for any additional resources or staffing a duty officer position.[100]

---

[98][NPS Report, at p. 53].

[99]Fire seasonal "severity funding" is defined in the Redbook as: "The authorized use of suppression operations funds (normally used exclusively for suppression operations and distinct from preparedness funds) for extraordinary preparedness activities that are required due to:

> ■ FMP [Fire Management Plan], FDOP [Fire Danger Operating Plan], or Annual Operating Plan criteria that indicate the need for additional preparedness/suppression resources. The plan(s) should identify thresholds for severity needs;
>
> ■ Anticipated fire activity that will exceed the capabilities of local resources;
>
> ■ Fire seasons that either start earlier or last longer than identified in the Fire Danger Operating Plan; or
>
> ■ An abnormal increase in fire potential or danger not planned for in existing preparedness plans.

[NPS Report, at p. 29].

[100][NPS Report, at p. 56].

81

**E.    DAY TWO – Thursday, November 24, 2016 – Salansky Fails to Order Aviation Support; Decides On An Indirect Attack; and Fails to Order Additional Resources.**

*"Aggressive initial attack provides the Incident Commander maximum flexibility in suppression operations."*[101]

### 1.    No Air-Attack Requested, Despite Availability

293.    For the first four days of The Chimney Tops 2 Fire, National Guard helicopters and air-tankers sat idle at a hangar in Chattanooga, available to drop water on wildfires in the region. However, Salansky concluded the fire was not large enough to warrant the expense. And while he was also concerned about potentially polluting the environment and the drinking water supply downstream, in the end, Salansky did not believe water-drops would work.[102]

### 2.    Salansky Decides On An Indirect-Attack Strategy

294.    At about 8:00 a.m. on Thursday, November 24, Salansky and four other NPS firefighters met and hiked up near the location of The Chimney Tops 1 Fire that had occurred a week earlier. There, a sign read, "[f]rom this area past it is closed," Salansky recalled, adding, "There's been one fatality and multiple injuries that cost like $20,000

---

[101][Redbook, at p. 9].

[102]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

82

apiece. So all the folks read that and they're like, 'It says it's closed and dangerous and you want us to go in and fight fire.'"[103]

295. Like Deming the day before, three of the firefighters refused to climb.[104] One, however, joined Salansky.[105] Salansky observed that The Chimney Tops 2 Fire had not grown much from the previous night. Winds were calm. The area had received an insignificant amount of rain overnight.[106] Salansky believed "building direct fire line in the boulders, cliffs and duff would be impossible" and he "began to assess options to contain the fire by identifying natural and human-made barriers."[107]

296. Salansky saw two options: fight the fire on the mountaintop or close the trail, wait, and hope the flames burned themselves out. "After reconsidering the fire location, size, and how to direct attack it," Salansky began planning "an indirect attack due to the inability to do a direct attack safely and effectively."[108]

297. Salansky opted to let the fire burn, using the West Prong of the Pigeon River, the Road Prong and Chimney Tops trails and an unnamed drainage and tributary to contain the fire. According to Deputy Superintendent Jordan, "That's where we made our defense."

---

[103]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[104]Under ¶ 6.1 of DO #18, "all employees have the right to turn down unsafe assignments."

[105][NPS Report, at p. 9].

[106][NPS Report, at p. 10].

[107][NPS Report, at p. 10].

[108][NPS Report, at p. 10].

83

Those natural features comprised about ninety percent (90%) of the boundaries, leaving the rest to be cobbled out manually by removing flammable vegetation and fallen logs.

298. By NPS policy, the Park Superintendent had to approve Salansky's plan to attack the fire indirectly. Because Superintendent Cash was on holiday leave, the responsibility fell to Deputy Superintendent Jordan, who appears to have consented to Salansky's plan.

### 3. Although Short-handed, Salansky Failed to Request Additional Firefighters.

299. The problem with Salansky's plan, however, was that he did not have sufficient personnel with which to consummate it. Constructing fire-lines where no drainages existed would surely require additional personnel, as Park officials said only five to ten of the Park's eighteen (18) firefighters were "on the scene" each day from Thursday, November 24, 2016 to Saturday, November 26, 2016. But inexplicably, Salansky failed to request more firefighters until Sunday, November 27, 2016.[109]

### 4. Salansky Failed to Recognize Overriding Suppression Priority: Protection of Human Life.

300. DO #18 states, in part, "the circumstances under which a fire occurs, and the likely consequences on firefighter and public safety and welfare, natural and cultural resources, and values to be protected, dictate the appropriate response to the fire."[110]

---

[109]Retired firefighters have observed that by Salansky's actions, he appears to have treated The Chimney Tops 2 Fire as a "prescribed burn" by allowing it to consume 410 acres before making any plans to directly attack it. But a "controlled burn" to rid an area of flammable duff and allow indigenous plants to flourish usually involves a year of planning and paperwork before it is approved.

[110][DO #18, at ¶ 5.1].

According to the Redbook:

> "The purpose of fire suppression is to put the fire out in a safe, effective, and efficient manner. Fires are easier and less expensive to suppress when they are small. When the management goal is full suppression, aggressive initial attack is the single most important method to ensure the safety of firefighters and the public and to limit suppression costs. Aggressive initial attack provides the Incident Commander maximum flexibility in suppression operations."[111]

301.   DO #18 mandates that the *protection of human life is the single, overriding suppression priority*. Setting priorities "to protect human communities and community infrastructure, other property and improvements, and natural and cultural resources will be done based on human health and safety, the values to be protected, and the costs of protection."[112]

**F.     DAY THREE – Friday, November 25, 2016 – With the Fire the Size of a Football Field, Salansky Devises a 410–Acre "Containment Box" as No Air Attack, Water Drops, or Fire Lines Were Ordered.**

**1.     Still No Request for Available Aviation Resources**

302.   Just after noon on the fire's third day, Friday, November 25, 2016, Chief Ranger Kloster texted Deputy Superintendent Jordan: "The fire is approximately two acres on the northeast side of the second summit. The fire is smoldering and creeping around. The area is too steep for attack. Will consider Air Ops tomorrow. It is unknown if [FMO] could even get aircraft with all of the other fires."[113] However, there is no evidence at all that

---

[111][Redbook, Ch. 1, at p. 9].

[112][DO #18, at ¶ 5.1].

[113][NPS Report, at p. 9] (quoting text message from chief ranger to Deputy Park Superintendent – sent on November 24 at 1237 hours).

either Salansky or Kloster[114] or anyone on either's behalf made any inquiries about the availability of aviation assets until Sunday, November 27, 2016, The Chimney Tops 2 Fire's fifth day since being discovered. Yet, air attack was the only resource available to Salansky up until Sunday.[115]

303. Although National Guard helicopters and air-tankers still reportedly sat idle at a hangar in Chattanooga, on standby, ready to drop water on wildfires in the region, Salansky again failed to request aviation resources.[116]

### 2. The "Containment Box"

304. Citing steep terrain and firefighter safety, Salansky had decided not to take direct action on The Chimney Tops 2 Fire, as it would have entailed constructing fire-lines along the edge of the fire to remove the fuel that allows it to spread. Instead, the Park's ad hoc fire management team,[117] comprised of Salansky, Chief Ranger Kloster, and Deputy Superintendent Jordan, decided to make an indirect attack: "backing-off," monitoring the fire during daylight hours only, and identifying a 410-acre fire-management area for indirect-containment lines. And so, depending on weather conditions, the "containment

---

[114]As FMO and IC, it would have been Salansky's responsibility to order aviation resources. As Chief Ranger, Kloster is responsible for all visitor and resource protection. Specifically, he coordinates with the FMO for initial response to wildfires; coordinates wildland fire-related issues with the Chief of Resource Management and Science; prepares and revises cooperative fire agreements with adjacent federal, state and local agencies and municipalities; and *coordinates public safety efforts* (evacuations, traffic control, etc.) on behalf of the IC during wildfire and prescribed fire incidents.

[115][NPS Report, at p. 49].

[116]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[117]This was not the Park's required "Fire Management Committee," described above.

box" would allow fire to grow from a small and smoldering fire of less than a single acre into a 410-acre inferno.

305. The "containment box" was delineated on paper using topographic/natural barriers and relying on natural drainages, Newfound Gap Road, and trails to contain the fire.[118] Salansky believed "the fire would never reach the perimeters of the box based on historical fire behavior in the park, coupled with the forecast of rain on Monday, November 28."[119]

306. Unfortunately, Salansky had been the Park's FMO just eight months and lacked FMO experience. Nevertheless, Deputy Superintendent Jordan and Chief Ranger Kloster were briefed on the plan and deferred completely to Salansky's opinion that the "containment box" was the only practical option for controlling the fire.[120] Jordan's deference to Salansky appears to have been necessitated by his own apparent ignorance of the rational for it (as he later informed Kloster and Salansky via a text message that he "would like to set up a call to *better understand the strategy and be able to fully articulate the rationale just incase it was to blow-up at some point*").[121]

307. To effectuate the "box," firefighters would need to clear-out fire-lines to the south and west, about 10% of the total boundary, with water landmarks and bare trails

---

[118][NPS Report, at p. 10].

[119][NPS Report, at p. 10].

[120][NPS Report, at p. 53].

[121][NPS Report, at p. 53].

taking care of the rest. But Salansky had few fire-personnel to implement his plan, as only five to ten of the Park's firefighters were available to him and he failed to request additional personnel until Sunday, November 27, 2016.

308. Nevertheless, according to Jordan, from Thursday, November 24 through Monday, November 28, firefighters scouted for routes to clear-out fire-lines closer to the fire, but no significant indirect fire-line construction ever occurred.[122]

309. Salansky and five NPS firefighters scouted below the fire to look for other options to contain the fire to the west, south, and north.[123] They also worked on trail closures and public safety information/closures due to fire and smoke.[124] However, none of the potential options for containment lines scouted by Salansky and other firefighters were suitable for an effective fire-line construction.[125]

### 3. No Contingency Plan Was Ever Conceived In Case the Containment Box Failed.

310. Despite the extraordinary conditions and these repeated failures, Salansky never devised a contingency plan to extinguish The Chimney Tops 2 Fire, much less put such a plan into action.

311. Three former experienced U.S. Forest Service firefighters questioned why a trained Hotshot crew — a Type 1 team that specializes in working on steep terrain — was

---

[122]A small section of "hand-line" was constructed off of The Chimney Tops Trail on November 27, according to Salansky. [NPS Report, at p. 10].

[123][NPS Report, at p. 11].

[124][NPS Report, at p. 11]. Yet, there is no evidence that Salansky or Park leadership notified the Park's neighbors, *i.e.*, residents or city and county officials, about The Chimney Tops 2 Fire until the morning of the sixth day of the fire, Monday, November 28, 2016.

[125][NPS Report, at p. 11].

88

not requested by Salansky or dispatched to extinguish the fire. Another retired firefighter, Bill Gabbert, who oversaw fire management for seven National Parks before retiring with 33 years of service, observed, "I can't help but think they could have and should have come up with a plan to stop the progress of the fire or put it out entirely." Another firefighter with nearly fifty (50) years of experience fighting wildland fires by air, Johnny Yount, said that "if the only option you had is to dump water, you drop water until it's out. That was a fire that needed to be aggressively attacked from the air with helicopters."

312.    Yount observed that helicopters using "Bambi Buckets" filled from nearby lakes could have poured water on the outer edges of the fire. A 2,000-gallon Bambi Bucket empties its contents through an 18-inch hole in about eight seconds. "You don't worry about the interior of the fire, it'll burn itself out," Yount said. An aerial attack on Thursday, November 24, 2016 would have extinguished the fire in "about four hours," according to Yount, who had decades of experience dropping water and retardant on wildfires. By that time, The Chimney Tops Fire was a little larger than the size of a football field, including end zones. "An acre and a half, the thing would be washed down into the creek, Yount said. "It would be mud."[126]

---

[126]Of the thousands of fires Yount fought as an aviator, twice he was able to extinguish flames with an aerial attack when firefighters could not get to the site. Both times saved nearby homes from approaching flames.

**G.** **DAY FOUR** – **Saturday, November 26, 2016 – The Chimney Tops 2 Fire Is Now Approximately 6-8 Acres; No Fire-Lines Are Constructed; No Air-Attack Is Ordered; High-Winds of 60 MPH Are Forecast for Monday, November 28, 2016; and The Chimney Tops 2 Fire Is Left Unmonitored for the Fourth Consecutive Night.**

313. Early in the pre-dawn hours of Saturday, November 26, 2016, David Hotz, Science and Operations Officer for the East Tennessee bureau of the NWS in Morristown, ran computer-model forecasts for the upcoming week. Hotz said "it was definitely a situation that doesn't happen very often. We wanted to get the word out. Given the conditions we saw, we definitely expected any fires that were out there to spread, and to spread quickly." Accordingly, at 3:21 a.m. on Saturday, November 26, 2016, the NWS issued a high-wind forecast, predicting winds would reach the mountains by Monday night – maybe sooner. The alert warned of "strong southerly winds" ahead of rain, with gusts that could reach up to 30 mph on Sunday, November 27, 2016 and exceed 60 mph by Monday night, November 28, 2016.[127]

### 1. The Mountain Wave Weather Phenomenon

314. A handful of times a year, winds strike the GSMNP at just the right speed, on just the right angle, to create what meteorologists call a "mountain wave." These extreme-wind events frequently occur from November through March in the western foothills of the southern Appalachian Mountains.[128] Winds driven by a low-pressure system of air blow in from the south, picking up momentum as the gusts crest the mountaintops. At around 5,000 feet, the currents crash into dry, stationary air held in place by a higher-pressure

---

[127][NPS Report, at p. 12].

[128][NPS Report, at p. 43].

90

system and careen down the mountain slopes like an invisible avalanche. Observation towers in the GSMNP had clocked wind speeds as high as 110 mph when the waves hit.

315. Former NPS fire manager Gabbert said the severe drought, coupled with the energy release component of dry fuels "even without the wind, should have been a concern, but when you add the winds, it **should have been alarming to a fire manager and started an immediate attack**." Other experienced wildland firefighters have observed that once the high-wind forecast was received two things should have happened: first, suppression efforts should have been bolstered by personnel, equipment and resources immediately. And second, Park officials should have contacted Sevier County, Gatlinburg and Pigeon Forge officials, among others, and informed them of all known details of The Chimney Tops 2 Fire.

### 2. High-Wind Forecast Prompted No Change in Fire-Suppression Strategy or Decision Not to Notify or Warn Others.

316. On Saturday, November 26, 2016, fire managers discussed the Hazardous Weather Outlook and the Fire Weather Planning Forecast – **and made no changes in strategy or tactics**.[129] At about 8:00 a.m. on Saturday, Salansky briefed eight firefighters and sent three of them to scout for fire-line construction points.[130] Salansky and the other

---

[129][NPS Report, at p. 56].

[130][NPS Report, at p. 12].

five firefighters hiked out to The Chimney Tops area. At about 10:30 a.m., Salansky and another firefighter arrived at The Chimney Tops and discovered the fire had grown to "approximately 6-8 acres in size."[131]

317. Salansky reported that they had looked at a proposed fire-line in a drainage "to see if it's doable, and trying to find a way to put in line from the top down." There was a trail across the ridge south of the fire that they figured could be the beginnings of a fire-line from which a constructed line might be built to the north to connect with the river in the drainage below the highway. But, Salansky reasoned, "it's vertical, it's steep, and there's not a comfort level there."[132]

318. Despite having failed to construct a single fire-line for the boundary of the "containment box," by Saturday, November 27, 2016, Salansky "still believed that they could catch and hold the fire in the drainage bottoms using a containment strategy of natural and human-made features based on historical fire events and practices in the park."[133] However, Salansky's fire-crews continued to report fire-lines could not be constructed with the limited manpower available to do it.[134]

319. A group of firefighters with two hundred (200) years of combined experience fighting wildland fires agreed that by this point, when alerted to the expected high-winds, at the very least, Salansky should have summoned every resource available.

---

[131][NPS Report, at p. 12-13].

[132]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[133][NPS Report, at p. 13].

[134][NPS Report, at p. 13].

Case 3:20-cv-00149-JRG-CRW Document 1 Filed 04/08/20 Page 102 of 185 PageID #: 102

320. Not only did Salansky not do this on Saturday, but neither he nor any other Park official made an effort to directly contact Sevier County, Gatlinburg and Pigeon Forge officials (or the public), to inform them of the coming danger.

### 3. Salansky Requests, Then Ignores, a Near-Term Fire Behavior ("NTFB") Projection Showing The Chimney Tops 2 Fire Spreading Through the GSMNP.

321. Salansky requested a Near-Term Fire-Behavior ("NTFB") projection (a computerized simulation of the fire to predict its likely path). This model was initiated by a Geospatial Analyst working in Asheville, North Carolina, as part of a working group of Southeast Regional Fire Behavior/Predictive Services.[135] Salansky received the results on Saturday, November 26, 2016, but failed to review them until Sunday morning. Importantly, one of the computer models showed the fire exploding out of the "containment box" and spreading through the Park.

322. Salansky, however, was not concerned: "I did not place a lot of weight on the information," Salansky later told the NPS Review Team. "I was still convinced that we could find places to go direct on the fire . . . and that was the strategy for the day."[136] Besides, Salansky was still filling multiple roles for the incident, leaving him little time to consider computer simulations.[137]

---

[135][NPS Report, at p. 53].

[136]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-chimney-tops-pigeon-forge/856268001/

[137][NPS Report, at p. 53].

93

323. Park policy called for Salansky to discuss these results with Chief Ranger Kloster, Deputy Superintendent Jordan, or Superintendent Cash. He did not do this. As the NPS Review Team subsequently concluded, all of Salansky's superiors lacked hands-on fire experience and took a hands-off approach to dealing with fires, mostly, if not always, deferring to Salansky, who himself lacked significant experience as FMO.

324. Though he had received word that a major wind-event was forecast for Monday afternoon,[138] he had also seen clouds overhead and frost underfoot. So, Salansky was not worried, saying later, "I'm not thinking we're going to have an 80-mile-an-hour wind event and it's going to blow this fire all to hell."[139] Yet, that is exactly what the NTFB projection he requested – then ignored – had predicted. In the end, due to Salansky's indirect-attack strategy, there was limited action on the ground and no action in the air to extinguish The Chimney Tops 2 Fire until its fifth day, Sunday, November 27, 2016.[140]

325. At about 5:00 p.m., Salansky and the firefighters left the fire and headed back to the trail-head,[141] knowing The Chimney Tops 2 Fire had grown about eight times in size since it was discovered, was still burning amidst severe drought conditions, fueled by eighty years of built-up duff, and a major wind-event was forecast for forty-eight (48) hours later. Add to this that at about 11:00 p.m., on Saturday, November 26, 2016, three different weather stations recorded relative humidity ranging from 7% to 14%: This extraordinarily-

---

[138]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[139]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-chimney-tops-trail/856267001/

[140][ABS Report, at p. 52].

[141][NPS Report, at p. 13].

low overnight humidity is extremely rare in the Appalachians and such conditions indicate very active night-time burning should be expected.

326. Salansky should have expected Sunday's operational period to have very active fire-behavior. Yet, for the fifth consecutive night, he and the Park's senior leaders appear to have not even discussed monitoring The Chimney Tops 2 Fire in the overnight hours. Instead, they again abandoned the fire overnight, altogether ignoring, yet again, Reference Manual 18,[142] which commands fire managers to monitor all wildland fires at all times.[143]

327. By Saturday night, November 27, 2016, neither Salansky nor any other member of Park staff had communicated with Park neighbors, local officials, local residents or visitors to warn them about The Chimney Tops 2 Fire, much less the potential that high winds forecast for Monday should be expected to affect the scope and path of the fire and endanger lives or private property outside the Park.

---

[142][*See Reed,* Doc. 5, # 1 (Exh. 10 - NPS Reference Manual), incorporated herein by reference as Exhibit 9].

[143][NPS Reference Manual 18, Wildland Fire Management, at p. 8] ("All wildland fire events must be monitored. Qualified personnel will be utilized"). Reference Manual 18 explains that fire managers must monitor wildland fires in order to gather information to:

> "provide managers with information essential for decision making; determine whether fire management program objectives are being met; ensure protection of human life, property, and natural and cultural resources; determine the effectiveness of the planned strategy; assist with contingency planning; increase knowledge of fire behavior and effects on park ecosystems; provide long-term documentation for actions taken on a wildland fire; identify human health and safety concerns from wildland fire."

**H.**     <u>DAY FIVE</u> – **Sunday, November 27, 2016 – The Chimney Tops 2 Fire Is Now 35-50 Acres; "Active on All Flanks;" Nearing the Edge of the "Containment Box;" With Strong Winds Ahead; Without Being Monitored for the Fifth Consecutive Night.**

*"No action was being taken on the fire perimeter . . . .*
*There were plenty of resources available."*[144]

328.    The last Spot Weather Forecast, issued at 7:00 a.m. on Sunday, November 27, confirmed the earlier prediction of strong southerly winds for the following day. The Park employee who requested this forecast wrote, "Concerned about ridgetop winds with the coming front. Thanks!" Wind gusts out of the south of 25 mph were predicted for Monday morning, increasing to 30 mph at noon, and to 40 mph by 6:00 p.m.[145]

329.    About an hour later, Salansky returned to The Chimney Tops Trailhead. Not only was the fire Salansky discovered four days earlier still burning, but he estimated it to be about ten acres.[146] This led him to believe it "had become more active overnight and that

---

[144]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-late r-chimney-tops-pigeon-forge/856268001/ (quoting Air-Attack Commander's statements to NPS Review Team).

[145]According to experienced wildland firefighters, it is standard operating procedure for fire managers to request and receive daily spot weather forecasts on-site.

[146][NPS Report, at p. 14].

96

they needed to be more proactive."[147] So, Salansky sent three firefighters to The Chimney Tops "to provide additional information regarding fire size, location, and behavior"[148] and also "began ordering additional fire resources – both ground and aerial fire assets "[149]

330. But the fire had actually grown to about 20-25 acres by Sunday morning. And a "Special Weather Statement" at 9:03 a.m. that morning warned of "critically dry conditions" early that afternoon, with relative humidity dipping into the teens, meaning "wildfires will be easier to ignite and much harder to control." The NWS Alert had predicted not just "high" winds but *enhanced fire danger.*" At last, Salansky was not so sure the proposed fire-line was "doable" any longer.[150]

---

[147][NPS Report, at p. 14].

[148][NPS Report, at p. 14].

[149]Salansky ordered following resources:

> **1.** One NPS wildland fire module. (A wildland fire module consists of 7-10 people fully capable of being inserted on a fire.
>
> **2.** One Type 1 helicopter capable of bucket-drops. This order was placed at 1235 hours.
>
> **3.** Two Type 6 engines from the Bureau of Indian Affairs (BIA) with three crew members each.
>
> **4.** One interagency air-attack fixed-wing aircraft.
>
> **5.** Two Type 1 helicopters, which were heli-tankers.
>
> **6.** One Long-Term Fire-Behavior Analyst (LTAN). This individual was located in the vicinity and offered to assist.

[NPS Report, at pp. 14-15].

[150]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-tha t-burned-into-gatlinburg/#more-53483

331. The Park posted "Fire Information" signs in the area. A map posted with a fire information sign dated November 27 indicated the Park hoped to stop The Chimney Tops 2 Fire before it crossed the bottom of drainages on the west, north and east sides, and The Chimney Tops Trail to the south.

### 1. No Notice or Warning Provided to Gatlinburg Officials About The Chimney Tops 2 Fire By Sunday, November 27, 2016.

332. As of Sunday morning, November 27, 2016, Park neighbors, local residents and visitors had still not been notified or warned by Salansky or other Park officials about the potential for imminent danger presented by The Chimney Tops 2 Fire. Specifically, the GFD had still not been notified regarding the status of any active fire burning in the Park, including The Chimney Tops 2 Fire.[151]

### 2. Darkness and Distance Limit Number of Water Drops

333. Reinforcements from National Guard hangars in Chattanooga arrived. As crews scraped fire-lines in the ravines below, a Chinook Type 1 helicopter – the largest helicopter for use on wildfires – arrived at around 1:00 p.m. and began pulling water from the Pigeon River's West Prong and dropping it onto The Chimney Tops 2 Fire. This was the first direct attack of any kind on the five-day-old fire. The first helicopter dropped 26,000 gallons of water onto the fire, working until it had to refuel. Two smaller Heli-tanker Sky Cranes arrived at about 3:00 p.m. Those tankers were less effective, as they could not dip water from the Little Pigeon River, but instead had to travel thirteen miles away to Fontana Lake – on the Park's North Carolina side. They wound up delivering only

---

[151]No such notice was provided by the Park until the following morning. [ABS Report, at p. 20].

three drops of 1,000 gallons each, working as an airborne bucket brigade until dark. Thus, by Monday, November 28, 2016, the aerial-attack had dumped less water than five percent (5%) of what it would take to fill an Olympic-size swimming pool (660,253.09 gallons).

334. At about 3:32 p.m. on Sunday, air-attack described The Chimney Tops 2 Fire as "active on all flanks with a slight SE to NW wind." The Air Tactical Group Supervisor "was surprised that no action was being taken on the fire perimeter" and was aware that "there were plenty of resources available since many of the large fires were nearing containment."[152] The crew commander wondered why NPS officials had not called for air support sooner. Similarly, former NPS fire manager Bill Gabbert observed, "Those (aerial) resources could have been called that should have been called two days earlier from Chattanooga." Yet another experienced wildland firefighter, Barry Hicks, a retired U.S. Forest Service smoke-jumper with forty-one (41) years of service,[153] observed, "There needs to be a good reason why you waited to use those tools until it was up and running."

335. Salansky's objective for the water drops was to prevent The Chimney Tops 2 Fire from backing down the slope into the area southwest of The Chimney Tops.[154] But distance and dwindling daylight terminated the air-attack at 4:30 p.m.[155] Despite the forecast for high-winds on Monday, Salansky asked the air-crew to return the following day.

---

[152][NPS Report, at p. 15].

[153]Hill was tasked with conducting a probe of the June 30, 2013, deaths of nineteen (19) hot-shot firefighters in Yarnell, Arizona.

[154][NPS Report, at p. 15].

[155][NPS Report, at 15].

336.    Air-attack also asked Salansky if he wanted an air-tanker to drop flame-retardant on the fire, perhaps across the top of a ridge.  Salansky considered that the river below was the water-source for Gatlinburg and the cost, *i.e.*, a tanker-drop would cost $10,000 or $20,000, and turned down the flame-retardant drops.[156]

### 3. With the Fire Continuing to Grow – Now 35 Acres – Salansky Released All Fire Personnel until Monday Morning.

337.    By 4:45 p.m. on Sunday, November 27, 2016, The Chimney Tops 2 Fire was mapped as having grown to about 35 acres.[157] Thermal-imaging showed flames spreading to the west, toward a nearby picnic area and a river bottom,[158] with images indicating that the fire perimeter was near the edge of the southwestern line of the "containment box."[159]

338.    An 8-person module of Type 2 wildland firefighters arrived at about 7:00 p.m. An hour later, Salansky took them to a lookout point off Newfound Gap Road, where, according to Salansky, they saw little to worry about: "[y]ou couldn't even see the fire except for a couple glowing areas."[160]  Salansky told the firefighters this was where they would be

---

[156]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[157][NPS Report, at p. 16].

[158][NPS Report, at p. 15]

[159][NPS Report, at p. 15].

[160][NPS Report, at p. 16].

working on Monday,[161] making no effort to discuss any of his fire-management decisions with the Type 2 firefighters.

339. When, as in this instance, fire managers face significant unknowns (*e.g.*, location, direction, rate of movement) regarding an approaching wildfire with conditions favorable for rapid movement, experienced wildland firefighters have stated it is important to err on the side of caution, *i.e.*, by presuming the worst until proven untrue.[162] In 1991, as documented in the Park's FMP, "crowning and torching fires" were observed in conditions involving non-significant drought. This prior incident should have put Salansky on-notice that The Chimney Tops 2 Fire could, and would, continue to worsen in a like manner.[163]

340. Salansky's plan for Monday was to again use firefighters and engines to build containment-lines using the drainages and any wet areas they found to control the spread of The Chimney Tops 2 Fire, remove the leaf-litter from the surface and move as far up the mountain as they could. Also, he intended to use aviation resources in attacking the western edges of The Chimney Tops 2 Fire to prevent the fire from spreading down into the

---

[161]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-tha t-burned-into-gatlinburg/#more-53483

[162][ABS Report, at p. 53].

[163][FMP, at p. 25] ("the Park was not in a significant drought in the fall of 1991 but torching and crowning in the understory did occur in an area with similar fuels. Under drought conditions, torching and spotting of 0.5 miles have been documented.")

bottoms toward The Chimneys Picnic Area.[164] But severe drought conditions made it evident to firefighters who were scouting to construct lines that drainage routes were not going to hold this fire.

341. By the end of the day on Sunday, The Chimney Tops 2 Fire had grown to between 35 and 40 acres. All of this notwithstanding, at about 8:15 p.m. on Sunday, Salansky released all fire-personnel, and they departed the area, believing "the fire appeared quiet."[165] He wanted everyone up and ready to go on Monday at first light. An early start, after all, might buy some time. Besides, lots of rain was on the way. And so, for a fifth consecutive night, Salansky did not monitor The Chimney Tops 2 Fire overnight.[166]

### 4. The Requirement to Monitor Wildfires Is Ignored for Five Consecutive Nights

342. The Chimney Tops 2 Fire was not monitored overnight *for five consecutive nights* – from Wednesday, November 23 through Monday, November 28, 2016. There was no night-time activity at all, not even a "road patrol" to monitor the fire's proximity/effects on the nearby highway.

343. Deputy Superintendent Jordan provided three reasons for having not monitored The Chimney Tops 2 Fire, which was just 5.5 miles from Gatlinburg. First, Jordan said Salansky would not have expected the fire to spread or spot to another ridge but this is dispelled by the 1991 incident documented in the FMP. Second, Salansky wanted a full staff the next day and did not want to relinquish personnel to a "fire watch." But

---

[164][NPS Report, at p. 16].

[165][NPS Report, at p. 16].

[166][ABS Report, at p. 13].

Salansky repeatedly failed to request additional manpower or to recall firefighters on vacation in sufficient number to monitor the fire. And third, even if monitors witnessed embers blown from The Chimney Tops 2 Fire a half-mile away over Newfound Gap Road and onto Mount LeConte, there was no way to extinguish new flames. But even if this reason had merit (it does not), monitoring would have provided extra warning to Park neighbors.

344. Gabbert, the former NPS fire manager who managed fires for 33 years in seven National Parks, was also unpersuaded: "That's not reasonable at all," Gabbert said. "With a weather forecast like that, you would have monitors." Gabbert said a monitor would have provided an earlier outcry to surrounding communities that The Chimney Tops 2 Fire was moving toward Gatlinburg.

345. The NPS Fire Monitoring Handbook refers to DO #18: Wildland Fire Management (USDI NPS 1998), directing fire managers to ***monitor all prescribed and wildland fires at all times***. And while neither DO #18 nor Reference Manual 18 describes exactly the manner in which wildfires are to be monitored ***at all times***, there can be no doubt that wildfires – especially a wildfire growing in size every day in severe drought conditions amidst eighty years worth of ground fuels with a forecast of a major wind event – cannot be abandoned overnight.

346. The FMH provides such guidance, however, by outlining standardized methods to be used throughout the National Park System for documenting, monitoring, and managing wildland fires. These standard techniques are ***mandatory*** for wildfires such as The Chimney Tops 2 Fire.

347.     For fire suppression, the FMH provides that "all management actions are intended to extinguish or limit the growth of the fire."[167] During the initial assessment phase of a fire, fire managers must determine the fire cause and location, ***and monitor fire size, fuels, spread potential, weather, and smoke characteristics***. They must also note particular threats and constraints regarding human safety.[168] Fire managers must also consider "the potential for the fire to leave a designated management zone, impact adjacent landowners, threaten human safety and property, impact cultural resources, affect air quality, or threaten special environmental resources such as threatened, endangered or sensitive species."[169]

348.     Five days into the fire, Park spokesperson Molly Schroer stated she was not aware of on-the-ground suppression efforts, other than perhaps some work on a distant indirect fire-line, until Monday, November 28, 2016, after The Chimney Tops 2 Fire crossed US Highway 141, the main road through the Park, moving rapidly toward Gatlinburg.[170]

## I.     DAY SIX – Monday, November 28, 2018 – *"Running Through Hell"*

### 1.     Monday Morning: The Chimney Tops 2 Fire Has Grown to 500 Acres with Long-Range Spotting.

349.     At 2:00 a.m. on Monday, November 28, wind-speeds recorded nearby at Indian Grave began increasing, becoming more consistently out of the south and southwest,

---

[167][FMH, at p. 3].

[168][FMH, at p. 9].

[169][FMH, at p. 10].

[170]http://wildfiretoday.com/2016/12/05/analyzing-the-fire-that-burned-into-gatl inburg/

*i.e.*, blowing toward the City of Gatlinburg. A high-wind warning issued by the NWS for the Park at 4:05 a.m. on Monday predicted *"sustained wind speeds of at least 40 mph" by 1:00* p.m. on Monday, with *gusts of up to 60 mph* ahead of the coming rain.

350. When firefighters returned to The Chimney Tops 2 Fire at sunrise, they discovered that burning embers had created smaller fires, called "spot fires,"[171] as far as a mile away from the origin of the fire, around The Chimney Tops Picnic Area. At about 7:00 a.m., Salansky arrived at the Park aware of the high-wind warning.[172] Around the same time, many people in Gatlinburg observed heavy smoke and ash falling from the sky.[173]

351. The intensity and rate of speed of the fire had dramatically increased. When Park personnel arrived at the picnic area to check out the fire, they began defensive suppression efforts to protect the Park structures in the area. Salansky sent the wildland firefighters to The Chimney Tops Picnic Area with a fire engine.

352. On arrival, the wildland firefighters spotted smoke near Bullhead Spur Ridge beyond Newfound Gap Road. Overnight, 20 mph southerly winds had carried embers from The Chimney Tops 2 Fire to about a mile away. Now, a 50-acre spot fire had become established north of the highway, more than a mile from The Chimney Tops 2 Fire.[174]

---

[171]Such wildfires, when not extinguished early, can create a wide disbursement of flying embers, igniting "spot fires" substantial distances from the original fire that can grow rapidly.

[172][NPS Report, at p. 16].

[173][ABS Report, at p. 30].

[174]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483; NPS Report, at p. 18].

353. At this point, Salansky estimated the fire to be between 250-500 acres. At approximately 7:30 a.m., the Park's senior leadership – Deputy Superintendent Jordan, Chief Ranger Kloster, and the Chief of Resource Management and Science Troutman – arrived at The Chimney Tops Picnic Area to evaluate the situation.[175] They were joined by Salansky at about 8:00 a.m. At that time, The Chimney Tops 2 Fire was still 4.5 miles away from Gatlinburg and separated by several mountain drainages. A decision was made – without performing a mandatory complexity analysis – to order a Type 2 IMT.[176]

354. Salansky immediately began ordering a large number of firefighting crews, air resources, and a complex fire IMT. Salansky contacted the Tennessee Interagency Coordination Center ("TICC") and requested four 20-person fire crews and a Type 2 IMT.[177] After Salansky saw the expansion of The Chimney Tops 2 Fire, he also requested four Type 1 Hotshot Crews,[178] but "they just laughed at me. They're like, there are no hotshot crews around, you know. So I said, 'What can you give me?' They said 'we're going to give you two Type 2 crews and two Type 2 Initial Attack crews, but they are going to be two days out.' I'm like, 'Order them. Give me what you've got.'"[179] Salansky also ordered a Type 3 IMT that was in Johnson City, Tennessee. That Type 3 IMT could respond by 6:00 p.m.[180]

---

[175][NPS Report, at p. 17].

[176][NPS Report, at pp. 17-18].

[177][NPS Report, at p. 18].

[178]The NPS maintains only a handful of hotshot crews east of the Mississippi, where wildfires tend to be handled by state forestry departments.

[179]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[180][NPS Report, at p. 18].

355. Salansky and senior Park leadership had continued to employ an indirect-attack strategy, avoiding the use of fire-retardants or significant aviation assets to contain the fire.[181] By Monday morning, November 28, 2016, the wind and the low visibility caused (by the smoke) made it impossible to fly aircraft over The Chimney Tops 2 Fire. Consequently, air-attack – which had mostly been available since The Chimney Tops 2 Fire began six days earlier– returned to Chattanooga.[182]

356. According to Deputy Superintendent Jordan, "what we were observing was extraordinary fire behavior." "Spot fires half a mile or more from the fire in this part of the country, in our experience, is extremely rare Given the strong winds, exceptionally dry conditions and fire on the ridgelines out of reach of firefighters, containment of the fire was going to require a much larger effort once the winds died down."[183]

357. Yet, even now, with The Chimney Tops 2 Fire at about 500 acres in size and the rare and "extraordinary fire behavior," neither Jordan nor Salansky (nor any other Park official) took the slightest action to notify or warn Park neighbors, local officials, local residents or visitors of the imminent danger. And while Jordan foresaw "a much larger effort once the winds died down," he failed to comprehend that by then, most of the carnage and destruction would be done, as those long-predicted winds would contribute to even more extraordinary and deadly fire-behavior in the coming hours.

---

[181][ABS Report, at p. 13].

[182]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[183]*Timeline: Gatlinburg Wildfires: National Park Service Explains How Chimney Tops 2 Fire Spread to Gatlinburg,"* Annie Culver, WATE 6 (Updated 6/30/17) http://www.wate.com/news/local-news/timeline-gatlinburg-wildfires/792912856

358. With additional resources arriving, Jordan said the Park's focus shifted to what they could do to protect threatened Park structures using wildland fire engines. Still prioritizing the protection of Park structures instead of lives (by not focusing on extinguishing The Chimney Tops 2 Fire before it reached Park boundaries), Jordan said Park staff "were unable to track the movement of the fire very well over the next few hours with the whole region shrouded in smoke. Plus, aircraft were unable to fly in the strong winds," Jordan said.[184]

### 2. Salansky Fails to Notify Park Neighbors, Local Residents and Visitors About the Imminent Danger Posed by The Chimney Tops 2 Fire Despite <u>Clear</u> Policy Directives to Do So.

*"No, it's under control."*[185]

359. By this point, Salansky knew the fire had escaped his ill-conceived "containment box."[186] From the discovery of The Chimney Tops 2 Fire on Wednesday,

---

[184]*"Timeline: Gatlinburg Wildfires: National Park Service explains how Chimney Tops 2 fire spread to Gatlinburg,"* Annie Culver, WATE 6 (Updated 6/30/17) http://www.wate.com/news/local-news/timeline-gatlinburg-wildfires/792912856

[185]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-chimney-tops-pigeon-forge/856268001/ (quoting Salansky's statement to GFD Captain).

[186]One former Park Ranger stated, "once the fire was out of control an incident command should have been convened and 'Crisis Management' should have taken priority and the ongoing communication with all cities, property owners and news media should have been implemented to ensure the public was aware of the imminent threat of a catastrophe. This was not done." He added,

> "With an equation that included fire-steep terrain, severe drought, heavy fuels, and no containment boundaries, officials should have stepped up the attack, knowing the fire can consume the heavy fuels and easily get out of control. This would have meant not going to bed, staying on the job all night

November 23, 2016 until Monday morning, November 28, 2016 there was no communication by Salansky, senior Park leadership, or any other Park official to any Gatlinburg or Sevier County official (or any other Park neighbor, local resident or visitor) regarding the progression of and imminent danger posed by The Chimney Tops 2 Fire.[187]

360. At about 9:00 a.m., on Monday, November 28, 2016, the GFD began to receive emergency calls from the public concerned about smoke and falling ash. Beginning at 10:30 a.m., E-911 began to dispatch GFD personnel in response to calls ranging from smoke-investigation to smoke-alarm activations.[188] At about 9:00 a.m., GFD Chief Greg Miller ("Chief Miller") contacted a GFD C-shift Captain and requested that he contact Salansky to investigate the smoke coming toward Gatlinburg from the Park.[189] The Captain tried Salansky, but the call was unanswered.

361. Salansky eventually returned the Captain's call nearly two hours later, at 10:58 a.m. This call was the *first communication* between Park staff and any Gatlinburg or local official concerning The Chimney Tops 2 Fire. During the call, Salansky explained to the GFD fire captain that the smoke was originating from The Chimney Tops 2 Fire (also

---

making phone calls, and getting all of your resources available for the next day."

[187][ABS Report, at p. 30].

[188][ABS Report, at p. 30].

[189]Before the GFD made inquiries with GSMNP personnel, in the early morning hours of November 28, Gatlinburg Police Chief Randy Brackins noticed heavy smoke and falling ashes. This caused him to immediately contact Police Dispatch and inquire about the possibility of fire in the area. According to the GPD Dispatcher, "There is a fire up around The Chimneys at the top. They can't get to it, but they are going to try and water bomb it today." [ABS Report, at p. 56].

now originating from Bullhead Ridge)[190] "and the potential for its smoke to travel to the city."[191] Salansky told him the GFD "would be alerted if needed, and that they considered the spread of fire to Gatlinburg unlikely" at that time and "prior to the time of predicted rains." The GFD Captain asked, "do you need us?" Salansky inexplicably responded, *"No, it's under control."*[192]

362. Since Saturday's forecast of high wind and rain, Salansky had relied on the "hope of rain," making it an integral part of his containment/suppression strategy – specifically, the "hope" that rain would arrive ahead of high winds. According to Salansky, when the initial spot fire was discovered, winds were blowing at about 30 mph, but those winds "were not forecast to be here until that evening, like at 4 o'clock that afternoon. But they kind of came in early."[193]

363. In truth, contrary to Salansky's statement, the last Spot Weather Forecast – issued at 7:00 a.m. on Sunday, November 27, 2016 – had actually predicted winds of 12 mph, gusting to 25 mph for 7:00 a.m. Monday, then, increasing to 15 mph and *gusting at 30 mph by noon*, and then, *increasing to 20 mph and gusting to 40 mph at 6:00 p.m.*[194]

---

[190][ABS Report, at p. 31].

[191][NPS Report, at p. 18].

[192]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-y ear-later-chimney-tops-pigeon-forge/856268001/

[193]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-tha t-burned-into-gatlinburg/#more-53483

[194]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-tha t-burned-into-gatlinburg/#more-53483. This is also in stark contrast to the representations made by Superintendent Cash during a press conference on December

364. The Park's FMP mandates that fire managers must inform the Park's neighbors and local residents of "all planned and unplanned fire management activities." Specifically, it provides:

> "Park neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them."[195]

365. The FMP also mandates that fire managers take actions to mitigate the risks to the neighboring public. Specifically, these mitigation actions are required "to protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public."[196] With respect to "Park neighbors," those actions include:

- Post current fire information on websites as available,

- Inform park neighbors of wildland fires, and

- Suppress those fires or parts thereof that threaten to burn of of Park property or that adversely impact public health and safety[197]

366. Under the FMP and DO #18, **_"Firefighter and public safety is the first priority in all fire management activities."_**[198] Specifically, ¶ 5.1 of DO #18 declares the following policy for wildland fires: "Firefighter and public safety is the first priority. All Fire Management Plans and activities must reflect this commitment." DO #18 adds:

---

2, 2016, in which he claimed the high winds were not expected until 4:00 p.m. and came early at around 1:00 p.m.

[195][FMP, 3.3.2, at p. 28] (emphasis added).

[196][FMP, 4.4.2, at p. 54].

[197][FMP, 4.4.2, at p. 55].

[198][FMP, 3.3.2, at p. 28; DO #18, ¶ 6.1].

111

"the protection of human life is the single, overriding suppression priority. Setting priorities to protect human communities and community infrastructure, other property and improvements, and natural and cultural resources will be done based on human health and safety, the values to be protected, and the costs of protection."[199]

367. These requirements and considerations are fully consistent with the primary goals of wildfire management in the Park.[200]

### 3. Mid-Day Monday: the Fire Threatens Mynatt Park and Nears the City of Gatlinburg.

368. Salansky recalls hearing a dispatch report of wildland fire – thought to be a spot-fire from The Chimney Tops 2 Fire – in the Park near the Twin Creeks Picnic Pavilion. This area is comprised of a science center, resource management offices and fire offices. It is about 1.5 miles from Gatlinburg.[201] The Chimney Tops 2 Fire had already jumped more than twice that far – from The Chimney Tops to Bullhead Ridge . . . and stronger winds were coming. Around this time, the fire began jumping from ridge to ridge.

369. At about 11:30 a.m. on Monday, November 28, 2016, Park personnel observed The Chimney Tops 2 Fire had spotted to Twin Creeks Science and Education Center.[202] This

---

[199][DO #18, at ¶ 5.1].

[200]*See e.g.*, DO #18 and Reference Manual 18, Standards for Operations and Safety:
> 4.1 "The management of unplanned ignitions (wildfires) has two primary goals: the protection of communities and assets; and the conservation of natural resources."

[FMP, 4.1, at p. 29].

[201][NPS Report, at p. 18].

[202]According to Jordan, "We don't know just how the fire crossed the drainages between the two locations: whether embers hopped from ridge top to ridge top, each time starting a new fire that would then grow hot enough to shoot off new embers, or

meant that the fire had spread *three miles in just four and one-half hours* and now engulfed about 500 acres.[203]

370. GFD Chief Miller was contacted by the Chief Ranger Kloster, who said he and Superintendent Cash[204] were en route to the GFD to brief him, GPD Chief Randy Brackens ("GPDC Brackins") and Gatlinburg City Manager Cindy Ogle ("Ms. Ogle"). They arrived at the GFD headquarters and met with the aforementioned officials. The meeting focused on fires that had spotted from The Chimney Tops to the Twin Creeks area, having the potential to leave the Park.[205]

371. Salansky moved the engines and the 8-person module to Twin Creeks, where they continued into Park structure-protection mode. He also called local agencies with wildland fire units for help.[206] The response times for most responders were at least two to three hours.[207]

---

whether some ember managed to sail several miles through the air. But either way, it is remarkable that the fire could spread 3 miles in just four and a half hours." *See "Timeline: Gatlinburg Wildfires,"* Annie Culver, WATE 6 (12/13/16updated) http://www.wate.com/news/local-news/timeline-gatlinburg-wildfires/792912856

[203][ABS Report, at p. 21].

[204] Superintendent Cash had apparently returned to work that morning and had been briefed on The Chimney Tops 2 Fire by Salansky and Jordan.

[205][ABS Report, at p. 31].

[206]This assistance request is referred to as "mutual aid" and is governed by written agreements between the Park and neighboring agencies with fire resources.

[207]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

372. At about 11:45 a.m., on Monday, November 28, 2016, Salansky contacted the GFD and asked for assistance at Twin Creeks[208] since fire threatened NPS structures[209] and all Park's fire resources were working around The Chimneys Picnic Area. He requested all manpower and resources from the GFD.[210] In response, the GFD sent an engine. All Park fire resources were pulled from The Chimneys Picnic Area, except a Type 6 engine and three firefighters, plus four firefighters off the wildland fire module. All remaining Park resources were re-directed to Twin Creeks to assist the GFD.[211]

373. At 11:53 a.m., Twin Creek Command described the fire at Twin Creek as a fast moving brush fire. At 12:12 p.m., the Sevier County Wildland Task Force was activated.

374. During the meeting at the GFD, Park and Gatlinburg officials overheard the request for the GFD to respond to the Twin Creeks area.[212] The officials traveled to Mynatt Park for an onsite-briefing and to assess conditions.

375. At about 1:00 p.m., Superintendent Cash met with Gatlinburg, Pigeon Forge and Sevier County officials in Mynatt Park to advise them that: (1) the fire is out of control and could be contained, (2) expected winds may cause the fire to spread into their

---

[208]A Memorandum of Understanding exists between the GSMNP and the Gatlinburg Fire Department. It provides the GSMNP's fire management staff to assist the Gatlinburg Fire Department in fire suppression operations outside the park and that the Department will provide structural fire suppression for the structures located inside the park, among other things. [NPS Report, at pp. 33-34].

[209]The Park relies on the Gatlinburg Fire Department for structure protection within the park under a written agreement. [NPS Report, at p. 18].

[210][NPS Report, at p. 18].

[211][NPS Report, at p. 18].

[212] When the first GFD units arrived at Twin Creeks, the GFD established its own Incident Command Team ("ICT"). [ABS Report, at p. 31].

114

communities, and (3) the Park was evacuating everyone and recommended officials evacuate their communities as well.

376. After the meeting, Salansky requested a 15-person fire-crew from the Cherokee National Forest and another engine, which he understood to be three hours away.[213] At 12:19 p.m. and 12:25 p.m., respectively, all manpower and resources from the Sevierville Fire Department (Station 2) and Pigeon Forge Fire Department were also requested. Salansky called the Tennessee Division of Forestry for bulldozers to build fire-breaks in the now-threatened Mynatt Park community. That neighborhood, totaling about 30 to 40 homes, surrounds a city park at the Park's northern edge.

### 4. Command-Confusion and Initial Evacuation Actions

377. Between 11:00 a.m. and 1:00 p.m., on Monday, November 28, 2016, the GFD and Park fire-personnel were defending structures inside the Park. Salansky recommended that Gatlinburg officials implement a voluntary evacuation of Mynatt Park. If The Chimney Tops 2 Fire left the Park, Salansky said, it would hit there first. Salansky later told others he "kind of recommended evacuations of my park and the vicinity."[214]

378. At about noon, GFD first-responders began delivering voluntary evacuation notices in Mynatt Park.[215] At 12:24 p.m., the Tennessee Emergency Management Agency ("TEMA") was notified.

---

[213][NPS Report, at p. 19].

[214]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[215][ABS Report, at p. 21].

379. Salansky described a 12:30 p.m. meeting at Mynatt Park as a "unified command structure" meeting, stating that he briefed Ms. Ogle, GFD Chief Miller, Pigeon Forge Fire Chief Tony Watson, Deputy Superintendent Jordan, and Chief Ranger Kloster.[216] Local agency officials, however, believe a "unified" or "joint" command was never established. Chiefs Miller and Watson both recall the organization as being "independent efforts" as opposed to a "unified command."[217] Similarly, Tennessee Division of Forestry crews described a "poorly organized" group, complaining later about a "muddled strategy," "scrambling" on the front-lines and unclear divisions of labor and responsibility, with one surmising that "[t]here seemed to be a hesitancy to call for assistance."[218]

380. At the meeting, concerns were expressed, "mainly about Mynatt Park," regarding the potential threat of The Chimney Tops 2 Fire leaving the Park. Also, the GFD had operational concerns, as Gatlinburg faced its own imminent threats and GFD was obligated to provide a "Mutual Aid" response to assist the Park in Twin Creeks.[219] During this meeting, a voluntary evacuation of the area was discussed. Salansky stated he recommended voluntary evacuations of the Mynatt Park area.[220]

---

[216][NPS Report, at p. 20].

[217][NPS Report, at p. 21]. According to the Review team, "the city's perspective was this meeting was not an attempt to unify command. The city's take away was "the fire is coming out of the park and this is where they think it will hit first." [NPS Report, at p. 34].

[218]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-chimney-tops-pigeon-forge/856268001/

[219][NPS Report, at p. 20].

[220][NPS Report, at p. 21].

381. At 1:07 p.m., TEMA requested the Red Cross to be placed on standby and determined that if needed, an evacuee shelter would be at the Gatlinburg Community Center. At 1:36 p.m., TEMA fully-activated the Red Cross shelter for voluntary evacuees.

382. Chief Miller said his firefighters positioned their trucks at the Park boundary and were prepared to hold The Chimney Tops 2 Fire while the Tennessee Division of Forestry continued building fire-lines with bulldozers. Firefighters and police officers began knocking on doors in Mynatt Park at noon telling residents that a wildfire could be headed their way and to leave if they could. "As a precaution, we went door-to-door with voluntary evacuations of Mynatt Park, the most threatened neighborhood at that time," said Chief Miller. They allegedly moved on to the nearby Turkeys Nest and Savage Gardens communities (although many residents of those communities have disputed that there was any GFD or GPD presence or effort to notify or warn them about The Chimney Tops 2 Fire).

383. Salansky remained the IC. The Type 2 IMT ordered earlier would not arrive for another 4-5 days. Since a Type 1 IMT could arrive by 6:00 p.m. on Tuesday, Salansky accepted the offer of the Type 1 IMT.[221] Without any follow-up complexity-analysis, as required, The Chimney Tops 2 Fire was nevertheless converted to a Type 3 complexity fire. Salansky, who had been the Type 4 IC, now assumed the role of Type 3 IC and DO[222] and divided the Park's already-limited fire-resources into two divisions: the "Mynatt Park Division" and the "Twin Creeks Division."[223]

---

[221][NPS Report, at p. 19].

[222][NPS Report, at p. 21].

[223][NPS Report, at p. 21].

## 5. Mid-Afternoon Monday: Fire Spreading as Much as Half a Mile Per Hour, Bouncing from Ridge to Ridge, and Spotting Fires as Far as Five Miles Away.

384. Salansky stated the Park was now receiving reports of long-range spot-fires at least five miles away from The Chimney Tops 2 Fire, which was last known to be located at The Chimneys Picnic Area, the Bullhead Ridge area north of Newfound Gap Road, and Twin Creeks.[224] The Chimney Tops 2 Fire appeared to have "bounced from ridge top to ridge top" from Bullhead Ridge to Twin Creeks. Salansky reported it had to have "jumped road, jumped trails, jumped wet drainages and wide creeks. I mean there was no natural barrier" and "there's no way this stuff could be humanly stopped." He described The Chimney Tops 2 Fire's behavior as "very, very intense and very extreme. And then as the day progressed, the winds progressed and increased . . . through the whole day."[225]

385. At 1:50 p.m., on Monday, November 28, 2016, Park officials advised that The Chimney Tops 2 Fire had jumped Cherokee Orchard Road and was heading towards Park Vista. At about 2:00 p.m., the Park closed roads and trails and ordered back-country campers out of the woods. By then, The Chimney Tops 2 Fire was estimated to be *moving as fast as a half a mile per hour*. An updated afternoon weather forecast predicted the wind could reach gusts of as much as 85 mph in the mountains.

386. At 2:14 p.m., on Monday, November 28, 2016, the Regional Task Force was activated for structural teams and wildland teams. At about 2:30 p.m., Chief Miller issued

---

[224][NPS Report, at p. 20].

[225][NPS Report, at p. 20].

a state-wide Mutual Aid request[226] for firefighting support.[227] According to Chief Miller, "Over the next several hours, our call for mutual aid from across the state arrived to provide protection all along our boundary as we focused efforts on the expected threat from the Twin Creeks area." The incident was the greatest call-out of structure fire units ever assembled in the City of Gatlinburg.[228]

387. By about 3:00 p.m., The Chimney Tops 2 Fire was moving closer to the Park boundary at Twin Creeks.[229] By this time, The Chimney Tops 2 Fire had ignited about 2,000 acres.[230] Without communicating with the Sevier County/Gatlinburg Emergency Operations Center ("EOC"), between about 2:50 p.m. and 3:10 p.m., Park crews continued to utilize an indirect-attack, setting backfires in the Park to protect Park structures in Twin Creeks.[231] This was a highly questionable tactic, taking into account hazardous conditions and the close proximity to the City of Gatlinburg boundary.[232]

---

[226]The State of Tennessee has a statewide mutual aid plan created by a state statute. This plan automatically allows for aid to be given and/or received from any other fire department in Tennessee. This mutual aid plan automatically supersedes and replaces any local agreements or memoranda of understanding regarding fire mutual aid. [ABS Report, at p. 35].

[227][NPS Report, at p. 67].

[228]*"Timeline: Gatlinburg Wildfires: National Park Service explains how Chimney Tops 2 fire spread to Gatlinburg,"* Annie Culver, WATE 6 (Dec. 13, 2016, updated June 30, 2017) http://www.wate.com/news/local-news/timeline-gatlinburg-wildfires/792912856

[229][ABS Report, at p. 22].

[230][ABS Report, at p. 22].

[231][ABS Report, at p. 31].

[232][ABS Report, at p. 51].

119

388. By 3:10 p.m., crews fighting The Chimney Tops 2 Fire at Twin Creeks reported it was racing up a nearby ridge toward the Park Vista Hotel, a 16-story, 300-room hotel just outside the Park near Mynatt Park.

### 6. Late-Afternoon Monday: Fire Spreads to About 4,000 Acres and Winds Carry Embers Miles Away, Igniting New Fires.

389. At 3:53 p.m., the GPD advised The Chimney Tops 2 Fire had moved past Park Vista onto Turkey Nest. At 3:56 p.m., forestry crews cut down a line by Park Vista to try to prevent the fire from reaching the Turkey Nest neighborhood. Around 4:00 p.m., Gatlinburg officials held a press conference to communicate the voluntary evacuations of Mynatt Park and to advise residents about an evacuation shelter established at the Gatlinburg Community Center. At 4:08 p.m., The Chimney Tops 2 Fire was reported to have been one mile from the Mynatt Park area. By 4:15 p.m., The Chimney Tops 2 Fire was within a mile of Mynatt Park and homes on nearby Turkey Nest Road to the east.

390. The blanket of smoke covering Gatlinburg and greater Sevier County made air reconnaissance impossible. At 4:30 p.m., Chief Miller and fellow fire officials utilized a predictive-computer model ("PCM"), using known variables. The PCM simulation indicated The Chimney Tops 2 Fire would not reach the Park boundary and Gatlinburg city limits for another nineteen (19) hours.

*"The whole mountain's on fire."*[233]

391. Another press conference was held around 5:00 p.m. on Monday, November 28, 2016, by Gatlinburg officials in which Chief Miller stated, "As of this time, there is no fire in the city limits of Gatlinburg."[234]

392. Sometime after 5:00 p.m., Salansky received information that The Chimney

120

Tops 2 Fire had now pushed west along Newfound Gap Road toward Park Headquarters within the Sugarlands Region of the Park, just two miles south of Gatlinburg.[235] By that time, The Chimney Tops 2 Fire had ignited about 4,000 acres, doubling its size in just two hours.[236] When the winds reached 80 mph, they began carrying embers from The Chimney Tops 2 Fire very far away, igniting still more fires.

393.    Around 5:15 p.m., Park Rangers discovered The Chimney Tops 2 Fire surging west toward the Park's Headquarters and Sugarlands Visitor Center. A decision was made to evacuate Park Headquarters and prepare the facilities and structures for the fire front.[237] Crews moved vehicles away from structures, secured the Sugarlands Visitor Center and maintenance facilities, and evacuated Park staff and visitors from the structures.[238]

394.    At 5:30 p.m., officials learned that an updated weather forecast called for no rain for another twelve (12) hours. Already, gusts were so hard, some firefighters could

---

[233]Quoting a 911 caller.

[234][ABS Report, at p. 22].

[235][NPS Report, at p. 23].

[236][ABS Report, at p. 22].

[237][NPS Report, at p. 22].

[238][NPS Report, at p. 23].

barely stand, trees and utility poles were snapping and power lines were falling onto dry grass, leaves and brush.

395. By 5:39 p.m., fire-crews were advised that The Chimney Tops 2 Fire was within one mile of the Sugarlands Visitor Center and Park Headquarters. Between 5:45 p.m. and 6:00 p.m., Chief Miller said that multiple fires had ignited around Gatlinburg, as The Chimney Tops 2 Fire began spotting and torching through, around and beyond the City of Gatlinburg.

### 7. Monday Night: Fire in the City

*"We had a new structure fire roughly every 18 seconds."*[239]

396. At about 5:45 p.m., the first report of fire in Gatlinburg[240] came in from Valley View Lane, more than four miles from Mynatt Park: "There's a big fire about 300 yards (from me), and it's getting bigger," the caller told an E-911 dispatcher. "I don't know where to get to it or how to get to it, but it's growing, going up the hill."[241] Soon came calls of brush fires on East Foothills Drive and Oglewood Lane. Then came calls to "hurry, hurry, hurry!"

397. Mark Robinson, a retired Emergency Manager for the U.S. Department of Energy assigned to the Oak Ridge National Laboratory, checked into a rental cabin on Ski Mountain on Sunday, November 27, 2016 with his wife, children and grandchildren, for a

---

[239]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-911-calls-evacuation-orders-communications-failures/856270001/

[240]Speaking of Gatlinburg, one fire expert observed, "[i]t's not a community that was designed to survive a wildfire." Henri Grissino-Mayer, a University of Tennessee geography professor who studies fire in the Smokies.

[241]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-911-calls-evacuation-orders-communications-failures/856270001/

122

vacation. Mr. Robinson was alarmed to discover the volume of smoke in downtown Gatlinburg and the number of people using clothing and masks to filter breathing air. Mr. Robinson searched the web for updates about the fire, found nothing, and decided to drive to the Sugarlands Visitor Center to get answers.

398. On arrival at the Sugarlands Visitor Center, Mr. Robinson asked a Park Ranger if it was safe to stay in the area and the Park Ranger responded, "nothing to worry about," pointing to the coming rain, as Mr. Robinson watched as Park staff blew leaves with leaf blowers away from the building as a fire-line. Shortly thereafter, Mr. Robinson gathered his family of six and fled his rental cabin through fire-ravaged Ski Mountain.[242] "When the wind shifted and the wind speed doubled, they should have known that everyone needed to get out," said Mr. Robinson.[243]

399. Conditions changed rapidly between 5:00 and 6:00 p.m. on Monday, November 28, 2016, with increasing strong southerly winds, just as predicted on Saturday. Just before weather monitoring equipment shut down due to a power outage, local television station, WATE-6, reported winds of up to *87 miles per hour* at 6:00 p.m. at Cove Mountain, just above Gatlinburg. According to Chief Miller, "it was so high that it took out power in the Park to the barometer that measures it The next several hours

---

[242]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-chimney-tops-pigeon-forge/856268001/

[243]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-911-calls-evacuation-orders-communications-failures/856270001/

123

after that, the winds were even greater – we just had no way to physically record it." Chief Miller added: "We were forced into a reactive response; multiple trees were falling, multiple power lines were down and multiple other areas of ignition occurred."[244]

400.   By 6:00 p.m., The Chimney Tops 2 Fire had ignited about 5,000 acres.[245] Salansky heard a call that the fire had crossed Newfound Gap Road north of Park Headquarters, jumped the Little Pigeon River, and was headed toward Ski Mountain.[246]

401.   Winds easily topped 60 mph – hitting triple-digits by some accounts – and The Chimney Tops 2 Fire roared through town, having split into two wings, threatening to envelope Gatlinburg from east and west. As one wing swept northeast toward Park Vista, Turkeys Nest, and East Foothills Drive, the other jumped Newfound Gap Road, hopping creeks toward Ski Mountain. As The Chimney Tops 2 Fire roared through Gatlinburg, the western-half of town was completely undefended. Most of those whose deaths were caused by The Chimney Tops 2 Fire were located on the west side of town, just beyond the city limits.

---

[244]*"Timeline: Gatlinburg Wildfires: National Park Service explains how Chimney Tops 2 fire spread to Gatlinburg,"* Annie Culver, WATE 6 (updated 6/30/17: http://www.wate.com/news/local-news/timeline-gatlinburg-wildfires/792912856 (quoting Gatlinburg Fire Chief Greg Miller).

[245][ABS Report, at p. 23].

[246][NPS Report, at p. 23].

### 8. The Chimney Tops 2 Fire Jumps Containment Lines, As Firefighters, Dispatchers and Mandatory Evacuations Are Stymied by Communications Breakdowns.

*"Everything that could go wrong did."*[247]

402. At 6:08 p.m. on Monday, November 28, 2016, the GFD C-shift Captain said The Chimney Tops 2 Fire at Twin Creeks physically-crossed the Park boundary towards the Park Vista Hotel. Just after 6:00 p.m., Salansky learned that the fire had moved into Gatlinburg.[248] Over the next half-hour, several other fires started in Gatlinburg.[249]

403. Calls began coming in about fires on Condo Drive and Davenport Road to the east and Garrett Drive and Norton Creek Road to the west. With embers from The Chimney Tops 2 Fire blowing in the hurricane-force winds, authorities estimate more than twenty (20) separate fires broke out in the first fifteen (15) minutes after the fire escaped the Park. Chief Miller said, "Looking at the final numbers, ***we had a new structure fire roughly every 18 seconds***."[250]

404. Around 6:10 p.m., fire crested the mountain at Park Vista. According to Chief Miller, a mandatory evacuation of the Mynatt Park community was issued at 6:11 p.m.[251]

---

[247] https://www.firehouse.com/leadership/news/12375900/gatlinburg-tn-fire-chief-greg -miller-smoky-mountain-wildfires-firefighter-news (quoting Gatlinburg Fire Department Chief Greg Miller)

[248] http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-tha t-burned-into-gatlinburg/#more-53483

[249] [ABS Report, at p. 23].

[250] http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-y ear-later-911-calls-evacuation-orders-communications-failures/856270001/

[251] [ABS Report, at p. 23].

125

A mandatory evacuation of the East Foothills Road, Turkey Nest Road, Davenport Road, and Savage Garden areas was issued at 6:27 p.m.[252] At 6:27 p.m., other mandatory evacuations were made in the area. By 6:30 p.m., callers reported fires in Chalet Village. By 6:34 p.m., The Chimney Tops 2 Fire had jumped containment lines and penetrated Mynatt Park, Turkeys Nest, and Davenport Road.

405. Fire hydrants ran dry as power failed at city pumping stations. Power loss destroyed most communications, as the fire melted fiber-optic cables and knocked out cell towers. Gatlinburg's internet-based police-dispatch system lost power off and on until crashing before midnight.

406. At around 7:00 p.m. on Monday, November 28, 2016, Chief Miller said crews began systematically evacuating the most immediately threatened areas. He said their efforts were focused around sending emergency resources to new calls and continuing to suppress the fires. "It was vital that incoming emergency traffic responders had open traffic routes to quickly access the fires. In order to achieve this we continued to focus on removing the residents and visitors from the most vulnerable areas," said Chief Miller.[253]

407. At 7:00 p.m., Pigeon Forge firefighters pulled out to fight a half-dozen fires threatening their own city.

408. Also at 7:00 p.m., Gatlinburg City Manager Ogle, Chief Miller, and the Park Superintendent held another press conference. The focus was on the available information regarding the fire-situation and existing evacuation orders. Still, the Park Superintendent

---

[252][ABS Report, at p. 23].

[253]*"Timeline: Gatlinburg Wildfires: National Park Service explains how Chimney Tops 2 fire spread to Gatlinburg,"* Annie Culver, WATE 6 (updated 6/30/17) http://www.wate.com/news/local-news/timeline-gatlinburg-wildfires/792912856

126

mentioned nothing about the imminent threat of The Chimney Tops 2 Fire, although it had already moved from the Park and into Gatlinburg.[254]

409. Evacuation-protocols also broke down. GPD officers, Sevier County deputies, and officers from Sevierville and Pigeon Forge simply lacked reasonable or sufficient time to reach every house, every apartment, every trailer, every campground, every cabin or every hotel room ahead of the fire. GPD officers began notifications at the south end of Chalet Village from Ski Mountain Road. Their efforts largely failed.

410. Sevier County Sheriff's Deputies began notifications at the north end of Chalet Village from Wiley Oakley Drive. The fire out-ran them. The areas most heavily damaged by The Chimney Tops 2 Fire were along Beech Branch Road, Wiley Oakley Drive, and Walker Trail.

411. The City of Gatlinburg had no way to issue a mass evacuation alert, other than a 20-year-old flood-alert siren system consisting of just four speakers arranged around the central business district and designed to warn of flooding of the Little Pigeon River. Captain David Puckett, the fire commander, radioed the command center at 7:12 p.m., "Chief, if the siren system's working, it probably would not be a bad thing to try to do a manual evacuation using that," Puckett said. Puckett asked for the sirens at 7:12 p.m., 7:15 p.m. and 7:50 p.m., but no one responded.

---

[254][ABS Report, at p. 106].

*"We were in above our heads."*[255]

412. Often, notes made by firefighters that night sounded desperate: "Wall of fire on Reagan Drive," reads a 7:55 p.m. note. "Overrun on Wiley Oakley Drive. Retreating. . . . Fire on two sides. . . . Request Pigeon Forge to shut down Spur……. Lost apartments and church on Reagan Drive; jumped Reagan Drive and heading up Ski Mountain. Evacuate West Gate. . . . Kill power to downtown. …… Tree down on Winfield Heights Road; can't evacuate."

413. According to Chief Miller, at 8:00 p.m., the Ski Mountain area was added to the list of mandatory evacuations. By then, The Chimney Tops 2 Fire had already ignited approximately 7,000 acres. There were multiple fire-fronts approaching Gatlinburg and surrounding communities.[256] At 8:14 p.m., Chief Miller said they started to have widespread power losses across Gatlinburg. "Fire resources became depleted, the wind-driven nature of the fire challenged suppression crews from extinguishing the growing blaze," said Chief Miller.

### 9. Communication-Breakdowns Affect Total Evacuation of Gatlinburg.

*"Feels like end of times."*[257]

414. A total evacuation of the Gatlinburg area was ordered shortly after 8:30 p.m. on Monday, November 28, 2016.[258] Not until 8:30 p.m. did the flood-warning sirens first

---

[255]https://www.firehouse.com/leadership/news/12375900/gatlinburg-tn-fire-chief-greg-miller-smoky-mountain-wildfires-firefighter-news (quoting Chief Greg Miller)

[256][ABS Report, at p. 23].

[257]A Facebook post on Monday, November 28, 2016, by Janet Summers.

[258]ABS Report, at p. 23].

sound, ten minutes after Chief Miller had given the order to evacuate. They sounded again at 9:30 p.m. Assistant Fire Chief Charlie Cole issued the live announcement: "Anyone who can hear this message, evacuate the area immediately." But Cole's message failed to carry beyond the edge of downtown, an area already evacuated.

415. Chief Miller said that Sevier County Emergency Management Director John Matthews was able to contact the Tennessee Emergency Management Agency ("TEMA") and ask that a public alert and warning system evacuation-message be sent to all mobile devices in the area to announce the Gatlinburg area was being evacuated. After that, two Verizon cell phone towers went down causing service interruptions.

416. At 8:40 p.m., when TEMA tried to call Director Mathews back to get his approval of the message, Chief Miller said they were unable to reach him because of an "infrastructure failure." In any event, TEMA officials in Nashville would not send the mass-evacuation alert without confirming details. "Therefore," Chief Miller said, "TEMA could not send the message, because the verbiage had not been approved. That is important to note, because we didn't want an inappropriate message to be disseminated which could have evacuated people towards an area of concern, rather than away from it."[259]

417. Ultimately, the only text-alert to reach anyone was just after 9:00 p.m., asking people to stay off their cell phones. Chief Miller said the NWS independently contacted the Sevier County E-911 to see if they could help with an alert-message after they were not able to contact Director Matthews. A supervisor at Sevier County E-911 was able to confirm to the NWS that they did want an alert sent out. The following message was sent at 9:03 p.m.

---

[259]"*Timeline: Gatlinburg Wildfires: National Park Service explains how Chimney Tops 2 fire spread to Gatlinburg*," Annie Culver, WATE 6 (updated 6/30/17) http://www.wate.com/news/local-news/timeline-gatlinburg-wildfires/792912856

128

via the Emergency Alert System ("EAS"), fully three hours after fires racing as fast as half a mile per hour had entered Gatlinburg:

> "THE CITY OF GATLINBURG AND NEARBY COMMUNITIES ARE BEING EVACUATED DUE TO WILDFIRES. NOBODY IS ALLOWED INTO THE CITY AT THIS TIME. IF YOU ARE CURRENTLY IN GATLINBURG AND ARE ABLE TO EVACUATE...EVACUATE IMMEDIATELY AND FOLLOW ANY INSTRUCTIONS FROM EMERGENCY OFFICIALS. IF YOU ARE NOT INSTRUCTED TO EVACUATE...PLEASE STAY OFF THE ROADS."[260]

418. Because this was a non-weather emergency message, the Wireless Emergency Alert ("WEA") could not be used for this evacuation.[261] TEMA personnel saw the message issued from the NWS and falsely assumed that the Emergency Operations Center ("EOC") had chosen to inform the public through the NWS EAS message and did not send the requested Integrated Public Alert and Warning System ("IPAWS") message. A separate IPAWS message was issued at about 10:30 p.m. by the TEMA Director requesting that everyone stay off their cell phones. Director Mathews was unaware for several days that the message initially requested for broadcast by TEMA was never disseminated.[262]

419. As the flood-warning sirens sounded, firefighters began to pull back, giving up against a fire that could not be beaten, abandoning all firefighting efforts and evacuation and rescue efforts because conditions were "too dangerous." Ski Mountain burned mostly unchecked all night.

---

[260][ABS Report, at p. 25] (emphasis in original).

[261][ABS Report, at p. 25].

[262][ABS Report, at p. 25].

420. Police, fire, and mass transit personnel were sent door-to-door in many areas to evacuate citizens and visitors despite being severely challenged by downed trees, intense fire, downed power lines, loss of power, loss of land-line phones and internet and cell phone services. Many citizens and visitors also made heroic efforts to warn their neighbors and to provide assistance in fleeing the fires.[263]

### 10. "It Was like Running Through Hell."[264]

421. Emergency personnel could not respond to calls for aid or ambulances. They could not get to residents. Due to untimely notice from Park personnel, people were stranded in their homes, hotels, resorts, elevators, cars and elsewhere. Emergency communications failed. Cell phone communications failed. Knoxville firefighters called in to help battle The Chimney Tops 2 Fire inside the Park at Sugarlands Visitor Center with a 5,000-gallon tank of water, watched as the fire "went around us on both sides."[265]

422. The ABS Consulting Review Team determined that timely and accurate communication from the Park personnel would have helped Gatlinburg prepare for the fire. Firefighting and evacuation plans would likely have been better directed and accelerated if more accurate fire location data had been timely received from Park personnel and NWS wind-data had been included to model fire-progression.[266] For instance, city and county

---

[263][ABS Report, at p. 25].

[264]Linda Morrow, who ran from her burning home on Baskins Creek Road. http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-victims-deaths-damage/856273001/

[265]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-911-calls-evacuation-orders-communications-failures/856270001/

[266][ABS Report, at p. 76].

130

officials learned (after the incident) that at about 5:58 p.m., Park personnel locked gates along the Gatlinburg Bypass adjoining the Park and Gatlinburg, effectively blocking the only evacuation route and restricting inbound access from responding mutual aid public safety departments.[267]

423. There were significant communications-gaps between Park fire managers and local and state agencies regarding: public notification of threats from rapidly moving wildfires,[268] the interoperability of communications equipment, establishment of a unified command center and information sharing. In an understated finding, the ABS Consulting Review Team concluded that there is a "radio communications gap between Park personnel and local and regional fire response agencies."[269]

424. By 9:00 p.m. on Monday, November 28, 2016, The Chimney Tops 2 Fire is assumed to have ignited about 9,000 acres, but was not done. It had ignited about 16,000 acres by midnight and about 17,000 acres by about 2:00 a.m. on November 29, 2016.[270]

425. At 9:00 p.m., The Chimney Tops 2 Fire showed no sign of burning out. Homes burned to their foundations. Trees burned to their roots and into the dirt. Few neighborhoods survived undamaged by the fire. Drivers abandoned their vehicles in their driveways or on and along the roads.

426. Nearly a dozen people wound up stranded on Baskins Creek Road, blocked by a fallen tree and a tangle of power lines. One fire engine had gone to Baskins Creek and

---

[267][ABS Report, at p. 74].

[268][ABS Report, at p. 77].

[269][ABS Report, at p. 78].

[270][ABS Report, at p. 26].

turned back, abandoning rescue efforts, believing the conditions were too risky. Three state troopers headed up Baskins Creek Road to rescue those stranded, first in a cruiser, then on-foot. The three heroes dodged fallen and burning trees, burning cars, downed power lines and transformers. They eventually rescued the stranded group by leading a procession through the flames, carrying a badly-burned woman and a child out of the inferno.

427. At 9:47 p.m., the NWS issued this message via radio and TV:

"PIGEON FORGE MAYOR DAVID WEAR HAS ISSUED A MANDATORY EVACUATION: IF YOU ARE LOCATED IN THE AREA BETWEEN THE SPUR AND TRAFFIC LIGHT NUMBER 8 IN THE CITY OF PIGEON FORGE, PLEASE FOLLOW THESE INSTRUCTIONS. PEOPLE WHO ARE IN A HARDENED STRUCTURE LOCATED ON THE PIGEON FORGE PARKWAY IN THE DESIGNATED AREA SHOULD REMAIN IN THAT STRUCTURE. IF YOU ARE IN A STRUCTURE LOCATED OFF THE PIGEON FORGE PARKWAY IN THE DESIGNATED AREA, IT IS IN YOUR BEST INTEREST TO EVACUATE NOW. PLEASE USE 441 NORTH PARKWAY TO TRAVEL. PLEASE AVOID SIDE STREETS AND BACKROADS."[271]

428. Like the previous message, because The Chimney Tops 2 Fire was a non-weather emergency, the established policy of the NWS did not allow for Wireless Emergency Alert ("WEA") distribution of this evacuation message.[272]

429. Many people who narrowly escaped The Chimney Tops 2 Fire said they never received a text message-alert warning to evacuate. Officials confirmed that is because it was never sent.

---

[271][ABS Report, at p. 26] (emphasis in original).

[272][ABS Report, at p. 26].

### 11. Rain Finally Comes

430. By approximately 10:00 p.m. on November 28, 2016, the majority of the residents and visitors (over 14,000) who had evacuated Gatlinburg were out of danger.[273] At The Chimney Tops 2 Fire's peak, between about 6:00 p.m. and about 11:00 p.m. on November 28, 2016, the fire was igniting *over 2,000 acres per hour*, indicating that it spread *more than half an acre per second*.[274] No human could have outrun that fire.

431. Around 10:10 p.m., flames shot down the Parkway toward the command center at City Hall as power blinked out again. Fearing the loss of City Hall, authorities evacuated and moved operations to the Gatlinburg Community Center atop a hill near the city's eastern edge. A light rain set in around 10:30-11:00 p.m., but the winds blew on. From 7:00 p.m. until midnight, sustained winds were at 13 to 17 mph with gusts from 34 to 49 mph. This data from Indian Grave was not too far off the forecast issued on Sunday. The NWS recorded wind-gusts in or around Sevier County of between 46 to 60 mph.

432. Gusts above 40 mph continued until 2:00 a.m. on Tuesday, November 29, 2016, then mostly dropped below 20 mph the remainder of the day. "At 2 a.m., the wind stopped like you had turned off a switch . . . . And the rains came There were no new structure fires after that point," said Chief Miller. Rain continued to fall until 6:00 a.m. on Tuesday, totaling 0.78 inch at Indian Grave. The rain took much of the heat out of the fire and slowed its spread.

---

[273][ABS Report, at p. 27].

[274][ABS Report, at p. 31].

**J. Aftermath – 14 Deaths, 191 Injuries, 2,500 Structures Damaged or Destroyed, and More Than 17,000 Acres Burned.**

433. By early morning on Tuesday, November 29, three (3) deaths within the City of Gatlinburg and eleven (11) deaths in the adjacent Chalet Village North community of Sevier County occurred, either directly from the fire or as a consequence of individuals attempting to flee The Chimney Tops 2 Fire. About 2,500 structures were damaged or destroyed and more than 17,000 acres burned.[275]

434. By Tuesday, multiple evacuation shelters had been set up where many victims remained for more than a week. By Wednesday, November 30, 2016, officials began to release the names of victims who died. On December 3, 2016, families were allowed to drive past the Gatlinburg checkpoint to visit their homes and assess damages.

435. By Monday, December 5, 2016, it had rained about every two to three days since November 29 in the Gatlinburg area. The IMT now managing The Chimney Tops 2 Fire reported that the fire had not increased in size over the previous twenty-four (24) hours and was still listed at 17,006 acres.

436. The magnitude of the Mutual-Aid Response was the largest ever in Tennessee history, utilizing resources from 50 counties, over 225 agencies, 445 apparatus, and 3,535 first responders.[276] Firefighting resources assigned to the fire included twenty-five (25) hand-crews, sixty-one (61) engines, six (6) helicopters and two (2) bulldozers for a total seven-hundred and eighty (780) personnel.

---

[275][ABS Report, at p. 13].

[276][ABS Report, at p. 97].

437. During the period of December 3-17, 2016, Gatlinburg residents were restricted to entering fire-damaged restriction zones from 8:00 a.,m. until 5:00 p.m. daily.

438. On December 7, 2016, property owners, business owners, renters, and lease holders were allowed to return to full time occupancy of their homes, businesses and properties.

439. On December 9, 2016, the Park and the City of Gatlinburg reopened to the public, though a number of locations within the Park remained closed.

440. On December 13, 2016, the Sevier County Mayor announced that all fires in the city area and the Park had been extinguished.

441. Officials soon announced that two juveniles were accused of starting the wildfires. By June 30, 2017, however, the state had announced that charges had been dropped against the juveniles. The State based its decision on lack of jurisdiction to prosecute anyone for crimes committed inside the Park.

### K. Park Fire Managers Generally Respond By Saying There Was Nothing They Could Have Done To Stop the Fire.

*"There was no way we could have controlled the fire prior to the wind event."*[277]

442. "All this happened in 12 hours," Salansky said to a group of wildfire professionals on June 7, 2017, commenting on the November 28, 2016 catastrophe. If he had "a 30-day window," Salansky told the group, he could "make contact with individuals and incorporate evacuation procedures and all this." But with:

---

[277] *"Timeline: Gatlinburg Wildfires: National Park Service explains how Chimney Tops 2 fire spread to Gatlinburg,"* Annie Culver, WATE 6 updated 6/30/17) http://www.wate.com/news/local-news/timeline-gatlinburg-wildfires/792912856 (quoting Deputy Superintendent Clay Jordan).

> "a 12-hour window, you're reacting to doing the best that you can at the time I'm living this hour by hour as it unfolds. I don't have a crystal ball saying this is what's going to happen in three hours. "[278]

443. In truth, Salansky actually *did* have a crystal ball, in the form of both a Saturday morning NWS Weather Alert that predicted the mountain wave for Monday, November 28, 2016 and a NTFB model that predicted The Chimney Tops 2 Fire would escape the Park largely as a result of those coming high winds.

444. Salansky, the FMO who was also the self-anointed IC, DO and Safety Officer for the incident, disregarded both the high-wind alert and the computer-model, opting instead to "hope for rain."

445. In responding to criticism, Salansky said:

> "This is not my first fire I've ever been on, I've got some experience. I've been all over the country. I've fought fire in a lot of places."[279]

446. Similarly, Deputy Superintendent Jordan said "There was no way we could have controlled the fire prior to the wind event," and "no number of firefighters or fire engines could have stopped the spread of such an extreme wind-driven fire."

447. Dana Soehn, the Park's Public Information Officer, stated:

> "From the onset, our focus was to put out The Chimney Tops 2 wildfire as safely and effectively as possible, as required by the park's Fire Management Plan and National Park Service firefighting policy. Our firefighters initially responded to

---

[278]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[279]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

smoke that was coming from deep pockets of duff on extreme, near-vertical slopes of 70–80 degrees. Despite the terrain, we took action immediately."

"These were very rare and unprecedented conditions that lead to the destruction," Soehn added. "The opinions that I have heard from the scientists around me this week say that this is completely unpredictable."[280]

448.    For six days, Salansky took mostly indirect-actions to contain, not suppress, The Chimney Tops 2 Fire (the only direct action was the limited water-drops on Sunday afternoon, November 28, 2016), choosing to treat The Chimney Tops 2 Fire as if was a prescribed burn and not what it was: a human-ignited wildfire.[281]

## L.    NPS After-Action Report

449.    In February 2017, the NPS delegated a review of The Chimney Tops 2 Fire to a team, including seven inter-agency fire experts, to determine facts leading up to the

---

[280]http://www.cnn.com/2016/12/02/us/weather-gatlinburg-was-made-to-burn/index.html

[281]On May 11, 2018, at the Pigeon Forge Fire Department's "Firewise" presentation during the annual Wilderness Wildlife Week event, firefighters were asked how many water/retardant -drops it would have taken to extinguish The Chimney Tops 2 Fire in the beginning, neither firefighter making the presentation could (or would) answer. However, referring to wildfires in the GSMNP, long-time Pigeon Forge Firefighter Kevin Nunn responded, "Remember, their policy is to let things burn.

137

devastation, whether the specific actions taken were consistent with policy and professional firefighting practices, and to make recommendations to planning and operational management to reduce the chances of another incident happening in the future.[282]

450. The focus of the report was on NPS's preparedness and response to The Chimney Tops 2 Fire as it originated and burned within the Park's boundaries up to the time the fire left the Park.[283] The "After-Action Report," issued on August 31, 2017, therefore did not detail anything that happened after The Chimney Tops 2 Fire spread outside the Park. The NPS Report blamed "[p]reparedness and planning weaknesses" for hindering the response by Park officials to The Chimney Tops 2 Fire. The NPS eventually concluded, however, that there was "no evidence" of negligence by Park officials.

451. Like Park officials who were involved with the incident, the NPS Review Team emphasized the unprecedented nature of The Chimney Tops 2 Fire. "The fire wasn't really one that was typical of East Tennessee, but more akin to a wildfire experience in Southern California."

452. According to Joe Stutler, The Chimney Tops 2 Fire Review Team leader, "Never in the history of this park or even the surrounding area had anyone seen the combination of severe drought, fire on the landscape, and extreme wind event" occurring at the same time.[284] Stutler explained, "They did the best they could with what was in their

---

[282]Not all fires in National Parks warrant an external review, but in this case, one was ordered because of the lives lost, the scale of the damage and the spread of the fire outside the park, according to fire review team leader Bill Kaage. Kaage is also the NPS Division of Fire and Aviation Chief.

[283][NPS Report, at p. 2].

[284]Eastern forests, when faced with prolonged drought, are more vulnerable to hotter-burning, terribly destructive wildfires."

hard drive. No one had seen this before." Combined with a wildland/urban interface, it was the "perfect storm," Stutler reasoned. The NPS Review Team concluded fire management officials did not see the potential for the low-frequency, high-risk event (despite innumerable indicators that a wildfire at that time and place and under the prevailing conditions would be resistant to control).

453. The NPS Report concluded that a lack of wildland fire preparedness during a period of drought conditions favorable to wildfires simply overwhelmed the Park's response to the fire.[285] Generally, the NPS Review Team found inaction, under-staffing and a failure to appreciate the danger led to a response that violated various NPS and Park policies and amounted to too little, too late.

454. The NPS Review Team made several findings critical of the Park's fire managers, concluding that The Chimney Tops 2 Fire "exposed several wildland fire situational preparedness and planning weaknesses" at the Park.[286] The Review Team criticized the chain-of-command and management of the fire, pointing to the lack of policy oversight.[287] Among other findings, the NPS Review Team concluded that "preparedness efforts were not communicated and coordinated between the Park and interagency partners

---

http://news.psu.edu/story/441686/2016/12/12/devastating-wildfires-eastern-forests-likely-be-repeated-expert-warns.

[285][NPS Report, at p. 4].

[286][NPS Report, at p. 63].

[287][NPS Report, at p. 58].

as per the Park's fire management plan requirements"[288] and that "the experience level of Salansky, the FMO, and Park leadership, was not sufficient to know and understand the NPS policies, requirements, and standards."[289]

### M.    ABS Group Consulting Report

455.    The City of Gatlinburg and Sevier County commissioned their own after-action report by ABSG Consulting to examine the response by Gatlinburg and Sevier County agencies to the wildfire after the flames left the Park. The December 2017 ABS Report concluded that "insufficient warning by [the Park] contributed to a dramatically reduced time frame to conduct needed evacuations."[290] In short, from Wednesday, November 23 until late Monday morning, November 28, 2016, the GFD and GPD were kept in the dark, uninformed by Park officials about the scale and scope of a fire heading toward Gatlinburg at speeds topping 2,000 acres per hour.

456.    A lack of early notice from the Park appeared to be the most critical failure of all, according to the ABS Report. Poor communication by Park staff with Gatlinburg authorities undermined the initial response to The Chimney Tops 2 Fire and cost lives, the ABS Report concluded. Gatlinburg firefighters received no advance warning of The Chimney Tops 2 Fire until about 11:00 a.m. on Monday morning, November 28, 2016, when the GFD Captain on-duty talked to Salansky to ask about the smoke pouring into the city. Salansky told him everything was "under control" – as rising winds carried embers from the fire miles toward Gatlinburg. Communications breakdowns inevitably blinded

---

[288][NPS Report, at p. 56].

[289][NPS Report, at p. 56].

[290][ABS Report, at p. 63].

Case 3:20-cv-00149-JRG-CRW    Document 1    Filed 04/08/20    Page 151 of 185
PageID #: 151

expectations, costing emergency crews precious time. By the time local officials informed about the true danger, The Chimney Tops 2 Fire was unstoppable.

457. "All first responders, (Gatlinburg command center) personnel and field command staff were unaware of the rate at which the fire spread was occurring," the ABS Report found, adding, "The fire was unable to be fully assessed in its entirety More timely and accurate communications from the [Park] personnel would have helped the city to prepare sooner for what was a catastrophic event."

## N. Other Reactions

458. U.S. Secretary of the Interior Ryan Zinke said the NPS could have done some things better on battling the wildfire and vowed to do what it takes to make sure a devastating fire doesn't happen again here. Zinke mentioned several times in his talk that there was a need for "better communication" among those dealing with the fire. "At 9/11, we learned that the different responding agencies couldn't talk to each other," he said. "That lesson didn't go down to the Department of the Interior, so we found out that some of our communication systems (in the fire) could not communicate with the responders who needed it."[291]

459. All of the ingredients existed for The Chimney Tops 2 Fire to explode on November 28, 2016: "For a catastrophic fire to occur you need ignition and fuel, but you need wind, and that's exactly what happened with this fire," said Dr. Henri Grissino-Mayer, the University of Tennessee professor who studies fire in the Great Smoky Mountains.

---

[291]http://www.knoxnews.com/story/news/local/tennessee/gatlinburg/2017/08/25/secretary-interior-promises-big-effort-avoid-another-devastating-fire-gatlinburg/600763001/

141

460. Jerry Grubb, a former Ranger at the Park, believes officials mismanaged The Chimney Tops 2 Fire. Grubb said the fire should have been extinguished immediately pursuant to the Park's FMP. "If it is a wildfire, you put it out," said Grubb, adding, "Had they gone back to their crisis management intervention and done what their regulations say they are supposed to do, it would have never happened," Grubb said.

## VII. CLAIMS FOR RELIEF

## (COUNT ONE – NEGLIGENCE – FAILURE TO MONITOR)

461. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

462. The USA is liable for tort actions in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. §§ 1346(b) & 2674.

463. Tennessee law provides that a party is negligent when there is "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)).

464. The USA, as owner of the GSMNP, owed a duty to prevent a dangerous condition on Park property – The Chimney Tops 2 Fire – from escaping the Park and causing injuries to people and property outside the Park.

465. As established above, the USA breached its duty by failing to comply with mandatory wildfire management policies and requirements that compel Park fire managers to monitor any wildfire on their land, including, but not limited to, DO #18, NPS Reference Manual 18, the GSMNP's FMP, the Interagency Standards for Fire and Fire Aviation

142

Operations (the "Redbook"), the Fire Monitoring Handbook ("FMH"), along with other written or settled fire management policies, procedures, rules, regulations and guidelines.

466. The FMH refers to DO #18: Wildland Fire Management (USDI NPS 1998), directing fire managers to monitor all wildland fires. Reference Manual 18 also commands fire managers to monitor all fires. [NPS Reference Manual 18, Wildland Fire Management, at p. 8] ("All wildland fire events must be monitored). Specifically, fire managers must monitor wildland fires in order to:

> "provide managers with information essential for decision making; determine whether fire management program objectives are being met; ensure protection of human life, property, and natural and cultural resources; determine the effectiveness of the planned strategy; assist with contingency planning; increase knowledge of fire behavior and effects on park ecosystems; provide long-term documentation for actions taken on a wildland fire; identify human health and safety concerns from wildland fire."

[Reference Manual 18, at p. 8].

467. Neither DO #18 nor Reference Manual 18 describes how such monitoring is to be done. However, the FMH provides Park FMOs such guidance by outlining standardized methods to be used throughout the National Park System for documenting, monitoring and managing all wildland fires. These standard techniques are ***mandatory***.

468. For fire suppression, the FMH provides that "all management actions are intended to extinguish or limit the growth of the fire." [FMH, at p. 3]. During the Initial Assessment phase of a fire, fire managers must determine the fire cause and location, ***and monitor fire size, fuels, spread potential, weather, and smoke characteristics***. They must also address particular threats and constraints regarding human safety, cultural resources, and threatened or endangered species or other sensitive natural resources

143

relative to the suppression effort (especially fire-line construction), and work collaboratively with other Park staff and inter-agency staff to address goals and objectives outlined in government agency policies, manuals, directives, etc. [FMH, at p. 9].

469. Fire managers must also consider "the potential for the fire to leave a designated management zone, impact adjacent landowners, threaten human safety and property, impact cultural resources, affect air quality, or threaten special environmental resources such as threatened, endangered or sensitive species." [FMH, at p. 10].

470. Here, not only were no night-time suppression operations conducted, but no overnight monitoring of fire-activity or smoke-impacts of any kind was performed from the time the fire was discovered on Wednesday, November 23, 2016 through Monday morning, November 28, 2016. This occurred notwithstanding eighty-years of ground fuels and severe drought conditions, as well as warnings of "high winds" and "enhanced fire danger" due to "critically dry conditions." Under hazardous drought conditions and a forecast of strong southerly winds (which would push The Chimney Tops 2 Fire north toward the Gatlinburg), the growing fire was abandoned and left unwatched and unattended. As predicted, on Monday, November 28, 2016, high-winds blew the unmonitored fire out of its ill-designed 410-acre "containment box" and out of control.

471. Proper monitoring of fire-behavior and spotting, at least during the overnight hours on Sunday, November 27 to Monday, November 28, 2016 would have provided more time for Salansky and Park officials to recognize that The Chimney Tops 2 Fire was most likely going to impact Gatlinburg and the surrounding area and to then notify Park neighbors, local officials, local residents and visitors.

472. Salansky's nonchalant approach to The Chimney Tops 2 Fire was likely engendered by his untenable and unchecked belief that the fire would never breach the 410-acre "containment box." This belief, based on historical fire-suppression success in the Park, should have been discarded as early as Saturday morning (when the high-wind forecast from the NWS was received), or at the latest, by early Sunday, November 27, 2016 (when crews attempting to construct fire-lines reported that moss on rocks was turning to dust on-contact, signifying severe drought conditions had largely eliminated the usefulness of a "containment box" secured by natural boundaries and drainage bottoms).

473. Although overnight monitoring may not be required for every wildfire, the extraordinary conditions existing (*e.g.*, fuels, severe drought, low-humidity and a high-wind forecast) from November 23-28, 2016 should have prompted Salansky and senior Park leadership to keep a watchful eye on the fire. Nothing in news reports, after-action reports or the public record indicates that a serious discussion or analysis of safety risks, including monitoring, ever occurred between fire managers.[292]

474. Some of Salansky's failures can be attributed to his inexperience fighting fires in the Park. Since being appointed the Park's FMO about eight months earlier, Salansky had fought only ten (10) fires. While he was an experienced firefighter, he was relatively inexperienced as an FMO, particularly in the culture of the Park's fire-fighting system.

475. This inexperience had disastrous consequences. By Wednesday, November 23, 2016, there was a shortage of fire-personnel and resources, as most personnel had been allowed to take leave for Thanksgiving. Although a severity request had been made by

---

[292]This may have been largely because Salansky was filling multiple (at least five) fire-management functions, and therefore lacked policy oversight and the ability to have his decisions checked by others.

Salansky earlier that month, fire-potential was extremely elevated, and major fires were already burning in the region,[293] Salansky failed to order additional resources until Sunday, November 27, 2016, after The Chimney Tops 2 Fire had been burning for at least five days.

476. As a proximate result of these negligent acts or omissions by Salansky and senior Park leadership – acting within the course and scope of their employment and in violation of mandated monitoring requirements – fourteen people were killed, over 190 others were injured, including several of the Plaintiffs herein, Plaintiffs' homes, businesses, and personal property were destroyed. Plaintiffs have therefore suffered monetary damages.

477. All of the injuries and damages suffered by the Plaintiffs were proximately caused by the negligent actions or omissions of NPS employees.

## COUNT TWO – NEGLIGENCE – FAILURE TO COMPLY WITH COMMAND-STRUCTURE REQUIREMENTS)

478. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

479. Wildfires are typed by complexity, from Type 5 (least complex) to Type 1 (most complex). The Incident Command System ("ICS") organizational structure develops in a modular fashion based on the complexity of the incident. The Interagency Standards for Fire and Fire Aviation Operations (the "Redbook") provides that "[a]ll wildfires,

---

[293]The severity request was submitted on November 4, 2016 and was approved due to drought and high-fire occurrence locally and regionally. However, Salansky had only requested funds largely to extend standby hours. That is, he had not requested additional resources, despite numerous warnings and actual fuel and weather conditions.

146

regardless of complexity, will have an Incident Commander ("IC"). The IC is a single individual responsible to the Agency Administrator(s) for 23 different incident activities." [Redbook, at p. 229].

480. Salansky was the Appalachian-Piedmont Zone Fire Management Officer ("Zone FMO"), responsible for the GSMNP and nineteen (19) other parks. [NPS Report, at p. 53]. As Zone FMO, Salansky was also the Park FMO. [NPS Report, at p. 30]. And, after The Chimney Tops 2 Fire was discovered on Wednesday, November 23, 2016, Salansky assumed the role of IC. As IC, Salansky was responsible for establishing the appropriate organizational structure for the fire and managing the fire based on his qualifications, incident complexity, and span of control. [Redbook, at p. 231].

481. In addition to the IC, Duty Officer ("DO") coverage must also be implemented during periods of anticipated prolonged increased fire danger. Salansky, as FMO, was also responsible for making that assignment.

482. Under the Park's FMP, the IC is responsible for performing a strategic fire assessment. The conditions and circumstances under which a fire occurs, the likely consequences to firefighter and public safety, natural and cultural resources, in addition to the values to be protected, all dictate the IC's response and management strategy for the fire. The Park's FMP requires the IC to relay the size-up and planned strategy and tactics *to both the FMO and the Duty Officer ("DO"),* who must initiate the Wildland Fire Decision Support System ("WFDSS") process and notify the Park's Fire Management Committee. [FMP, 4.1.2, at p. 45].

483. To maintain fire-management policy oversight, he Redbook strictly prohibits a single person from holding the positions of IC and DO simultaneously. It further

prohibits an IC from holding concurrent management duties, such as functioning as the Zone and Park FMO and DO. [NPS Report, at p. 36]. Further, under Redbook policies, a DO may not fill any incident-command function connected to any incident. [FMP, Table 6, at p. 40; NPS Report, at p. 31].

484. Thus, under NPS policy and the FMP, three different people should have been running the fire-management operation: the FMO, who oversees the big picture; an overall IC; and an on-scene DO. These three sets of eyes are required to check and balance one another's decisions.

485. From the beginning, as the NPS Review Team recognized, FMO Salansky disregarded the FMP's command-structure requirements. He "did not follow the direction of the fire management plan to staff with duty officers and additional support functions. The park's leadership did not ensure that the fire management plan was followed." [NPS Report, at p. 31]. Specifically, Salansky violated the FMP by taking on all of the responsibilities of five critical command positions: Zone FMO, Park FMO, IC, the DO, as well as that of Safety Officer.

486. Salansky appears to have unilaterally decided to function in all five critical roles – Zone FMO, Park FMO, IC, DO and Safety Officer – contrary to policies outlined in the Redbook, and continued to function in those roles until at least Tuesday, November 29, 2016, when a Type 1 IMT assumed command. There are no records to indicate that the Park's senior leadership ever questioned or opposed Salansky's assumption of those duties at any time during The Chimney Tops 2 Fire. [NPS Report, at pp. 9, 36, 53].

487. If Salansky had designated others to be the IC or DO from Park personnel or elsewhere, the required process would likely have produced policy oversight and the system of checks and balances required and necessary to assess and manage the fire-suppression response and make fire-related decisions.

488. As FMO, Salansky also failed at the preparedness level by not appropriately utilizing the Park's Step-Up Plan. The Step-Up Plan is a wildland fire preparedness plan, which specifies when fire-danger increases. The Park identifies additional measures and staffing needs [294] that must be taken to provide appropriate response to wildland fires. [NPS Report, at p. 31]. The NPS Review Team concluded that based on conditions existing when the fire was discovered on November 23 through November 28, when The Chimney Tops 2 Fire left the Park, management actions were not in place, support functions were not fully initiated, and daily coordination of available resources with other agencies was not conducted with the Tennessee and North Carolina Divisions of Forestry, Cherokee Bureau of Indian Affairs (BIA) and Cherokee National Forest. [NPS Report, at pp. 31-33].

489. As the NPS Review Team also concluded, Salansky wore too many hats and was unable to manage all of the tasks assumed and assigned, resulting in gross responsibility-failures for each of those roles. Salansky's unilateral actions and invalid assumption of multiple command functions led directly to a lack of policy oversight, which, in turn, led to slipshod decisions throughout the fire concerning the Park's efforts to first contain and then to suppress the fire and duty to notify and warn Park neighbors, local

---

[294]DO #18 also provides that the"superintendent of each park will integrate fire management with all other aspects of park management, and will make employees available for fire assignments during periods of high regional or national fire activity, while providing for NPS mission priorities." [DO #18, at ¶ 5.2].

149

residents and visitors of the potential imminent danger The Chimney Tops 2 Fire presented to them.

490. As a result of these negligent acts or omissions by Salansky and Park leaders, acting within the course and scope of their employment, in violation of mandated command-structure requirements, fourteen people were killed, over 190 others were injured, including several of the Plaintiffs named herein, and Plaintiffs' homes, businesses, and personal property were destroyed. Plaintiffs have therefore suffered monetary damages.

491. All of the injuries and damages suffered by the Plaintiffs were proximately caused by the negligent actions or omissions of NPS employees.

### COUNT THREE – NEGLIGENCE – FAILURE TO ADHERE TO MANDATORY FIRE MANAGEMENT POLICIES AND REQUIREMENTS

492. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

493. The failures of NPS employees are illustrated by the following: former United States Forest Service firefighters said that "officials in the national park should have summoned every resource available when alerted Nov. 26 of the expected high winds." Another experienced fire-fighter added, "the best way to keep fires from becoming mega-fires is to attack them with overwhelming force, both on the ground and from the air. People say that is very expensive, but it is not as expensive as losing 14 lives and $500 million in lost structures."

494. One report of the fire correctly observed, ***"no one turned the first spade of dirt for several days to contain the flames"*** after The Chimney Tops 2 Fire was discovered on Wednesday, November 23, 2016. In an apparent breach of policy, no one

monitored The Chimney Tops 2 fire before high winds on Monday, November 28, 2016 swept flames to ridges a mile away. The first direct-attack on the fire did not occur until it had grown to 35 acres – four days after it was discovered – and that suppression started late Sunday, November 27, 2016, limiting airborne water dumps on the flames.

### *Neglecting to Perform Requisite Complexity Analysis*

495. Salansky initially classified the fire-organization as a Type 4-complexity fire, reasoning:

> "The fire is small with low potential to make a significant run as it is on top of a mountain and can only back down slope, with lower fire intensity and behavior. Type 4 organization sufficient."

[NPS Report, at p. 30].[295]

496. As an incident escalates and de-escalates, however, a continuing reassessment of complexity should be completed to validate the current command-organization and identify the need for a different level of incident-management. After Salansky's initial assessment, this was not done until at least Monday, November.

497. Despite the fire's rapid growth from a small fire of less than an acre in size on Wednesday, November 23, 2016 to a thirty-five (35)-acre fire on Sunday, November 27, 2016 – despite eighty-years worth of ground fuels, despite the continuing severe drought conditions, and despite the warnings of high-winds for Monday, November 28, 2016 – the complexity organization of The Chimney Tops 2 Fire remained at the Type 4 level *until*

---

[295]Salansky and other fire managers negligently failed to recognize that conditions and activity occurring outside the Park were actually applicable within the Park as well. Several major and historic fires had been burning all over the region for weeks prior to The Chimney Tops 2 Fire. Such conditions should have made it obvious to anyone experienced in fire-suppression that highly unusual and dangerous fire-conditions existed.

151

*Monday morning, November 28.* Then, a Type 3 organization was created using the Park's own fire-staff without an additional complexity analysis. [NPS Report, at p. 30].

498.    A complexity analysis was performed only once – on November 25, 2016 - two days after The Chimney Tops 2 Fire was discovered. And even then, Salansky underestimated both the complexity and potential of the fire. This analysis indicated a complexity level of Type 3. Salansky instead justified operating as a Type 4 incident. There was no analysis performed for either the Type 2 or Type 1 IMT request.[296] Significantly, at the Type 3 level, a complexity analysis should be performed *daily*. And even at the Type 4 level, experienced fire managers still check the analysis daily to make sure it still fit the situation. The NPS Review Team attributed Salansky's error to his "lack of awareness regarding actual conditions on the ground." [NPS Report, at p. 30].

499.    Salansky's failure to make any complexity assessment of The Chimney Tops 2 Fire until Friday, November 25, 2016, contributed to the many failures outlined herein, including Salansky's failure to appreciate the actual complexity and seriousness of The Chimney Tops 2 Fire.

### *Negligently Implementing a 410-Acre Containment Box*

500.    "The circumstances under which a fire occurs, and the likely consequences on firefighter and public safety and welfare, natural and cultural resources, and values to be protected, dictate the appropriate response to the fire." [DO #18, at ¶ 5.1]. According to the Redbook:

> The purpose of fire suppression is to put the fire out in a safe, effective, and efficient manner. Fires are easier and less expensive to suppress when they are small. When the

---

[296][NPS Report, at p. 30].

> management goal is full suppression, aggressive initial attack is the single most important method to ensure the safety of firefighters and the public and to limit suppression costs. Aggressive initial attack provides the Incident Commander maximum flexibility in suppression operations.

[Redbook, at p. 9].

501. DO #18 mandates that *the protection of human life* is the single, overriding suppression priority. Setting priorities to protect human communities and community infrastructure, other property and improvements, and natural and cultural resources will be done based on human health and safety, the values to be protected, and the costs of protection." [DO #18, at ¶ 5.1]. "Fires will be suppressed at minimum cost, considering firefighter and public safety, benefits and values to be protected, and be consistent with resource objectives." [DO #18, at ¶ 5.1].

502. Salansky decided to attack The Chimney Tops 2 Fire indirectly: "backing-off," monitoring, and identifying a 410-acre "containment box" for indirect containment lines, which would allow for substantial fire growth. This decision appears to have been approved by Chief Ranger Kloster and Deputy Superintendent Jordan.

503. To "build" the "containment box," Park Rangers would need to clear-out fire-lines. But the few firefighters Salansky had scouted from November 24 through November 27, 2016 without constructing any significant or effective indirect fire-lines.[297] [NPS Report, at p. 11]. On Saturday, crews reported fire-lines could not be constructed with the available manpower and safety prohibited use of other options. [NPS Report, at p. 13].

---

[297]A small section of "hand line" was constructed off of The Chimney Top Trail on November 27, according to Salansky. [NPS Report, at p. 10].

504. Salansky's post-fire comments indicate that based on historical fire suppression success in the Park, he believed The Chimney Tops 2 Fire would never reach the perimeter of the "containment box."[298] But on Sunday, November 27, 2016, firefighting crews attempting to construct lines in drainages along the perimeter of the "containment box" reported that the use of natural drainages, which had been successful in the past, was not going to work under these extreme drought conditions.

505. "Very little direct action was taken to suppress the fire during those first five days until a predicted wind event caused it to spread very rapidly out of the park and into the city."[299] Park PIO Molly Schroer stated she was not aware of any on-the-ground fire suppression efforts, other than a distant indirect fire-line, until Monday, November 28, after The Chimney tops 2 Fire crossed US Highway 441.[300]

506. The "containment box" was designed without following certain safety procedures and/or without warning Park neighbors, local residents and visitors, including Plaintiffs, of the risk posed to lives and properties. As such, Salansky and Park senior leadership caused the hazard at issue, and inexplicably failed to warn Park neighbors, local residents and visitors of the substantial safety risks posed thereby.

---

[298]Salansky negligently adhered to the long-held belief that "blue lines always hold," indicating that drainages within the Park would always contain the fire. This ill-advised strategy simply did not apply to the conditions in the Park then and there existing, e.g., extreme drought, high-duff, and rough terrain, much less the high-wind forecast.

[299]Bill Gabbert, *"Report released about wildfire that burned into Gatllinburg" Wildfire Today,* http://wildfiretoday.com/tag/chimney-2-fire/

[300]http://wildfiretoday.com/2016/12/05/analyzing-the-fire-that-burned-into-gatl inburg/

### *Negligently Failing to Adopt Contingency Plans In Case the Chimney Tops 2 Fire Escaped the Containment Box or the Park*

*507.* According to Salansky, the reports he received from firefighters who were scouting lines for the 410-acre "containment box" did not correspond to the map. Scouts reported steep terrain, heavy fuels, dead-fall, and "moss turning to dust." Indeed, although Salansky stated that he had an aggressive philosophy on fire suppression, Rob Klein, the Fire Ecologist for the Park, said one thing that made the repair of damage from fire suppression activities easier was that *"no containment lines were built."*

508. Instead of altering his strategy or tactics due to these reports (and the changing conditions), Salansky stubbornly adhered to his original plan. One experienced wildland firefighter described Salansky's refusal to alter the plan as an example of "target fixation," *i.e.*, locking into a course of action – regardless of changing conditions of fuels, weather, and fire behavior in the Park and in the region – whether it makes sense or not. In Salansky's case, this ultimately meant hoping for rain, or hoping – despite the conditions – that the fire would not spread.

509. Despite all of this, there is no record that a single contingency plan was developed by Salansky or other fire managers in case The Chimney Tops 2 Fire escaped the "containment box," much less the Park. Yet, contingency plans are standard operating procedure for fire managers in all wildfires. For Type 3 complexity incidents (and more complex incidents), contingency plans are formal, detailed, and well-documented. There is no record of such a plan being discussed, much less documented.

510. Salansky requested Near-Term Fire-Behavior ("NTFB") projections (computerized simulations of the fire to predict its likely path) and models were timely generated by a Geospatial Analyst in Asheville, North Carolina. [NPS Report, at p. 53]. One model showed the fire bursting through the "containment box" and spreading through the Park. Salansky, however, "did not place a lot of weight" on the model. [NPS Report, at p. 53].

511. Furthermore, although Park policy required Salansky to discuss these results with Chief Ranger Kloster and Deputy Superintendent Jordan, or Superintendent Cash, he did not do so until much later, after The Chimney Tops 2 Fire had exploded and burned through Gatlinburg and other areas of Sevier County.[301] Asked when the information was shared with the Deputy Superintendent, Salansky stated: "Much later, maybe the 29th or 30th. I can't remember the exact date/time" [NPS Report, at p. 38], providing still another example of a failure of policy oversight.

512. Similarly, on Saturday, November 26, 2016, David Hotz, Science and Operations Officer for the East Tennessee Bureau of the NWS in Morristown, ran a computer modeling forecast for the upcoming week, and ***definitely expected any fires that were out there to spread, and to spread quickly.***" At 3:21 a.m., the NWS

---

[301] Asked by the ABS Group if fire-progression information was available from the NPS, Chief Ranger Kloster responded by saying the NPS did not have fire-progression information at the time of The Chimney Tops 2 Fire and Park officials advised the ABS Group that they had not developed any fire progression data since the incident started. Thus, other than the NTFB projection requested by and largely ignored by Salansky, no meaningful attempt was made to predict fire-behavior, *i.e.*, to get some idea of rate of spread, probability of ignition, flame heights, intensity, spotting potential, distance, etc.

predicted the winds would reach the mountains by at least Monday night, November 28, 2016 ahead of the coming rain, with gusts that could reach up to 30 mph on Sunday, November 27 and 60 mph by Monday night, November 28, 2016.[302]

513. Yet, while Salansky and Park senior leadership acknowledged the forecast, they nevertheless made no change at all to their fire-management strategy or tactics, continuing to believe the "containment box" would work. [NPS Report, at p. 56].

### *Negligently Failing to Utilize Available Air Operations to Suppress The Chimney Tops 2 Fire*

514. On Wednesday, The Chimney Tops 2 Fire was about the size of a football field. The only resource available to Park fire managers between Wednesday, November 23, 2016 up until Sunday, November 27, 2016 was aircraft. Yet, neither Salansky nor Kloster[303] made any inquiries about the availability of aviation assets until Sunday, November 27, 2016, five full days after the fire was first discovered. [NPS Report, at p. 49].

515. On Sunday afternoon, the Air Tactical Group Supervisor "was surprised that no action was being taken on the fire perimeter" and was aware that "there were plenty of resources available since many of the large fires were nearing containment." [NPS Report, at p. 15]. The Air Tactical Supervisor wondered why NPS officials had not called for air-

---

[302]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-year-later-chimney-tops-trail/856267001/. This story relied on interviews by News Sentinel staff that began the night of the fire, as well as hundreds of hours of E-911 recordings and thousands of pages of public records. [*See also*, NPS Report, at p. 12].

[303]As FMO and IC, it would have been Salansky's responsibility to order aviation resources. As Chief Ranger, Kloster is responsible for all visitor and resource protection. Specifically, he coordinates with the FMO for initial response to wildfires; coordinates wildland fire-related issues with the Chief of Resource Management and Science; prepares and revises cooperative fire agreements with adjacent federal, state and local agencies and municipalities; and *coordinates public safety efforts* (evacuations, traffic control, etc.) on behalf of the IC during wildfire and prescribed fire incidents.

157

support sooner. National Guard helicopters and air tankers sat idle at a hangar in Chattanooga – on standby to drop water in case of wildfires. Salansky, acting as Zone FMO, Park FMO, IC, DO and Safety Officer turned down non-toxic water-drops and flame-retardant drops[304] due to expense and environmental concerns.[305]

516.    Salansky and senior Park leadership continued to employ an indirect-attack strategy that avoided the use of fire-retardants or significant air-assets to contain The Chimney Tops 2 Fire. [ABS Report, at p. 13]. By Monday morning, the wind and low visibility caused by the smoke made conditions impossible to fly aircraft over the fire.

### Negligently Failing to Implement a Universal Communications System to Permit Inter-Agency Communications, Thus Preventing Many Responders from Effectively Communicating With One Another

517.    There was no communication between Park fire managers and the GFD from Wednesday, November 23 until the morning of Monday, November 28, 2016. But that was not all of the communication problems. There were a total of 3,535 first responders and 445 pieces of apparatus from 50 counties and 225 agencies. Because the Park did not utilize the same radio-frequency as other agencies (UHF versus VHF systems), radio communications between agencies were virtually non-existent. Repeaters were also down and there was too much traffic on the radios that were working. Cellular communications were also problematic, as cell towers became inoperable on Monday, November 28, 2018.

518.    There were significant gaps regarding the interoperability of communications

---

[304]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

[305]http://wildfiretoday.com/2017/06/13/nps-official-talks-about-the-wildfire-that-burned-into-gatlinburg/#more-53483

equipment, establishment of a Unified Command Center, information sharing, and public notification of threats from rapidly moving wildfires. [ABS Report, at p. 77]. In an understated finding, the ABS Consulting Review Team concluded that there is a "radio communications gap between Park personnel and local and regional fire response agencies." [ABS Report, at p. 78].

519. Without communicating with the Emergency Operations Center ("EOC"), between about 2:50 p.m. and 3:10 p.m. on Monday, November 28, 2016, Park crews began setting backfires in Park locations to protect Park structures in the Twin Creeks area. [ABS Report, at p. 31]. This tactic was highly questionable, considering the hazardous conditions already present and the close proximity to Gatlinburg. [ABS Report, at p. 51].

520. According to Secretary of the Interior Ryan Zinke, "the interoperability of communications systems needs to be improved so that firefighters from different divisions within the NPS and also between other agencies can more easily communicate during an emergency."

521. This communications breakdown repeatedly led to responders not having correct information about the fire-situation and affected the lives and property of innumerable local residents and visitors.

### *Neglecting to Utilize the Wildland Fire Decision Support System ("WFDSS"), Which Would Have Prompted (1) Periodic Assessments of the Ongoing Effectiveness and (2) Re-evaluation of Suppression-Strategies*

522. The response to a wildland fire is based on an evaluation of risks to firefighter and public safety, the circumstances under which the fire occurs, including weather and fuel conditions, natural and cultural resource management objectives, protection priorities, and values to the protected. The evaluation must also include an analysis of the context of the

specific fire within the overall local, geographic area, or national wildland fire situation. This is called a strategic fire response ("SFR"). The SFR evaluation process uses the Wildland Fire Decision Support System ("WFDSS") decision support system. [FMP, at p. 64].

523. The WFDSS is a strategic fire-management assessment and documentation process (program) used to determine the appropriate response to wildfires. [FMP, at p. 65]. As the NPS Report summarized, the WFDSS is a web-based decision-support system that provides a single dynamic documentation system for use beginning at the time of the fire's discovery and concluding when the fire is declared out. The system allows the agency administrator, in this instance, the Park Superintendent, to describe and analyze the fire situation, develop incident objectives and requirements, develop a course of action, evaluate relative risk, complete an organization assessment, document the rationale, and publish a decision. [NPS Report, at p. 36].

524. The Park's FMP directs fire managers to use the WFDSS on each wildland fire to document the decision-making process and outline the strategy and tactics employed. [FMP, at p. 30]. Direction is also given that after the fire's size-up and planned strategy and tactics are determined by the IC, that information must be relayed to the FMO or fire duty officer ("FDO") who will initiate the WFDSS documentation process and notify the Fire Management Committee ("FMC"). [FMP, ¶ 4.1.3, at p. 47]. The FMC is required to review the WFDSS documents for recommendation to the Superintendent for approval. [FMP, ¶ 4.1.3, at p. 47; NPS Report, at p. 37].

525. In the Park's FMP, an "extended attack" occurs when objectives have not been met in the case of initial fire response. [FMP, 4.1.3, at p. 47]. At some point after The Chimney Tops 2 Fire was discovered, likely by Friday, November 27, when firefighters scouting to construct lines along the perimeter of the containment box had repeatedly reported that such lines could not be made, it was evident that the objective (contain the fire within the 410-acre box) could not be met. At that point, the Park's FMP required Salansky and other fire managers to adopt the WFDSS to guide the ongoing effectiveness and re-evaluation of suppression-strategies. [FMP, ¶ 4.1.3, at p. 47; NPS Report, at p. 37].

526. The FMP requires periodic assessments by the IC, FMO, and FDO if Park staff is managing a fire. Unfortunately, in this case, the IC was Salansky, the FMO was Salansky, the DO was Salansky, and the Safety officer, by default, was also Salansky. Salansky's multiple responsibilities in these separate roles necessarily significantly impeded his performance and documentation of these periodic assessments and kept him from recognizing, among other things, situations that should have required a new strategy through the WFDSS analysis, including, but not limited to:

- Exceeding periodic assessment criteria (*i.e.* trigger points, air quality);

- Unacceptable risk to firefighter safety, natural or cultural resources, improvements;

- Fire leaving or threatening to leave the Maximum Manageable Area boundary or park boundary;

- Fire exceeds prescribed fire plan;

- Increasing demand on local and/or national fire management situation; and

- Agency administrator prerogative.

[FMP, at p. 47-48; NPS Report, at p. 37].

527.    The following direction appears in NPS Reference Manual 18:

Parks will use the current decision support process (e.g. Wildland Fire Decision Support System, WFDSS) to guide and document wildfire management decisions. The process will provide situational assessment, analyze hazards and risk, define implementation actions, and document decisions and rationale for those decisions.

When a wildfire is burning on National Park Service lands and adjoining jurisdictions, a single interagency decision support document should be prepared with input from all jurisdictional agencies.

Approval of the decision to manage a wildfire and the resulting course of actions to be taken to achieve management goals is the responsibility of the park superintendent and will be published in a decision support document. Approval of each successive decision is based on current approval requirement guidelines and thresholds as defined in the 2016 Interagency Standards for Fire and Fire Aviation Operations."

[NPS Reference Manual 18, at p. 10].

528.    As to The Chimney Tops 2 Fire, the NPS Review Team found:

On The Chimney Tops 2 Fire, WFDSS was utilized to update acreage beginning on November 25 at 0758 hours through November 28 at 0550 hours. A Relative Risk Assessment was completed on November 28 at 1717 hours. The first Published Decision by park staff (deputy park superintendent) was on December 5 at 1825 hours.

[NPS Report, at p. 38]. It also found that Park leadership:

was unaware of 2016 Redbook requirements that WFDSS be applied to all fires within park boundaries. The deputy superintendent stated that WFDSS was only used when a Type 1 incident management team was brought in. No one in the agency administrator role has training in WFDSS.

[NPS Report, at p. 38] (emphasis added).

529. No Park fire manager or personnel were trained in WFDSS. Usually, it is the role of the agency administrator, here the Superintendent, to make sure such training is completed. WFDSS, which should have been activated by Salansky in his role as IC, FMO, and DO, was instead not utilized until the Type 1 IMT arrived, contrary to NPS fire policy and interagency standards. By failing to utilize WFDSS, Park fire managers, including Salansky, neglected to perform situational assessments, to analyze hazards and risks, to define implementation actions, and to document decisions, as well as the rationale for those decisions.

530. These failures substantially contributed to the inability to suppress and/or contain The Chimney Tops 2 Fire before it left the Park, as appropriate ongoing assessments – along with recognition of command-control functions – would have demanded significant additional suppression resources to put out the fire.

### ALL VIOLATIONS OF FIRE POLICIES BREACHED THE PARK'S DUTIES TO PARK NEIGHBORS

531. The breaches of duties outlined above were violations of mandated requirements and policies that do not permit the exercise of discretion.

532. Each of the foregoing failures made successful suppression of The Chimney Tops 2 Fire impossible, unreasonably endangering Park neighbors, including the Plaintiffs.

533. Each of the forgoing failures constituted a failure to recognize a threat to human life, property, or public and firefighter safety that cannot be mitigated.

534. The failure by the NPS to take the immediate suppression actions required by the FMP, DO #18, and the Redbook caused The Chimney Tops 2 Fire to bum into Gatlinburg and other areas of Sevier County, causing injuries and damages to the Plaintiffs.

163

535. Had Park employees acted reasonably and in accordance with the FMP, DO #18, and the Redbook, The Chimney Tops 2 Fire would have been contained before leaving the Park and Plaintiffs would not have suffered the injuries and damages described above.

536. As a result of these negligent acts or omissions by Salansky and senior Park leaders, acting within the course and scope of their employment, failing to adhere to mandatory fire management policies and requirements, fourteen people were killed, over 190 others were injured, including several of the Plaintiffs named herein, and Plaintiffs' homes, businesses, and personal property were destroyed. Plaintiffs have therefore suffered monetary damages.

537. All of the injuries and damages suffered by the Plaintiffs were proximately caused by the negligent actions or omissions of NPS employees.

## COUNT FOUR – NEGLIGENCE – FAILURE TO WARN

538. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

539. Management considerations outlined in the FMP provide that firefighter and public safety is the first priority in all fire management activities, and requires Park officials to notify Park neighbors – including local government officials, local residents and visitors – of all unplanned fire management activities that have the potential to impact them.[306]

540. The Park's FMP mandates that fire managers must inform the Park's neighbors and local residents of "all planned and unplanned fire management activities." Specifically, the FMP provides:

---

[306][NPS Report, at p. 41].

> "Park neighbors, Park visitors and local residents will be notified of **all planned and unplanned fire management activities that have the potential to impact them**."

[FMP, 3.3.2, at p. 28] (emphasis added).

541. The FMP further mandates that fire managers take actions to mitigate the risks to the neighboring public. Specifically, these mitigation actions are required "to protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public." [FMP, 4.4.2, at p. 54]. With respect to "Park neighbors," those actions include:

- Post current fire information on websites as available,

- Inform park neighbors of wildland fires, and

- Suppress those fires or parts there of that threaten to burn off of park property or that adversely impact public health and safety.

[FMP, 4.4.2, at p. 55].

542. Under the FMP and DO #18, "Firefighter and public safety is the first priority in all fire management activities." [FMP, 3.3.2, at p. 28; DO #18, ¶ 6.1]. ¶ 5.1 of DO #18 declares the following policy for wildland fires: "Firefighter and public safety is the first priority. All Fire Management Plans and activities must reflect this commitment." DO #18 adds:

> the protection of human life is the single, overriding suppression priority. Setting priorities to protect human communities and community infrastructure, other property and improvements, and natural and cultural resources will be done based on human health and safety, the values to be protected, and the costs of protection.

[DO #18, at ¶ 5.1].

543. These requirements and considerations are fully consistent with the primary goals of wildfire management in the Park, pursuant to DO #18 and Reference Manual 18, Standards for Operations and Safety: "the protection of communities and assets; and the conservation of natural resources." [FMP, 4.1, at p. 29].

### Neglecting to Provide Timely and Accurate Notice and Warning to Park Neighbors, Local Government Officials, Local Fire Departments, Local Residents and Visitors About the Status of and Imminent Danger Presented by The Chimney Top 2 Fire

544. While the Park issued media releases about The Chimney Tops 2 Fire on Wednesday, November 23, 2016 and Friday, November 25, 2016, neither release warned Park neighbors, local residents or visitors of The Chimney Tops 2 Fire's potential to leave the Park due to unusually dangerous fire conditions, *i.e.*, extreme drought. And for reasons unexplained, not a single release was issued *after* Park fire managers received a forecast about a high-wind event at 3:21 a.m. Saturday morning, November 26, 2016 until 11:30 a.m. on Monday, November 28, 2016 when the Park advised the public that "the fire posed no immediate threat" to, among other areas, Gatlinburg. [NPS Report, at p. 39].

545. On November 23, 2016, the first press release was issued describing The Chimney Tops 2 Fire as approximately 1.5 acres with slow rates of spread, smoldering in a location approximately ¼ mile from The Chimney Top 1 Fire, and located in extremely remote, steep and inaccessible terrain. The press release further informed that area trail closures were implemented. [NPS Report, at p. 38].

546. Two days later, on November 25, 2016, another press release described the fire at approximately three acres and slow moving, saying it was a backing fire in heath balds fuels in extremely steep, rugged terrain. This press release also misinformed readers

that "*fire suppression crews were establishing containment lines* utilizing trails, drainages and hand built lines; and trail closures and campfire bans remain in effect." [NPS Report, at p. 39]. In fact, virtually no containment lines were constructed until Monday, November 28, 2016.

547. Although a public information officer was assigned to The Chimney Tops 2 Fire two days later (on November 27, 2016), the next press release was not issued until Monday, November 28, 2016, at approximately 10:00 a.m., describing how The Chimney Tops 2 Fire had grown to approximately 500 acres due to terrain, drought, and winds in excess of 20 mph. It also stated that "spot" fires around The Chimneys Picnic Area and Bullhead Ridge had been detected and suppression efforts were taking place at the picnic area. Additional trail and road closures were also identified. This release also stated that additional fire-suppression resources were being ordered due to fire-size and predicted winds later in the day. [NPS Report, at p. 39].

548. From approximately 11:00 a.m. to 3:40 p.m. on November 28, 2016, the Park issued two additional press releases and conducted a press conference at Park Headquarters, providing various updates on fire-progressions, air quality advisories, and the areas affected by the fire. At approximately 11:30 a.m., the air quality advisory release advised that the fire posed *no immediate threat to structures in Le Conte Lodge or any areas outside of Park boundaries, including Gatlinburg,* the Pittman Center, or the Cosby facilities. [NPS Report, at p. 39].

549. At approximately 3:40 p.m. on Monday, November 28, 2016, the City of Gatlinburg and the Park issued a unified press release identifying a spot fire in the Twin Creeks area inside the Park that was being suppressed by an interagency response. [NPS

Case 3:20-cv-00149-JRG-CRW    Document 1    Filed 04/08/20    Page 178 of 185
PageID #: 178

Report, at p. 39]. The release stated that the new spot fire posed a threat to the Mynatt Park neighborhood and that the GFD was making preparations to protect Mynatt Park. The release also advised that GPD officers were notifying residents to request voluntary evacuations. [NPS Report, at p. 39]. It also warned of more fire growth in the Park over the next eight hours with a potential for spot fires to form outside the fire area. According to this press release, the GFD would continue monitoring and the Tennessee Division of Forestry had staged equipment in Mynatt Park. [NPS Report, at p. 39].

550. A press briefing was announced for 4:00 p.m. at the GFD. Shortly after that briefing, high-winds disrupted power in Gatlinburg and the surrounding area, preventing the dissemination of further published press releases. No other press releases were issued until 6:10 a.m. on Tuesday, November 29, 2016. [NPS Report, at p. 39].

551. Salansky and senior Park leadership failed to provide timely and accurate communication to the Park's neighbors, including Gatlinburg and Gatlinburg officials, local residents and visitors. Such communications would have aided all of them to prepare for the fire. Firefighting and evacuation plans would likely have been better directed and accelerated if more accurate fire location data had been received from Park personnel and NWS wind-data had been used to model fire progression. [ABS Report, at p. 76].

552. From discovery of The Chimney Tops 2 Fire on November 23 until the morning of November 28, 2016, there were no direct communications by Park personnel to any Gatlinburg official alerting them to the real and imminent danger posed by The Chimney Tops 2 Fire. [ABS Report, at p. 30].

553. As of the morning of Sunday, November 27, the GFD had not been notified regarding the status of any active fire burning in the Park, including The Chimney Tops 2

Fire, notwithstanding the extreme drought conditions, high wind forecast, inability to construct fire-lines to implement the containment box, computer models predicting the fire would blow through the containment box and leave the Park, and very limited Park fire personnel. No such contact occurred until the following morning, when it was already too late. [ABS Report, at p. 20].

554. By Monday morning, November 28, 2016, Salansky knew that The Chimney Tops 2 Fire had escaped the ill-conceived "containment box." Yet, when Salansky eventually returned call by a GFD shift Captain at 10:58 a.m. on Monday, November 28, 2016, Salansky's call was the first communication of any kind between the Park and any Gatlinburg employee regarding a fire that had been burning – and growing – for six days. Even then, Salansky told the captain that the GFD the city may see some "smoke" and "would be alerted if needed, and that they considered the spread of fire to Gatlinburg unlikely at the time and prior to the time of predicted rains." The GFD Captain asked, "do you need us?" Salansky responded, "no, it's under control."[307]

555. At 11:30 a.m. on Monday, Chief Ranger Kloster and Superintendent Cash arrived at the GFD headquarters to meet with Gatlinburg officials. This was the first indication to Gatlinburg officials that there was a fire-threat, as Park representatives advised of the potential for fires that had spotted to the Twin Creeks area to leave the Park. [ABS Report, at p. 31].

556. At a 7:00 p.m. press conference on Monday, November 28, 2016, the Park Superintendent mentioned nothing about the potentially imminent movement of The

---

[307]http://www.knoxnews.com/story/news/2017/11/22/gatlinburg-wildfire-one-y ear-later-chimney-tops-pigeon-forge/856268001/

Chimney Tops 2 Fire from the Park into the Ski Mountain area, though reports later confirmed the first presence of fire in Gatlinburg at about 6:00 p.m. [ABS Report, at p. 106].

557. The NPS Review Team found there was insufficient information provided to the public from the Park and Tennessee Division of Forestry fire management personnel regarding the potential for The Chimney Tops 2 Fire in the Park to impact the City of Gatlinburg and other areas of Sevier County, including anticipated fire growth, current location, size and direction.

558. From all of this, the City of Gatlinburg, other Sevier County officials, local residents and visitors had no communication from Park officials regarding imminent danger posed by The Chimney Tops 2 Fire, what it was doing or what actions were being taken to extinguish it – until the morning of Monday, November 28, when Park officials realized the fire had moved across Newfound Gap Road. [NPS Report, at p. 34].

559. If Plaintiffs and other victims or landowners had been notified of the danger posed by The Chimney Tops 2 Fire as soon as Park officials knew of the predicted winds from an early Saturday morning NWS Special Weather Alert, they would have been able to take measures to protect their lives and their properties, or at least ensured the NPS or local agencies took measures to do so. They would certainly have had sufficient time to evacuate. And simple actions, such as reducing vegetation near homes or storing firewood away from structures, would have been remarkably effective in reducing the risk of damage if a fire reached a home.[308]

---

[308] *See* Ross W. Gorte, *Cong. Research Serv., Rl30755, Forest Fire/wildfire Protection* 1, 6 (2008) (remarking that "[t]he characteristics of the structure and their immediate surroundings are the primary determinants of whether a structure bums. In particular, non-flammable roofs and cleared vegetation for at least ten meters (thirty-three feet) and up to forty meters (130 feet) around the structure is highly likely to protect the structure from wildfire, even when neighboring structures burn.").

560.    If the residents, public and/or local fire agencies had received timely notice of the risk of The Chimney Tops 2 Fire expanding into their communities, they could have taken precautionary actions, including (1) evacuating themselves and their pets, (2) removing their most valuable property to a safer location, and (3) preparing their properties for lower fire spread risk (*e.g.*, cutting back tree limbs, drenching the exterior of their homes with water, digging their own fire lines, where possible, etc.).

561.    There is no evidence the Park's failure to notify the property owners of the danger presented by The Chimney Tops 2 Fire was susceptible to a policy analysis grounded in some "social, economic, or political concerns." Nor is there any evidence to support the notion that the nature of Park employees' actions in this case – *i.e.*, deciding when and whether to communicate directly with city officials or private citizens whose properties might have been in harm's way – are susceptible to policy analyses. Besides, a decision not to warn of a specific, known hazard for which the NPS is responsible is not the kind of broader "social, economic or political policy" decision that the discretionary function exception is intended to protect.

562.    As a result of these negligent acts or omissions by Salansky and Park leaders, acting within the course and scope of their employment, in violation of mandated requirements, fourteen people were killed, over 190 others were injured, including several of the Plaintiffs herein, and Plaintiffs' homes, businesses, and personal property were destroyed. Plaintiffs have therefore suffered monetary damages.

171

563. All of the injuries and damages suffered by the Plaintiffs were proximately caused by the negligent actions or omissions of NPS employees.

564. All plaintiffs allege that the defendant gratuitously undertook to warn all plaintiffs of the danger imposed by the Chimney Tops II Fire. Further, that the defendant's failure to warn was negligent and caused the harm complained of by the plaintiffs. See, Restatement of Second of Torts § 323. Tennessee tort law provides that an individual can assume a duty to act and thereby become subject to the duty of acting reasonably. In evaluating whether such a duty has been assumed, Tennessee courts look to the Restatement Second of Torts § 323, 324. *Grogan v. Uggla*, 535 S.W.3d 864 (Tenn. 2017).

565. In this case, plaintiffs allege that the defendant gratuitously undertook to warn plaintiffs of the fires in the national park evidenced by defendant's documents and specifically the Fire Management Plan. All plaintiffs specifically relied upon defendant's promise that they would be notified of wildland fires to their detriment.

566. The reliance of the plaintiffs on accurate warnings/notice of wildland fires is justifiable, obvious and self-evident. In this case, the defendant's employees were active participants in providing notice to the plaintiffs. This notice was a service to the plaintiffs to which Tennessee state law and good Samaritan principles attach a duty of care. Liability would be imposed in this case were the defendant a private person.

567. In this case, plaintiffs allege that the negligence of the defendant actively worsened the situation of the plaintiffs. Plaintiffs were not notified to evacuate timely and Plaintiffs were not notified timely that they could have saved their real and personal property, thereby causing their physical injury, and in some cases, their relatives' death. Clearly, the conduct of failing to warn of the Chimney Tops II Fire worsened the situation and caused the plaintiffs personal injuries and property damage. See, *Myers v. United States*, 17 F.3d 890 (6th Cir. 1994).

568. The plaintiffs allege facts (heretofore stated) that the defendant either made or caused to be made a change from the Fire Management Plan. The failure to warn increased the risk of harm to the plaintiffs. Further, on Saturday, November 26, 2016, the defendant gave no warnings to the plaintiff of a change in the defendant's firefighting strategy, thereby increasing the risk of harm to the plaintiffs.

569. Plaintiff's reliance on the Fire Management Plan and its mandated warnings induced Plaintiffs to forego other remedies or precautions, such as evacuation or protecting their real and personal property. This reliance was detrimental to the plaintiffs. The defendant violated two well-established principles of Tennessee law to the detriment of all plaintiffs the voluntary assumption of a duty to warn and the negligent violation to provide any/or accurate warnings.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray:

A.     That the Court determine that their claims are valid.

B.     That the Court determine that the discretionary function exception is inapplicable to each of the Plaintiffs' claims in this cause.

C.     That the Court find the Defendant liable to the Plaintiffs under the Federal Tort Claims Act for each the claims asserted herein.

D.     That Plaintiffs be awarded EIGHTY-TWO MILLION THREE HUNDRED AND TWENTY-THREE THOUSAND ONE HUNDRED AND NINETY-EIGHT DOLLARS ($82,323,198) in compensatory damages, or the collective amount of the sums identified in their respective Standard Form 95 Claims attached hereto as Collective Exhibit 1.

E.     For such other and further relief that is just and proper under the

173

circumstances.

Respectfully submitted, this 7th day of April, 2020.

/s/ Sidney W. Gilreath
SIDNEY W. GILREATH
**GILREATH & ASSOCIATES**
Bank of America Center
550 Main Street
Suite 600
Knoxville, TN 37902
Telephone: 866.584.7015
Email: GilKnox@SidGilreath.com

GORDON BALL
**GORDON BALL LLC**
7001 Old Kent Drive
Knoxville, TN 37919
Telephone: 865.525.7028
Facsimile: 865.525.4679
Email: gball@gordonball.com

THEODORE J. LEOPOLD
**COHEN MILSTEIN SELLERS & TOLL, PLLC**
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, Florida 33410-2909
Telephone: 561.515.1400
Facsimile: 561.515.1401
Email: TLeopold@CohenMilstein.com

Counsel for Plaintiff

174